**The below described is SIGNED.**



Dated: November 15, 2011 _____

**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Bankruptcy Case No. 11-32259 |
|  | ) | Jointly Administered |
| KOREA TECHNOLOGY INDUSTRY | ) |  |
| AMERICA, INC., <u>et al.</u>,[1] | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Honorable R. Kimball Mosier |
|  | ) |  |
|  | ) |  |
|  | ) |  |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### APPROVING THE SALE OR SALES OF SUBSTANTIALLY ALL
### OF THE DEBTORS' ASSETS AND APPROVING THE
### ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES

Upon the motion (the "Motion") of the debtors and debtors-in-possession in the above-

captioned cases (the "Debtors"), pursuant to sections 105, 363, and 365 of title 11 of the United

States Code (the "Bankruptcy Code"), and rules 2002, 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for an Order authorizing and approving (a) the

sale of certain assets relating to the Debtor's business (the "Purchased Assets") described in and

pursuant to the terms and conditions of an executed Asset Purchase Agreement, filed November

---

[1] The Debtors, followed by the last four digits of their respective taxpayer identification numbers, are as
follows: Korea Technology Industry America, Inc. (9016); Uintah Basin Resources, LLC (2493); Crown
Asphalt Ridge, LLC (9470) c/o 1245 East Brickyard Road, Suite 110, Salt Lake City, UT  84106.

10, 2011, (collectively with all exhibits thereto, the "Stalking Horse Purchase Agreement") by

and between the Debtors, as sellers (the "Sellers"), and the Stalking Horse Purchaser (as defined

below), subject to higher and better offers and (b) the assumption and assignment of various

contracts and leases identified in connection with the Stalking Horse Purchase Agreement; and a

hearing on the Motion having been held on the third, seventh and ninth day of November, 2011

(the "Sale Hearing"); and due notice of the Sale Hearing and the Motion having been provided,

and it appearing that no other or further notice need be provided; and after due deliberation; and

the Court having made findings and conclusions on the record and having approved the Debtors'

Motion; the Court makes the following additional;

## FINDINGS OF FACT AND CONCLUSIONS OF LAW:

### I. GENERAL

A.      All capitalized terms not otherwise defined in this Order have the meanings

ascribed to such terms in the Motion or the Purchase Agreement (defined below).

B.      The Court has jurisdiction to consider the Motion and the relief requested therein

under 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding under 28 U.S.C.

§ 157(b)(2)(A), (N) and (O). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief sought in the Motion are sections 105(a),

363(b), (f), and (m) and 365(a), (b) and (f) of the Bankruptcy Code and Bankruptcy Rules 2002,

6004, 6006 and 9014.

D.      On October 13, 2011, the Court entered the Order (A) Approving (I) Bidding

Procedures; (II)  Auction Procedures; and (III) Assumption and Assignment Procedures; (B)

Approving Notice Procedures for (I) the Solicitation of Bids; (II) an Auction; (C) Scheduling

Hearings on Approval of a Sale or Sales of Substantially All of Debtors' Assets; and

(D) Granting Related Relief (Dkt. 157) (the "Bidding Procedures Order"), pursuant to which the

Court, inter alia, authorized the Debtors to conduct an auction involving the Purchased Assets

(the "Auction"), approved the bidding procedures annexed to the Bidding Procedures Order (the

"Bidding Procedures"), and approved an Expense Reimbursement (as defined in the Bidding

Procedures Order) (which is inclusive of any and all attorneys' fees and expenses, incurred as

Expense Reimbursement) incurred by Rutter and Wilbanks Corporation (the " Purchaser").

      E.      As evidenced by the certificates of service filed with the Court, and based on the

representations of counsel at the Sale Hearing, (I) proper, timely, adequate, and sufficient notice

of the Motion, the transactions contemplated therein, the Bidding Procedures Order, the Bidding

Procedures, the Auction and the Sale Hearing has been provided in accordance with sections

102, 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and

9014; (ii) such notice was good and sufficient and appropriate under the particular

circumstances; and (iii) no other or further notice of the Motion, the transactions contemplated

therein, the Bidding Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing

and the entry of this Order is required.

      F.      A reasonable opportunity to object or be heard with respect to the Motion and the

relief requested therein has been afforded to all interested persons and entities, including, but not

limited to: (I) all entities reasonably known to have expressed an interest in a transaction with

respect to the Assets during the past twelve (12) months, (ii) all taxing authorities or recording

offices which have a reasonably known interest in the relief requested, (iii) the Office of the

United States Trustee, (iv) counsel to the Creditors' Committee, if any, or, if not, to the members

of the Creditors' Committee, if appointed, (v) the office of the United States Attorney, (vi) all

non-debtor parties to relevant contracts or leases (executory or other), (vii) all known creditors of

the Debtors, including all known persons asserting a lien, claim, encumbrance or other interest

in, to or against any of the Debtors' assets, and (viii) all parties who have requested service

pursuant to Bankruptcy Rule 2002.

## II.  THE BANKRUPTCY CASE

G.      On August 22, 2011, the Debtors filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code in this Court. The Debtors are debtors in possession under

sections 1107(a) and 1108 of the Bankruptcy Code.

## III.  THE SALE PROCESS FOR THE PURCHASED ASSETS

H.      Debtors have marketed the Purchased Assets diligently, in good faith and in a

commercially reasonable manner to secure the highest and best offer or offers therefor by,

among other things, delivering offering materials to potential purchasers and inviting potential

purchasers to meet with management and the Debtors' professionals and providing potential

purchasers with the opportunity to conduct extensive due diligence. In addition, the Debtors

delivered the Bidding Procedures Order, the Bidding Procedures, the notices and the Motion to

each of the entities that had previously expressed an interest in the Purchased Assets.

I.      The Purchaser submitted the highest and best offer for the Purchased Assets on

terms and conditions set forth in the Asset Purchase Agreement by and between the Debtors and

the Purchaser, filed on November 10, 2011 (collectively with all exhibits and ancillary

agreements thereto, the "Purchase Agreement").

J.      The Bidding Procedures afforded a full, fair and reasonable opportunity for any

entity to make a higher or better offer, on the terms and conditions set forth in the Asset

Purchase Agreement, to purchase the Purchased Assets and no higher or better offer has been

made.

K.      The Debtors and the Purchaser have complied with the Bidding Procedures Order

and the Bidding Procedures in all respects.

### IV.   THE SALE OF THE PURCHASED ASSETS TO THE PURCHASER

L.      The transactions effectuating, and the terms and conditions governing, the sale of

the Purchased Assets to the Purchaser are embodied in the Purchase Agreement, which is in

substantially the form attached hereto as **Exhibit A**. A description of the Purchased Assets is

contained in the Purchase Agreement. On appropriate notice and in accordance with the

procedures set forth below, the Purchaser may designate executory contracts and unexpired

leases for assumption and assignment for a period of ninety (90) days following the execution

date of the Purchase Agreement (the "Assigned Contracts").

M.      The Purchase Agreement contemplates that the sale of the Purchased Assets shall

be free and clear of all liens, claims, interests, and other encumbrances within the meaning of

section 363(f) of the Bankruptcy Code (collectively, "Liens"), except as expressly permitted by

the Purchase Agreement; provided, however, that all Liens (in the same priority as exists pre-

Closing) will attach to the proceeds of the Sale.

N.      The Purchaser's obligation to consummate the transactions contemplated in the

Purchase Agreement is subject to the specific conditions outlined in that contract, including

Court approval. As of the date of entry of this Order, there is no known failure of any condition

5

under the Purchase Agreement to the Purchaser's obligation to consummate the Sale that would

entitle the Purchaser not to consummate the Sale pursuant to the Purchase Agreement or to

terminate the Purchase Agreement.

O.    The Purchase Agreement was negotiated, proposed, and entered into by and

between the Purchaser and the Debtors without collusion, in good faith, and from arm's length

bargaining positions. Neither the Debtors nor the Purchaser has engaged in any conduct that

would cause or permit the application of section 363(n) of the Bankruptcy Code to the Sale,

including having the Purchase Agreement voided.

P.    The Purchaser is a good faith purchaser in accordance with section 363(m) of the

Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  Absent a

stay of the effectiveness of this Order, if any, the Purchaser will be acting in good faith within

the meaning of section 363(m) of the Bankruptcy Code in closing the transaction under the

Purchase Agreement, including the assumption and assignment of the Assigned Contracts, at any

time after the expiration of any stay of this Order, whether pursuant to Bankruptcy Rule 6004(g)

or otherwise.

Q.    The terms and conditions of the Purchase Agreement: (I) are fair and reasonable,

(ii) valid, binding and enforceable, (iii) constitute the highest and best offer for the Purchased

Assets, (iv) constitute reasonably equivalent value and fair consideration for the Purchased

Assets.

R.    The transactions contemplated by the Purchase Agreement will, upon

consummation thereof (the "Closing"), (I) be a legal, valid, and effective transfer of the

Purchased Assets to the Purchaser with no further action required on the part of the Debtors or

their respective affiliates and (ii) vest the Purchaser with good title to the Purchased Assets free and clear of all Liens within the meaning of section 363(f) of the Bankruptcy Code, except as expressly permitted by the Purchase Agreement.

S.    The Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions described in the Purchase Agreement (thus adversely affecting the bankruptcy estate and its creditors) if the sale of the Purchased Assets and the proposed assignment of the Assigned Contracts were not free and clear of all Liens, except as expressly permitted by the Purchase Agreement.

T.    The relief sought in the Motion, including approval of the Purchase Agreement and consummation of the transactions contemplated thereof, is in the best interests of the Debtors, their bankruptcy estates, creditors, and all parties in interest. The Sale must be approved promptly in order to maximize the value of the Debtors' estates.

U.    Upon entry of this Order, the Debtors have all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the Purchase Agreement.

V.    Except as otherwise provided in this Order, no consents or approvals, other than this Order and those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the transactions contemplated by the Purchase Agreement.

W.    The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of their business judgment, to (I) sell the Purchased Assets on the terms and conditions set forth in the Purchase Agreement; (ii) assume and assign the Assigned Contracts to the Purchaser in accordance with the procedures set forth herein; (iii)

reject certain other executory contracts and unexpired leases; and (iv) consummate all transactions contemplated by the Purchase Agreement, and the sale, assumption and assignment of the Purchased Assets and the rejection of certain other executory contracts and unexpired leases is in the best interests of the Debtors, their estates and their creditors.

X.      The provisions of sections 363 and 365 of the Bankruptcy Code (subject to the additional notice, opportunity to object and hearing, if necessary, with respect to any Assigned Contracts) have been complied with and are applicable to the sale of the Purchased Assets.

Y.      The Debtors may consummate the transactions and transfer the Purchased Assets free and clear of all Liens of any kind or nature whatsoever, except as expressly permitted by the Purchase Agreement, because one or more of the standards set forth in section 363(f)(1)- (5) of the Bankruptcy Code has been satisfied. All parties with Liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the transactions, are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code. All parties with Liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did object to the Motion and the relief requested therein fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens attach to the net proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest with respect to such Liens.

Z.      Except as otherwise provided in the Purchase Agreement, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust or successor or transferee liability.

AA.      To the extent that the Purchased Assets constitute all or substantially all of the assets of any of the Debtors, substantial and sufficient business exigencies exist that permit the Purchased Assets to be sold outside of the context of a plan of reorganization.

BB.      The Debtors hereafter will (I) cure, or provide adequate assurance that they will promptly cure, all defaults under the Assigned Contracts, if any, existing before the date of the assumption and assignment of any Assigned Contracts to the Purchaser, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default before the date of the assumption and assignment of any Assigned Contracts to the Purchaser under the Assigned Contracts, if any, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and by assigning the Assigned Contracts to the Purchaser, adequate assurance of its future performance of and under the Assigned Contracts has been provided, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

CC.     If any of Debtors' current or former employees are hired by the Purchaser, such

arrangements have (I) been disclosed to the Court, and (ii) are new employment contracts or

other arrangements to be entered into or to become effective at or after the Closing.

*****END OF DOCUMENT*****

### <u>COURT SERVICE LIST</u>

Service of the FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING

THE SALE OR SALES OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND

APPROVING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES

will be effected through the Bankruptcy Noticing Center of each party listed with the Court.



# EXHIBIT A

**Purchase Agreement**



# ASSET PURCHASE AGREEMENT

**November __, 2011**

**Korea Technology Industry America, Inc.**
**Uintah Basin Resources, LLC**
**Crown Asphalt Ridge, LLC**

**SELLERS**

**Rutter and Wilbanks Corporation**

**BUYER**

**"Asphalt Ridge Oil Sands Project"**

# TABLE OF CONTENTS

Article I – Recitals and Definitions
    1.1 Incorporation by Reference..................................................................  2
    1.2 Definitions.........................................................................................  2

Article II – Sale of Assets; Certain Rights of Sellers
    2.1 Purchase and Sale of the Assets.....................................................  7
    2.2 Purchase Price and Consideration...................................................  8
        (a) Purchase Price...........................................................................  8
        (b) Dry Froth Circuit and Production Program ...............................  8
        (c) Mineral Royalty Conveyance ....................................................  8
        (d) Due Diligence, Completion, and Commissioning: Start-up
            Funds; Core Hole Drilling, Dry Froth, and Confidentiality........  9
        (e) Objections to Claims..................................................................  9
    2.3 Verification of Buyer's Funds…………….....................................  9
    2.4 Certain Rights and Obligations of Sellers.......................................  9
        (a) Right of CAR to Sell Oil Sands.................................................  9
        (b) Sale of Product..........................................................................  10
        (c) Bidding Procedures…………….................................................  10
        (d) Observation Committee…………..............................................  10
        (e) Data Room…………….............................................................  11

Article III – Due Diligence
    3.1 Due Diligence.................................................................................  11
    3.2 Cooperation by Sellers...................................................................  12
    3.3 (Intentionally Omitted)...................................................................  12
    3.4 Confidentiality...............................................................................  12
        (a) Disclosure of Confidential Information.....................................  12
        (b) Information Not Deemed Confidential.......................................  12
        (c) Return or Destruction of Confidential Information....................  13
    3.5 Material Event Notice; Termination, Cure Period Extension...............  13
    3.6 Release/Indemnification.................................................................  13
    3.7 Extensions of Due Diligence Period...............................................  13

Article IV – Closing
    4.1 Buyer's Conditions of Closing.......................................................  14
        (a) No Material Events....................................................................  14
        (b) Representations and Warranties.................................................  14
        (c) Condition of Assets....................................................................  14
        (d) No Circumstance of Material Adverse Effect...........................  14
        (e) Marketable Title........................................................................  14
        (f) Lease Amendment.....................................................................  14
        (g) Sellers' Covenants....................................................................  14
        (h) Bankruptcy Court Approval......................................................  14

(i) Bankruptcy Court Order.................................................................. 14
4.2 Sellers' Conditions of Closing......................................................... 15
    (a) Representations and Warranties................................................. 15
    (b) Buyer's Covenants...................................................................... 15
    (c) Bankruptcy Court Approval........................................................ 15
4.3 Additional Conditions of Closing by Buyers and Sellers.................... 15
    (a) Necessary Consents.................................................................... 15
    (b) No Pending Claims...................................................................... 15
    (c) No Adverse Law.......................................................................... 15
4.4 Necessary Pre-Closing Activities..................................................... 15
    (a) Warranty Deed............................................................................ 15
    (b) Lease Assignment....................................................................... 16
    (c) Assignment, Bill of Sale and Conveyance.................................. 16
    (d) Mineral Royalty Conveyance...................................................... 16
    (e) Delivery of Purchase Price.......................................................... 16
4.5 Closing.......................................................................................... 16
4.6 Extension of Closing....................................................................... 16

Article V – Representations and Warranties
5.1 Representations and Warranties of Sellers........................................ 16
    (a) Authority.................................................................................... 16
    (b) Binding Obligation..................................................................... 16
5.2 Additional Representations of the KTIA Group................................. 17
    (a) Organization, Conduct of Business, Etc..................................... 17
    (b) Transfer of Real Property........................................................... 17
    (c) Financials and Accounting.......................................................... 17
    (d) Other Contracts.......................................................................... 17
    (e) Mortgages, Encumbrances and Liens......................................... 17
    (f) Title to and Condition of Assets.................................................. 17
    (g) Licenses and Permits.................................................................. 18
    (h) Litigation, Claims and Disputes................................................. 18
    (i) Insurance.................................................................................... 18
    (j) Compliance with Laws; Documentation...................................... 18
    (k) Employees and Employees' Benefits.......................................... 18
    (l) Taxes and Tax Returns................................................................ 18
    (m) Material Contracts..................................................................... 19
    (n) Environmental Matters............................................................... 19
5.3 Representations and Warranties of Buyer.......................................... 20
    (a) Organization............................................................................... 20
    (b) Authority.................................................................................... 20
    (c) No Conflicts............................................................................... 20
    (d) Execution................................................................................... 21
    (e) Binding Obligation..................................................................... 21
    (f) Commissions.............................................................................. 21
5.4 Further Representations and Assurances of Buyer.............................. 21
    (a) Independent Examination............................................................ 21

(b) Risk.................................................................................. 21
(c) Project Viability............................................................. 21

Article VI – Termination
6.1 Termination.......................................................................... 22

Article VII – Notices
7.1 Notices................................................................................. 22

Article VIII – Indemnification
8.1 Survival…………….......................................................... 23
8.2 Indemnification by Seller.................................................... 24
8.3 Effect of Investigation........................................................ 24
8.4 Remedies and Right to Off Set............................................ 24

Article IX – Miscellaneous
9.1 Time is of the Essence......................................................... 24
9.2 Fees and Taxes.................................................................... 25
9.3 Amendments........................................................................ 25
9.4 Preparation of Agreement................................................... 25
9.5 Headings.............................................................................. 25
9.6 Counterparts........................................................................ 25
9.7 Governing Law.................................................................... 25
9.8 Entire Agreement................................................................ 25
9.9 Parties in Interest................................................................ 25
9.10 Remedies........................................................................... 25
9.11 Disputes; Attorneys' Fees................................................. 26
9.12 Assignments...................................................................... 26
9.13 Severability........................................................................ 26
9.14 Further Assurances............................................................ 26
9.15 Press Release..................................................................... 26

Exhibit A – Property and Assets
Exhibit B – Pre-Petition Claims, Debts, Taxes, Expenses and Litigation
Exhibit C – Permitted Encumbrances
Exhibit D – Dry Froth Circuit and Production Program
Exhibit E – Mineral Royalty Conveyance
Exhibit F – Release of All Claims (Form)
Exhibit G – Debtor in Possession Warranty Deed
Exhibit H – Lease Assignment
Exhibit I – Assignment, Bill of Sale and Conveyance
Exhibit J – Licenses and Permits
Exhibit K - Insurance

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") dated effective as of the _____ day of November, 2011, between and among Rutter and Wilbanks Corporation, P.O. Box 3186, Midland, Texas, 79702, or its designees or assigns, hereinafter referred to as "**Buyer**", Korea Technology Industry America, Inc. ("**KTIA**"), Uintah Basin Resources, LLC ("**UBR**"), and Crown Asphalt Ridge, LLC, ("**CAR**") all of 1245 East Brickyard Road, Brickyard Tower, Suite 110, Salt Lake City, Utah 84106. **KTIA, UBR,** and **CAR** are sometimes hereinafter referred to collectively as "**Sellers**" or, individually, as "**Seller**", and sometimes hereinafter referred to collectively as the "**KTIA Group**". The **Buyer** and each **Seller** are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A.      This Agreement sets forth the terms and conditions pursuant to which **Buyer** is to purchase and acquire free and clear title and ownership in and to the Assets except for Permitted Encumbrances. Capitalized terms or words are defined or described in this Agreement.

B.      On August 22, 2011 (the "Petition Date") each **Seller** separately filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. with the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**") Case Nos. : 11-32259 for **KTIA**; 11-32261 for **UBR**; and 11-32264 for **CAR**;

C.      All of the Assets are currently owned by the **Sellers** in differing portions as identified below, and some or all of such Assets are subject to Claims;

D.      **UBR** owns fee simple title to all of the Real Property;

E.      **CAR** is the lessee and operator under the Lease covering all of the Real Property;

F.      **KTIA** and **CAR** are also the owners or licensees of the Technologies;

G.      **CAR** has constructed the Production Facility on part of the Real Property;

H.      **CAR** is wholly owned by **UBR. UBR** is wholly owned by **KTIA** through **KTIA's** wholly owned subsidiary Utah Hydrocarbon, Inc.;

I.      The **KTIA Group** owes certain indebtedness to the Creditors and some of the Creditors have made Claims against the Assets including, but not limited to, the filing of lawsuits, liens, and encumbrances against the Assets;

J.      On September 16, 2011, the KTIA Group, Tar Sands Holdings, LLC ("**TSH**") Western Energy Partners, LLC ("**Western**"), and Elgin Services Company, Inc., ("**Elgin**") entered into a certain Stipulation Between Sellers, Tar Sands Holdings, LLC, Western Energy Partners, LLC, and Elgin Services Company (the "Stipulation").  As more particularly set forth herein, certain of the matters set forth in the Stipulation are related to the Transaction; and

K.      Subject to its confirmation of **Sellers'** representations and final approval of its Due Diligence, and subject to confirmation by the **Bankruptcy Court**, Buyer agrees to purchase and acquire the Assets and **Sellers** have agreed to sell all of the Assets to **Buyer** free and clear of all Claims except Permitted Encumbrances under the terms and conditions contained in this Agreement.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the **Parties** agree as follows:

## ARTICLE I

## RECITALS AND DEFINITIONS

1.1     <u>Incorporation by Reference</u>.   The foregoing Recitals are incorporated by this reference.

1.2     <u>Definitions</u>.   Unless defined or described in this Agreement, all capitalized terms and words shall have the meaning commonly used in the oil, gas and mining industries.

(a)     "ABS" means an Assignment, Bill of Sale and Conveyance to be delivered by each applicable **Seller** transferring to **Buyer**, or its designees or assigns, the Assets owned by such **Seller** in substantially the form attached hereto as Exhibit "I" and by this reference made a part hereof;

(b)     "Additional Conditions of Closing" means those conditions set out in Section 4.3 below;

(c)     "Agreement" means this Asset Purchase Agreement together with all Exhibits attached hereto;

(d)     "Assets" means the Real Property, Production Facility, Technologies, Lease, and Other Property;

(e)     "Buyer's Conditions of Closing" means those conditions set out in Section 4.1 below;

(f)     "Buyer-Related Parties" means any of **Buyer's** consultants, agents, designees, members, managers, shareholders, directors, officers, employees, contractors, agents, or other representatives;

(g)     "Claims" means any legal, beneficial or other right or claim of any party that may be asserted or made in whole or in part against the Debtors or their bankruptcy estates

2

or the Assets, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind whatsoever, and any interest accrued thereon or costs payable in respect thereof, including without limitation, by reason of the commission of a tort (intentional or unintentional), by reason of any breach of contract or other agreement (oral or written), by reason of any breach of duty (including, without limitation, any legal, statutory, equitable or fiduciary duty) or by reason of any right of ownership of or title to property or assets (including a working interest in the Assets) or right to a trust or deemed trust (statutory, express, implied, resulting, constructive or otherwise), and whether or not any indebtedness, liability or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present or future, known or unknown, by guarantee, surety or otherwise, and whether or not any right or claim is executory or anticipatory in nature including, without limitation, any right or ability of any party to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action whether existing at present or commenced in the future;

(h)     "Closing" means the completion of the Transaction as approved by the **Bankruptcy Court** whereby **Buyer** purchases the Assets from the **Sellers** and **Sellers** transfer the Assets to **Buyer** in accordance with the terms of this Agreement;

(i)     "Closing Date" means the date on which the Closing shall occur as agreed by **Buyer** and the **Sellers,** which shall occur on  or before June 30, 2012;

(j)     "Commissions" means any broker's or finder's fees or commissions;

(k)     "Confidential Information" means all documents, materials, analyses, studies, reports  and information, whether in written, electronic, or any other form or media, in any way relating to one or more of the Assets, the Due Diligence, Completion, and Commissioning, the proposed Transaction, or any of the other actions described in or contemplated by this Agreement, together with all copies thereof including, but not limited to, all documents, materials, analyses, studies, reports and information developed by or on behalf of Buyer during the Due Diligence Period;

(l)     "Creditor" means any person or company having a Claim against the Debtors or their Bankruptcy estates (including the holder of an allowed administrative expenses claim) or the Assets;

(m)     "D Tract" means that portion of the Real Property identified as the "D Tract" located in Uintah County, Utah, and more particularly described in Part "II" of Exhibit "A" attached hereto and by this reference made a part hereof;

(n)     "Dry Froth Circuit and Production Program" means that portion of the Production Facility,   along with the descriptions, proposed expenditures and other matters

described and set forth in Exhibit "D" attached hereto and by this reference made a part hereof and further discussed in Section 2.2 (b) below;

(o)   "Due Diligence, Completion, and Commissioning" or "Due Diligence" means any and all inspections, examinations, reviews, analyses, studies and related activities that **Buyer** deems necessary or appropriate involving the Assets, including consulting with Norwest Corporation and JAM Industrial, Inc., and the completion and commissioning of the Dry Froth Circuit and Production Program;

(p)   "Due Diligence Period" means the period commencing as of the date hereof and concluding at 5:00 p.m. on May 31, 2012, or such later date as is set in accordance with the provisions of this Agreement and approved by the **Bankruptcy Court**;

(q)   "*Force Majeure*" means if **Buyer** or **Sellers** are prevented in good faith from complying with any of their obligations or performing any of the activities contemplated under this Agreement, or prevented from conducting any Due Diligence, or delayed in completing any Due Diligence activity including the timely and successful completion of the Dry Froth Circuit and Production Program by reason of fire, storm, flood, explosion, act of God; by reason of rebellion, insurrection or riot; by reason of differences with the workmen or material suppliers or labor disputes, including strikes and walkouts; by reason of lack of water, electricity, natural gas or other materials and resources; by reason of failure to receive timely delivery of supplies, materials, or equipment; by reason of failure of carriers to transport or to furnish facilities for transportation; by reason of non-availability of equipment including but not limited to cranes, mining equipment, processing equipment, haul trucks, water trucks and storage facilities; by reason of the inability to obtain adequate replacement equipment, parts and materials; or by the inability to employ qualified engineers, professionals, supervisors, work crews and labor; by reason of any federal, or state law, or any order, rule or regulation of a governmental authority; by reason of lack of permits or extreme weather conditions; or by reason of any other cause or causes beyond **Buyer's** or **Sellers'** control or any operation of *Force Majeure* then, while so prevented, this Agreement shall not terminate in whole or in part and performance under this Agreement shall be temporarily excused. Any period of time for which performance is temporarily excused hereunder shall be added to the term or the time(s) set forth for performance of this Agreement;

(r)   "Hazardous Material" means any hazardous, toxic, or dangerous waste, substance, or material, as currently defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any other federal, state, or local law, ordinance, rule, or regulation applicable to the Real Property, and establishing liability standards or required action as to reporting, discharge, spillage, storage, uncontrolled loss, seepage, filtration, disposal, removal, use, or existence of a hazardous, toxic, or dangerous waste, substance, or material;

(s)    "Pre-Petition Claims" means all Claims of the Pre-Petition Creditors as of September 30, 2011 which are listed in Exhibit "B" attached hereto and by this reference made a part hereof.  Exhibit "B" was prepared prior to the Petition Date based on the books and records of the Sellers, but using assumptions including application of terms contemplated before the Petition Date that assumed reduced or limited interest rates as of December 2010.  The bar date for filing claims against the Sellers in their bankruptcy cases is October 15, 2011.  Accordingly, proofs of claim filed with the Bankruptcy Court or claims as ultimately allowed or treated under a Plan of Reorganization may differ from the amounts on Exhibit "B;"

(t)    "Pre-Petition Creditors" means those Creditors holding a Pre-Petition Claim;

(u)    "Lease" means that certain Oil, Gas and Minerals Lease granted by Wembco, Inc. (prior land owner to **UBR**) dated effective May 1, 2008, and recorded as entry number 2008004641 in Book 1090, at Page 166, Uintah County Records covering the Real Property, as amended by Amendment and Ratification of Oil, Gas and Minerals Lease dated April 29, 2011 (effective May 1, 2011) and recorded as entry number 2011003533 in Book 1233, at Page 111, Uintah County Records;

(v)    "Lease Assignment" means the Lease Assignment assigning to **Buyer**  all of **CAR's** leasehold rights and interests under and in connection with the Lease in substantially the form attached hereto as Exhibit "H" and by this reference is made a part hereof;

(w)    "Material Event" means one or more of the following events:

   (i)    in **Buyer's** good faith opinion, after Due Diligence, technological reviews and completion of the Dry Froth Circuit and Production Program,  the Technologies are not suitable or adequate to commercially, environmentally  or efficiently separate bitumen from oil sands or produce a saleable oil or asphalt product at a reasonable profit;

   (ii)    the analyses associated with the Due Diligence reveal that the oil sands resource present on the Real Property (consisting of the combined South "A" and "D" Tracts resource "reserve base" quantified in the Norwest Corporation's Asphalt Ridge Oil Sands Property Evaluation report dated February 2, 2011 as may be amended by Due Diligence) is less than 50 million barrels of recoverable bitumen;

   (iii)    in **Buyer's** good faith opinion the Production Facility and related equipment cannot be commissioned or made operable to produce dry froth, bitumen and PG  asphalt without extraordinary repair;

(iv)   in **Buyer's** good faith opinion   an environmental audit or environmental inspection of the Assets, including but not limited to an Environmental Phase I inspection, is not reasonably satisfactory to **Buyer**; and

(v)   in **Buyer's** good faith opinion the Conditions of Closing and the Additional Conditions of Closing have not been satisfied.

(x)   "Mineral Royalty Conveyance" means the conveyance of a mineral royalty to **KTIA** in the form attached hereto as Exhibit "E" and by this reference made a part hereof;

(y)   "Other Property" means all other property of the Sellers, excluding the assets listed on Schedule 1.2(y) to this Agreement, which the **Parties** shall prepare and initial prior to Closing.  The **Parties** may amend Schedule 1.2(y) from time to time during the Due Diligence Period to exclude certain assets from the Assets to be purchased in the Transaction; provided, however, that the Purchase Price shall not change due to the exclusion of any such assets;

(z)   "Parties" means collectively the **Buyer** and the **Sellers**;

(aa)   "Permitted Encumbrances" means those encumbrances identified in Exhibit "C" attached hereto and by this reference made a part hereof;

(bb)   "Plan of Reorganization" means the Plan of Reorganization for Sellers to be proposed and confirmed by the Bankruptcy Court and pursuant to which the allowed claims of creditors of the Sellers will be treated using the proceeds of sale to Buyer.  Sellers agree that nothing in the Plan of Reorganization will contradict, alter or amend the provisions of this Agreement.

(cc)   "Pollutants" means any solid waste, Hazardous Material, toxic substance, or any other pollutants or contaminations;

(dd)   "Purchase Price" means the amount described in Section 2.2.(a) below;

(ee)   "Product" means all wet froth, dry froth, bitumen and any other saleable product produced during the Dry Froth Circuit and Production Program.

(ff)   "Production Facility" means a certain production facility on the South A Tract consisting of the improvements and equipment identified in Part III of Exhibit "A" attached hereto;

(gg)   "Project" means the Assets and related rights and interests involved in an oil sands project of the **KTIA Group** located at Asphalt Ridge in Uintah County, Utah;

(hh)  "Release" means the document pursuant to which each Creditor will release its Claim against the Assets in substantially the form attached hereto as Exhibit "F" and by this reference made a part hereof and approved by the **Bankruptcy Court**;

(ii)  "Real Property" means collectively the South A Tract and the D Tract;

(jj)  "Sale Motion" means that certain motion filed by Sellers with the Bankruptcy Court seeking approval of this Agreement and the sale of the Assets to Buyer on the Closing Date free and clear of liens, interests, and claims pursuant to Bankruptcy Code Section 363, as well as other matters, including bidding procedures (the "Bidding Procedures")

(kk)  "Sellers Conditions of Closing" means those conditions set out in Section 4.2 below and as approved by the **Bankruptcy Court**;

(ll)  "Warranty Deed" means a Debtor in Possession Warranty Deed granting to **Buyer** all of **UBR's** right, title and interest in and to the Real Property in substantially the form attached hereto as Exhibit "G" and by this reference made a part hereof;

(mm) "South A Tract" means that portion of the Real Property identified as the "South A Tract" located in Uintah County, Utah, and more particularly described in Part "I" of Exhibit "A" attached hereto and by this reference made a part hereof;

(nn)  "Technologies" means the technologies described in Part "III" of Exhibit "A" utilized by the **KTIA Group** in connection with the commercial extraction and processing of oil from oil sands and for manufacturing dry froth, bitumen, asphalt, and related products from oil sands deposits located on the Real Property;

(oo)  "Third Party Oil Sands Sales" means the sale of oil sands ore to third parties by **CAR** from the date of this Agreement to the Closing Date;

(pp)  "Transaction" means the purchase and sale of the Assets pursuant to this Agreement;

## ARTICLE II

## SALE OF ASSETS; CERTAIN RIGHTS OF SELLERS

2.1    Purchase and Sale of the Assets. Subject to Article IV of this Agreement and approval of the **Bankruptcy Court**, **Sellers** agree to convey, assign, and transfer to **Buyer** all right, title, and interest in the Assets, free and clear of all liens, interests and claims pursuant to Bankruptcy Code Section 363(f) against the Assets, including the Pre-Petition Claims, except for the Permitted Encumbrances, with liens, interests and claims other than the Permitted Encumbrances to attach to the proceeds of sale with the same validity and priority such liens, interests and claims had on the Petition Date.

2.2     Purchase Price and Consideration.

(a)     Purchase Price.  The Purchase Price and other consideration to be paid by **Buyer** in connection with **Buyer's** purchase and acquisition of the Assets shall be the sum of (1) the Mineral Royalty Conveyance to **KTIA** described in Section 2.2(c) below; (2) due and unpaid amounts of any Debtor in Possession Loans extended to the Sellers by **Buyer**, including but not limited to the **Start-up Loan,** as defined below in Section 2.2(b); and (3) money in the amount equal to the total amount of Creditors' Claims that are verified and allowed by the Bankruptcy Court.  The Purchase Price money shall be paid by **Buyer**, in full, by wire transfer to facilitate the Closing.

(b)     Dry Froth Circuit and Production Program.   **Buyer** agrees to use its best efforts and pay all expenses, by way of a Debtor-in-Possession loan to Sellers (the "**Start-up Loan**") under 11 U.S.C. Section 364, and approved by the Bankruptcy Court after notice and a hearing pursuant to a motion to be filed by Sellers, to place into a producing status the Dry Froth portion of the Production Facility substantially in accordance with the Dry Froth Circuit and Production Program described in Exhibit "D".  The Sellers will propose that the Start-up Loan have terms and conditions including the following:  (i) principal balance of the Start-up Loan of the Start-up Funds (defined below) shall bear interest at a non-default rate of five percent (5%) per annum from the date of each advancement of funds by Buyer for costs of the Dry Froth Circuit and Production Program and shall have a default interest rate of ten percent (10%); (ii) if Buyer elects not to consummate the Transaction, then its loan of the Start-up Funds shall be due and payable in full on August 31, 2012; (iii) the principal amount of the Start-up Funds is anticipated to reach $5,000,000.00, but the Start-up Funds may exceed that amount; (iv) the Start-up Funds shall be secured by liens recorded against the Sellers' Assets as of the date of this Agreement; and (v) the Start-up Loan may, if required, be evidenced by a promissory note consistent with the terms contained in this Section 2.2(b).  **Buyer** may begin its work on the Production Facility at its discretion and intends to do so prior to completing its Due Diligence review.  **Buyer** shall keep records of its costs and expenses to put the Production Facility into production (the "Start-up Funds").

(c)     Mineral Royalty Conveyance.  As partial consideration for the Transaction, **Buyer** and **Sellers** agree that **KTIA** shall receive a perpetual royalty initially as a portion of the ten percent (10%) net royalty set forth in the Lease or an equivalent amount under any future royalties established by **Buyer** under a future minerals lease applicable to the Real Property.  The perpetual royalty shall be transferred to **KTIA** at Closing pursuant to the Mineral Royalty Conveyance.  **Buyer** shall have the right to offset from any royalty payment owed to **KTIA** under the Mineral Royalty Conveyance, in addition to its right of offset under Section 8.4 below, an amount equal to the difference between the cash portion of the Purchase Price paid by **Buyer** under Section 2.2(a)(3) above and Thirty Four Million Four Hundred Eighty Four Thousand Sixty Eight Dollars and No Cents ($34,484,068.00) (the "**Purchase Price Difference**") plus interest accrued on such Purchase Price Difference at the rate of ten percent (10%) per year from the Closing Date until such Purchase Price Difference is paid in full.  Any amounts that are offset by **Buyer** pursuant to this Section shall be applied first to accrued and unpaid interest on the Purchase Price Difference and then to the principal balance of the Purchase Price Difference.

Until such Purchase Price Difference, and accrued interest, is paid in full, **Buyer** shall not have any obligation to pay **KTIA** any amounts under the Mineral Royalty Conveyance.  Buyer shall provide accountings in writing, at least quarterly, of all amounts necessary to calculate any royalty payment owed under the Mineral Royalty Conveyance or any offset.

(d)     Due Diligence, Completion and Commissioning; Start-up Funds; , Core Hole Drilling, Dry Froth, and Confidentiality.  During the Due Diligence Period**, Buyer** may conduct and, to the extent conducted, shall pay, all costs for its Due Diligence, Completion, and Commissioning, including any core hole drilling and ore sampling and analyses, subject to Section 2.2(b) above, the completion of the Dry Froth Circuit and Production Program, and other activities involving the Real Property or other Assets deemed necessary or advisable by **Buyer** in connection with its Due Diligence. Until Closing shall occur, all information ("Information") learned by Buyer during Due Diligence shall be Confidential Information. Should the Closing of the Transaction contemplated by this Agreement not take place for any reason, **Buyer** shall immediately deliver all of the Information to **CAR and TSH,** regardless of whether such Information is in written, electronic, or any other form or media.  The lien status and all other matters associated with the Start-up Funds actually advanced by **Buyer** shall be treated as described in the Stipulation and as ordered by the **Bankruptcy Court.**

(e)     Objections to Claims.  Sellers and Buyer acknowledge that they share the common goal of assuring that only valid Creditors' Claims are allowed and paid in Sellers' bankruptcy case.  In fact, a component of the Purchase Price is affected by the aggregate of valid and allowed Claims in the case.  Sellers and Buyer shall take all reasonable steps to provide for Buyer's ability to object to Creditors' Claims.  If for any reason, Buyer is unable directly to object to Creditor Claims, Sellers will: (1) provide Buyer with their evaluation of claims and potential objections to claims, advance drafts of objections to claims, and a reasonable opportunity for advance comment; (2) consult with Buyer throughout the claim resolution process, and in advance, concerning claim objections, any litigation on claim objections, and any settlements of claim objections; and (3) take all other reasonable and necessary steps to assure that only valid Creditors Claims are allowed and paid.

2.3     Verification of Buyer's Funds.   Buyer acknowledges that, notwithstanding the submission and approval of the Sale Motion seeking approval of this Agreement, Sellers shall not be required to execute and deliver this Agreement until such time as Sellers and TSH receive reasonable verification of the availability of the Start-up Funds.

2.4     Certain Rights and Obligations of Sellers.

(a)     Right of CAR to Sell Oil Sands. If approved by the Bankruptcy Court, **CAR** shall be entitled to continue transacting Third Party Oil Sands Sales not to exceed in the aggregate for the remainder of the 2011 sales year fifteen thousand (15,000) short tons, with the proceeds of such Third Party Oil Sands Sales being paid to **CAR** for the payment, of bankruptcy administrative costs if sold prior to the Closing Date; provided, however, that Sellers will not (i) use any cash collateral without an order of the Bankruptcy Court or (ii) pay any professional fees or costs until after such fees or costs have been allowed by the Bankruptcy Court.  In the event

any Third Party Oil Sands Sales require the delivery of oil sands after the Closing, **Buyer** agrees to permit the mining, transportation, and delivery of such oil sands for **Buyer's** account in order to fulfill the obligations of **CAR** in connection with the affected pre-Closing Third Party Oil Sands Sales.

(b)  Sale of Product. If during the Due Diligence Period, as may be extended, **Buyer** produces and sells any Product, but not raw tar sands, the proceeds realized from the sale shall be deposited with the **Bankruptcy Court** in an account established for such purpose. All proceeds deposited in the account, plus any accrued interest, shall be used to pay allowed administrative expenses of the Sellers' bankruptcy estates. If Closing occurs, the entire amount in the account at Closing will be used towards the Purchase Price paid to the Creditors. If Closing does not occur, the entire amount in the account shall be distributed as determined by the **Bankruptcy Court**.

(c)  Bidding Procedures.  The Bidding Procedures as approved by the Bankruptcy Court are incorporated herein by this reference.  The Bidding Procedures will provide a period of time for other potential bidders to submit higher and better offers and for Buyer to meet or exceed any such offers.  Except as otherwise provided in the Bidding Procedures at all times from the date hereof until the date this Agreement is terminated, **Sellers** shall not be entitled to market, or take any other steps whatsoever to dispose of, the Assets to third parties except Third Party Oil Sands Sales.  However, nothing in this Agreement shall be interpreted to preclude Sellers from (i) receiving and reporting to the Bankruptcy Court and parties in interest in Sellers bankruptcy cases any unsolicited offers; (ii) implementing and complying with the Bidding Procedures; or (iii) acting in accordance with any order of the Bankruptcy Court.

(d)  Observation Committee.  Consistent with the terms of the Stipulation, during the Due Diligence Period, an observation committee (the "Observation Committee") consisting of up to five members shall be established to observe and review the ongoing status of Buyer's Due Diligence, Completion, and Commissioning activities.  The Observation Committee shall include (i) a representative selected by each of Western and Elgin; and (ii) up to two other representatives selected by creditors (and, if an official committee of unsecured creditors is appointed by the United States Trustee, one representative shall be a member of that Official Committee of Unsecured Creditors).  The purpose of the committee is to allow the Creditors to receive and review information regarding Buyer's Due Diligence.  Buyer shall not be required to share any information in the nature of trade secrets that Buyer develops in connection with its work on the Production Facility.  Buyer will cooperate with the representative regarding the particular methods and means of sharing information to keep the Creditors informed about Buyer's progress.  The Observation Committee is not an official committee under the Bankruptcy Code and its costs and expenses are not intended to be allowed administrative expenses of the Sellers' bankruptcy estates.  All costs and expenses of the Observation Committee shall be the responsibility of the parties designating members to serve on the Observation Committee.

       (e)    <u>Data Room</u>.  Buyer acknowledges that Sellers have agreed to set up a data room in accordance with the Stipulation and Buyer agrees not to interfere with such agreement or any other agreement of Sellers in the Stipulation.

# ARTICLE III

## DUE DILIGENCE

3.1    <u>Due Diligence.</u>  **Buyer** shall be entitled to conduct Due Diligence during the Due Diligence Period in its sole discretion.  The specific **Seller** which is in possession of the applicable documents, materials or property shall provide **Buyer** reasonable access to all documents and records, including but not limited to, company books and records, title documents, permits, taxes, and all other information reasonably requested by **Buyer** which is available to or can be reasonably obtained by **Sellers**. **Buyer** shall pay all reasonable out-of-pocket costs and expenses incurred by the specific **Seller** in connection with providing the foregoing Due Diligence materials requested by **Buyer**. **Sellers** hereby waive all conflicts and consent to **Buyer** independently utilizing and contracting with **Sellers'** existing experts and consultants for conducting its Due Diligence including, but not limited to, land, title, environmental, permitting, engineering, marketing, mining, and reserve analysis consultants and attorneys, excluding professionals whose employment has been approved by the Bankruptcy Court, unless otherwise authorized by the Bankruptcy Court.

       **Buyer** acknowledges that, as part of the Due Diligence, Completion, and Commissioning, **Buyer** may carry out completion and commissioning of the Dry Froth Circuit and Production Program by expending the required Start-up Funds.  It is estimated that the Start-up Funds will be in the approximate amount of five million dollars ($5,000,000), as estimated in Exhibit D to this Agreement.  Buyer shall use diligent efforts to meet the milestones set forth below, which shall be measured from and begin on November 1, 2011, a date when the **Parties** believe this Agreement will have been approved by the Bankruptcy Court.  If this Agreement has not been approved by the Bankruptcy Court by November 1, 2011, or in the event of a Force Majeure, then the milestones below shall measured from and begin on the date when such approval is granted.  Exhibit D provides, among other things, for the estimated advancement of the Start-up Funds necessary to achieve the milestones.

-     <u>By not later than Week 6</u> – Completion of engineering updates and site inspection, including developing action items and identification of key procurement items.

-     <u>By not later than Week 10</u> – Placement of purchase orders for all necessary equipment, materials and services.

-     <u>By not later than Week 20</u> – Commencement of sequential commissioning (mechanical, water, oil sands) and introduction of oil sands feed to the plant (Approximately 90% of construction would be completed at this point with the remainder of construction work to be completed in conjunction with the sequential commissioning)

• <u>By not later than Week 24</u> – Achieve steady production of (wet) froth and introduction of froth to the evaporator circuit

• <u>By not later than Week 28</u> – Achieve desired level of steady Dry Froth production and product specification.

3.2   <u>Cooperation by Sellers</u>.   **Sellers** shall in good faith cooperate with **Buyer** in conducting **Buyer's** Due Diligence, Completion, and Commissioning. Additionally, **Sellers** shall provide **Buyer**, its attorneys, and consultants, with access to the Assets, and each specific **Seller** which is in possession of documents related to the Assets shall also provide **Buyer**, upon **Buyer's** written request, with access to all available relevant and reasonably requested documentation at **Sellers'** office in Salt Lake City, Utah, and when reasonably available, with access electronically by email or computer disc, during the Due Diligence Period.

3.3   (Intentionally Omitted)

3.4   <u>Confidentiality</u>.

(a)   <u>Disclosure of Confidential Information</u>.   The Confidential Information shall be deemed confidential, and shall not be disclosed to, or be permitted to be disclosed to, any third party by or through **Buyer** or any Buyer-Related Parties, except that Confidential Information may be disclosed to Buyer-Related Parties and consultants and representatives assisting in the Due Diligence, Completion, and Commissioning on "a need-to-know basis" with respect to the particular Confidential Information. The extent and scope of Confidential Information disclosed to any Buyer-Related Party and other third party shall be limited to the portions of the Confidential Information needed by such Buyer-Related Party or third-party to perform such person's or entity's obligations with respect to the Due Diligence, Completion, and Commissioning. Each Buyer-Related Party and other third party to whom any portion of the Confidential Information is at any time to be disclosed shall be required to sign a confidentiality agreement, in form and substance approved by **Sellers** prior to receiving any portion of the Confidential Information.

(b)   <u>Information Not Deemed Confidential</u>.   Confidential Information shall not include information:

(i)   known or disclosed to **Buyer** from a source other than **Sellers,** which source is not under an obligation of confidentiality with respect to such information, prior to the effective date of this Agreement;

(ii)   independently developed by or for **Buyer** and not using any Confidential Information, as evidenced by written records or other reasonable evidence;

(iii)   acquired by **Buyer** from a third party which is not under an obligation of confidentiality with respect to such information;

12

(iv)  which is or becomes generally available to the public other than as a result of a disclosure by **Buyer** or any Buyer-Related Parties; or

(v)  which **Buyer** is required by law to disclose.

(c)  Return or Destruction of Confidential Information.  In the event the Transaction does not timely close, or is terminated in accordance with this Agreement prior to the Closing Date, **Buyer** shall be required to immediately return all Confidential Information to **Sellers and TSH**, together with all copies and versions thereof and/or  **Buyer** shall be required to destroy or permanently erase such portions of the Confidential Information which are in written or electronic form.

3.5  Material Event Notice; Termination; Cure Period Extension.  In the event that during the Due Diligence Period, **Buyer** identifies a Material Event, it shall immediately provide Sellers with written notice detailing such event.  If **Sellers** cannot resolve or otherwise mitigate the applicable Material Event to the reasonable satisfaction of **Buyer** within ten (10) business days following the receipt of the aforementioned written notice (the "Cure Period"), this Agreement shall immediately terminate and be of no further force and effect unless, prior to the expiration of the Cure Period, the Buyer has: (i) extended, in its sole option and in writing, the Cure Period by up to thirty (30) days (the "Extended Cure Period"); or (ii) has provided to the **Sellers** a written waiver releasing the condition to resolve the Material Event.  This Agreement shall immediately terminate and be of no further force and effect upon the expiration of the Extended Cure Period unless **Buyer** has provided to the **Sellers** a written waiver releasing the condition to resolve the Material Event.

3.6  Release/Indemnification.  **Buyer** hereby agrees and acknowledges that it will conduct the Due Diligence, Completion, and Commissioning at its sole risk.  **Buyer** will repair any damage to the Assets resulting from **Buyer's** Due Diligence, Completion, and Commissioning or any related activities deemed necessary by **Buyer** to determine the condition and fitness of the Assets or to complete or commission the Dry Froth Circuit and Production Program.  **Buyer** hereby releases and indemnifies **Sellers** from any claims, damages or loss arising out of **Buyer's** Due Diligence, Completion, and Commissioning and not arising out of **Sellers'** negligence or willful misconduct.

3.7  Extensions of Due Diligence Period.  In the event that **Buyer** cannot complete its Due Diligence, Completion, and Commissioning within the Due Diligence Period as a result of delays caused by **Sellers** or third parties, or by an event of *Force Majeure,* the Due Diligence Period shall be extended for the period of the delay(s), or by the event(s) of *Force Majeure.*  In the event that a Material Event is identified in accordance with Section 3.5 above, and the Cure Period or Extended Cure Period will expire less than six (6) business days before the expiration of the Due Diligence Period or after the expiration of the Due Diligence Period, the Due Diligence Period will be extended to expire five (5) business days after the expiration of the Cure Period or the Extended Cure Period, as applicable.  Notwithstanding any provision of this Agreement, the Due Diligence Period may be extended by the mutual agreement of the **Parties** in writing and as approved by the **Bankruptcy Court**.

## ARTICLE IV

## CLOSING

4.1    Buyer's Conditions of Closing.   Notwithstanding any provision herein to the contrary, **Buyer** may, in its sole and absolute discretion and for any reason and at any time prior to Closing, elect not to consummate the Transaction contemplated by this Agreement and proceed with the Closing and terminate this Agreement. Without limiting the foregoing, **Buyer** will have the option to proceed with Closing subject to the following conditions:

(a)    No Material Events. There being no unresolved or unmitigated Material Event which is not acceptable to and waived by **Buyer**;

(b)    Representations and Warranties. The written satisfaction or written waiver of the condition that all representations and warranties of **Sellers** contained in this Agreement shall be true in all material respects on the Closing Date;

(c)    Condition of Assets. The condition of the Assets shall not have deteriorated beyond ordinary wear and tear at the time of Closing;

(d)    No Circumstance of Material Adverse Effect. There will have been no change, effect or circumstance that is or has been materially adverse to, or could reasonably be expected to have a material adverse effect on the Assets or future commercial operations at the time of Closing;

(e)    Marketable Title. Good and marketable title to and possession of all Assets free and clear of all iiens, interests, and claims pursuant to Bankruptcy Code Section 363(f), except Permitted Encumbrances, being conveyed, transferred and delivered to **Buyer** at Closing, including the receipt by the **Buyer** of an order of the Bankruptcy Court in form and substance acceptable to Seller which is satisfactory to **Buyer** in its good faith discretion;

(f)    Lease Amendment. The Lease shall have been amended to take into account the Mineral Royalty Conveyance and properly reflect the royalties associated with the Project;

(g)    Sellers' Covenants. **Sellers** having performed and satisfied all covenants and conditions required by this Agreement to be performed and satisfied by **Sellers** at or prior to the Closing Date in all material respects; and

(h)    Bankruptcy Court Approval.  Final approval of the Bankruptcy Court.

(i)    Bankruptcy Court Order.  The Bankruptcy Court having entered an order that meets Buyer's approval in form and substance finding that, among other things, Buyer is a good faith purchaser entitled to the protections of 11 U.S.C. Section 363(m) and (n) and that Sellers have the ability to sell the Assets free and clear of liens, interests and claims under 11 U.S.C. Section 363(f).

4.2     Sellers' Conditions of Closing.   The obligations of **Sellers** to consummate the Transaction contemplated by this Agreement and proceed with the Closing are subject to the following conditions:

(a)     Representations and Warranties. The written satisfaction or written waiver of the condition that all representations and warranties of **Buyer** contained in this Agreement shall be true in all material respects at and as of the date of Closing;

(b)     Buyer's Covenants. **Buyer** shall have performed and satisfied all covenants and conditions required by this Agreement to be performed and satisfied by **Buyer** in all material respects at or prior to the date of Closing; and

(c)     Bankruptcy Court Approval. Final approval by the **Bankruptcy Court**.

4.3     Additional Conditions of Closing by Buyer and Sellers. The obligations of **Buyer** and **Sellers** to consummate the Transaction contemplated by this Agreement and proceed with the Closing are additionally subject, at the respective options of **Buyer** and **Sellers**, to the satisfaction or written waiver by each such **Party**, of the following conditions:

(a)     Necessary Consents. All necessary consents, permissions, and approvals, or amendments thereto, by governmental authorities, Sellers, or other third parties (except consents, permissions, and approvals of governmental authorities customarily obtained subsequent to transfer) in connection with the sale and transfer by **Sellers** and purchase by **Buyer** of the Assets shall have been obtained on behalf of or waived by the **Party** adversely affected, and all necessary regulatory filings shall have been made;

(b)     No Pending Claims. Except for Permitted Encumbrances, at Closing there shall be no Claims against the Assets or any pending or instituted, threatened, or proposed, action or proceeding before any court or administrative agency or any other person challenging or complaining of, or seeking to collect damages or other relief in connection with the Transaction contemplated by this Agreement; and

(c)     No Adverse Law. At Closing, no state or federal statute, rule, regulation, or action shall exist or shall have been adopted or taken, and no judicial or administrative decision shall have been entered (whether on a preliminary or final basis), which would prohibit the consummation of the Transaction contemplated by this Agreement or make illegal the payments due hereunder.

4.4     Necessary Pre-Closing Activities.

(a)     Warranty Deed. At least two (2) days prior to Closing **UBR** shall deliver the duly executed and notarized Warranty Deed substantially in the form attached hereto as Exhibit "G."

(b)     Lease Assignment. At least two (2) days prior to Closing, **CAR** shall deliver the duly executed and notarized Lease Assignment substantially in the form attached hereto as Exhibit "H."

(c)     Assignment, Bill of Sale and Conveyance. At least two (2) days prior to Closing, each applicable **Seller** shall deliver a duly executed and notarized ABS, substantially in the form attached hereto as Exhibit "I."

(d)     Mineral Royalty Conveyance. At least two (2) days prior to Closing, **Buyer** shall deliver the duly executed and notarized Mineral Royalty Conveyance, substantially in the form attached hereto as Exhibit "E" dated effective on the Closing Date.

(e)     Delivery of Purchase Price. Not later than 2 p.m. Mountain Time one (1) day prior to the Closing, Buyer shall deliver the full cash portion of the Purchase Price to be held by the Sellers and distributed only as ordered by the Bankruptcy Court. All liens, interests, and claims previously on the Assets, except for Permitted Encumbrances, will attach to such cash proceeds with the same validity and priority such liens, interests, and claims had prior to the Closing.

4.5     Closing. If Buyer exercises its right to close the Transaction, the Closing shall occur on the Closing Date and the Sellers  shall distribute the Purchase Price funds as directed by the Bankruptcy Court and deliver and record, as appropriate, the conveyance and other documents and instruments described in Section [4.4]., or as otherwise reasonably required to Close the Transaction.

4.6     Extension of Closing.  The Closing Date may be extended by the mutual agreement of the **Parties** in writing and approved by the **Bankruptcy Court.**  The Closing Date may also be extended due to a Force Majeure event, but only if such event is a federal, or state law, or any order, rule or regulation of a governmental authority (including, without limitation, a moratorium on tar sands mining or processing).

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES

5.1     Representations and Warranties of Sellers. Each **Seller** represents and warrants to **Buyer** for and on behalf of itself, but not for the other **Sellers**, the following:

(a)     Authority.  Upon approval of the Bankruptcy Court, such **Seller** has all requisite power and authority to enter into this Agreement and to perform its respective obligations hereunder.

(b)     Binding Obligation. This Agreement has been duly executed by, and delivered on behalf of such **Seller**, and all documents and instruments required hereunder to be executed and delivered by such **Seller** to **Buyer** will be duly executed and delivered. This

Agreement constitutes the legal, valid, and binding obligation of such **Seller,** enforceable in accordance with its terms and as approved by the **Bankruptcy Court**.

     5.2    <u>Additional Representations of the **KTIA Group**</u>.  Each member of the **KTIA Group** additionally jointly and severally represents and warrants to **Buyer**, the following matters, all of which representations and warranties shall automatically expire at the end of twenty four (24) months after the date of the Closing:

     (a)    <u>Organization, Conduct of Business, etc</u>.  Each member of the **KTIA Group**: (i) is duly organized and validly existing and in good standing under the laws of the State of Utah for **CAR**, and the State of Delaware for **KTIA** and **UBR**, (ii) has all requisite power to own its properties, conduct its business as now being conducted, and complete the portions of the Transaction applicable to such entity, (iii) is duly qualified to do business and is in good standing in Utah, and (iv) is not in any material respect transacting business in violation of any provision of federal or state law or any rule or regulation promulgated thereunder.

     (b)    <u>Transfer of Real Property</u>.  **UBR** will convey to **Buyer** at the Closing via Warranty Deed, fee title to the Real Property. **Buyer** will acquire fee title to the Real Property, free and clear of all liens, interests and claims pursuant to Bankruptcy Code Section 363(f), except for the Permitted Encumbrances.

     (c)    <u>Financials and Accounting</u>.  All financial and accounting records and statements relating to any one or more of the **KTIA Group** which are delivered, submitted, or available to **Buyer** are substantially true and accurate business records of the respective member of the **KTIA Group**, and from the date of such financial and accounting records and statements to the date hereof, there has not been any material adverse change regarding the financial condition of such member of the **KTIA Group**.

     (d)    <u>Other Contracts</u>.  Except for the Lease, there are no contracts, agreements, arrangements, commitments, understandings, rights of first refusal, or options, whether written or oral, express or implied, which are known to any member of the **KTIA Group** other than this Agreement relating to a sale, ownership, assignment, conveyance, transfer, or delivery of the Assets.

     (e)    <u>Mortgages, Encumbrances and Liens</u>.  No member of the **KTIA Group** has sold, assigned, transferred, conveyed, leased, or otherwise disposed of or agreed to sell, assign, transfer, convey, lease, or otherwise dispose of the Real Property, or any of the other Assets owned by any one or more of the members of the **KTIA Group**, and there exist no Claims against the Real Property, or the other Assets except the Pre-Petition Claims and the Permitted Encumbrances.

     (f)    <u>Title to and Condition of Assets</u>.  The applicable members of the **KTIA Group** have good and marketable title in and to the Real Property and the other Assets described or referred to in Exhibit "A", which, except for the Pre-Petition Claims and the Permitted Encumbrances, are free and clear of all Claims. Each member of the **KTIA Group** represents that it has not received and is not aware of any notice of violation of any applicable

zoning regulation, ordinance, or other law, order, regulation, or requirement relating to the Assets owned by a member of the **KTIA Group**. All buildings, structures, and other improvements on the Real Property do not violate applicable ordinances, codes, and regulations.

(g)     Licenses and Permits.  Sellers have all licenses and permits necessary to own and operate the Assets including the Dry Froth Circuit and Production Program and all such licenses and permits are set forth in Exhibit "J" attached hereto and by this reference is made a part hereof.  Except as set forth on Exhibit "J," all licenses and permits are transferable to **Buyer** and will be transferred to **Buyer** at Closing.

(h)     Litigation, Claims and Disputes.  Except for the Pre-Petition Claims and the Permitted Encumbrances, no claims, suits, actions, proceedings, or investigations exist or are pending against or affect any member of the **KTIA Group** or the Assets, whether at law or in equity are pending, or, to the **KTIA Group**'s knowledge, threatened before any court, arbitration panel or governmental agency.

(i)     Insurance.  Exhibit "K" attached hereto and by this reference made a part hereof sets forth all of the policies of insurance now in effect covering the Assets of the **KTIA Group**, and true and accurate copies of each policy will be provided to **Buyers** upon request. Such policies are in full force and effect as of the date hereof, and no member of the **KTIA Group** has received written notice from any insurance carrier of any intentions to terminate such policies.

(j)     Compliance with Laws; Documentation.  The conduct by the members of the **KTIA Group** of their respective businesses does not violate or infringe any domestic or foreign laws, statues, ordinances, rules, or regulations, and each of the members of the **KTIA Group** has complied with all applicable local, state, or federal laws, ordinances, rules and regulations now in effect and applicable to them.

(k)     Employees and Employee Benefits.  No member of the **KTIA Group** has employees with benefit, compensation, or welfare benefit plans, programs, or agreements, nor are they required to contribute to any such plan. **Buyer** will have no obligation to make any contribution to and will not be subject to any liability under any existing benefit plan of the **KTIA Group**.

(l)     Taxes and Tax Returns.

(i) Except as set forth and identified in Exhibit "B", each member of the **KTIA Group** has timely filed all U.S. federal, state and other material tax returns or filed for extensions (defined herein as any return, declaration, report, claim, for refund, or information return or statement relating to taxes, including without limitation, any schedule or attachment thereto and any amendment thereof) that they were required to file under applicable laws and regulations. All such tax returns were correct and complete in all material respects. All taxes (defined herein as any and all federal, state, local, or foreign

18

net or gross income, gross receipts, net proceeds, sales, use, ad valorem, value added, franchise, bank shares, withholding, payroll, employment, excise, property, deed stamp, alternative or add-on minimum, environmental, profits, windfall profits, transaction, license, lease, service, service use, occupation, severance, energy, unemployment, social security, worker's compensation, capital, premium, and other taxes, assessments, customs, duties, fees, levies, or other governmental charges) due and owing by each member of the **KTIA Group** through the Closing (whether or not shown on any tax return) have been paid, except recent property and income tax filings of **KTIA**, **UBR,** and **CAR** set forth and identified in Exhibit "B". No claim has ever been made by an authority in a jurisdiction where any member of the **KTIA Group** does not file tax returns that it may be subject to taxation by that jurisdiction. There are no liens for taxes in existence upon any of the Assets of any member of the **KTIA Group** except as set forth and identified in Exhibit "B".

(ii) No member of the **KTIA Group** has knowledge or reason to believe that any authority intends to assess any additional taxes against any member of the **KTIA Group** for any period for which tax returns have been filed. No foreign, federal, state, or local tax audits or administrative or judicial tax proceedings are pending or being conducted with respect to any member of the **KTIA Group**. No member of the **KTIA Group** has received from any foreign, federal, state, or local taxing authority (including jurisdictions where they have not filed tax returns) any written (A) notice indicating an intent to open an audit or other review, (B) request for information related to tax matters, or (C) notice of deficiency or proposed adjustment for any amount of tax proposed, asserted, or assessed by any taxing authority against any member of the **KTIA Group**.

(m)    Material Contracts. No member of the **KTIA Group** has knowledge of any undisclosed written agreements, contracts, commitments, arrangements, or understandings involving any member of the **KTIA Group** or the Assets owned by the members of the **KTIA Group**. Excluding intercompany claims or loans, there are no agreements or undertakings pursuant to which any member of the **KTIA Group** is borrowing or is entitled to borrow any money, is lending or has committed itself to lend any money, or is a guarantor or surety with respect to the obligations of any person except for Pre-Petition Claims set forth and identified in Exhibit "B".

(n)    Environmental Matters. Each member of the **KTIA Group** is and has at all times been in compliance with all applicable laws and regulations relating to pollution prevention and protection of the environment. No member of the **KTIA Group** has received any summons, citation, directive, notice, complaint, letter, or other communication from any governmental entity or third party, of any actual or potential violation or failure to comply with

applicable laws and regulations relating to pollution prevention and protection of the environment or to undertake or bear the costs of any environmental liabilities with respect to any real property owned or leased by any member of the **KTIA Group**. Except for storage of small quantities of diesel and bitumen from test operations, no member of the **KTIA Group** has knowledge of the storage, production, transportation, disposal, treatment, or release of any Pollutants on or in the Real Property. Each member of the **KTIA Group** has complied with all applicable local, state, and federal environmental laws and regulations, and there are no wells, underground storage tanks, covered surface impoundments, or other sources of Pollutants on the Real Property. No member of the **KTIA Group** has knowledge of any Pollutants on or in neighboring properties which, through soil or groundwater migration, could have moved, or could move, to the Real Property. No member of the **KTIA Group** has knowledge of any wetlands or any earth settlement, movement, instability, or damage affecting the Real Property, and has no notice of any violations of any laws, ordinances, or regulations affecting the Real Property. Hazardous Material has not been used, generated, transported, treated, stored, released, discharged, or disposed of in, onto, under, or from the Real Property by any member of the **KTIA Group**. Each member of the **KTIA Group** will deliver to **Buyer** all third party engineering and environmental reports, soil tests, and appraisals which such member has in its possession relating to the Property. No member of the **KTIA Group** has knowledge of any PCBs, asbestos, asbestos containing material, lead paint, radon, or other hazardous substances present on or in the Real Property.

5.3     Representations and Warranties of Buyer.   **Buyer** represents and warrants to **Sellers** the following:

(a)     Organization.   **Buyer** is a company, duly organized, validly existing and in good standing under the laws of [to be determined by Buyer].

(b)     Authority.   **Buyer** has all requisite power and authority to carry on its businesses as presently conducted.   Buyer has all necessary corporate power and authority to execute and deliver this Agreement and each of the other documents or instruments to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

(c)     No Conflicts.  The execution and delivery by Buyer of this Agreement and each of the other documents and instruments to which Buyer is a party, do not, and the performance by Buyer of its obligations under this Agreement and each of the other documents and instruments and the consummation of the transactions contemplated hereby and thereby do not and will not (with or without notice or lapse of time or both), (i) violate any provision of the charter documents of Buyer or any law or order applicable to Buyer or any of its assets and properties such as to prevent Buyer from consummating the transactions contemplated by this Agreement or (ii) conflict with or result in a violation or breach of, constitute a default under (with or without notice or lapse of time or both), require Buyer to obtain any approval of, make any filing with or give any notice to any person as a result or under the terms of, or result in or give to any person any right of termination, cancellation, acceleration or modification in or with respect to, any contract to which Buyer is a party or by which any of the assets and properties of

20

Buyer are bound that would prevent Buyer from consummating the transactions contemplated by this Agreement.

(d)     Execution.  The execution and delivery by Buyer of this Agreement and each of the other documents and instruments to which it is a party and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action by Buyer's board of directors, or manager(s), as the case may be, and no other action on the part of Buyer's board of directors is required to authorize the execution, delivery and performance of this Agreement or any of the other documents or instruments or the consummation by Buyer of the transactions contemplated hereby and thereby.

(e)     Binding Obligation.  This Agreement has been duly executed and delivered by or on behalf of **Buyer**; all documents and instruments required hereunder to be executed and delivered by **Buyer** herewith shall have been duly executed and delivered; and this Agreement does, and such documents and instruments shall, constitute legal, valid, and binding obligations of **Buyer** enforceable in accordance with their terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general equitable principles (whether considered in a proceeding at law or in equity)

(f)     Commissions.  **Buyer** has incurred no liability, contingent or otherwise, for Commissions relating to the Transaction contemplated by this Agreement for which **Sellers** shall have any responsibility whatsoever.  **Buyer** agrees to indemnify, defend (with counsel chosen by **Sellers)**, and hold **Sellers** harmless from, of, against, and with respect to any claims for Commissions made by persons or entities claiming under or through **Buyer.**

5.4     Further Representations and Assurances of Buyer.

(a)     Independent Examination.  **Buyer** acknowledges that its decision to purchase and acquire all of the Assets pursuant to this Agreement will be made based solely upon Sellers' representations and warranties made in this Agreement and Buyer's own Due Diligence examination and inspection of the Assets.  **Buyer** further acknowledges that it will rely solely and exclusively upon such representations and warranties and its Due Diligence to more fully investigate the advisability of the Transaction.

(b)     Risk.  **Buyer** is aware that its purchase of the Assets is speculative and subject to risk.  **Buyer** is capable of bearing the degree of economic risk including but not limited to the possibility of a complete loss of **Buyer's** investment.

(c)     Project Viability.  **Buyer** acknowledges that no certified or third party representation has been made by or on behalf of any of the **Sellers** to **Buyer** as to projected revenue, yield, quantity of resources, future sales or marketing conditions, valuation or appraisal value of the Real Property, or any other matters pertaining to the future viability of the Assets, the Project, or industry or market conditions.

# ARTICLE VI

## TERMINATION

6.1   <u>Termination</u>.  This Agreement shall be terminated and of no further force or effect in the event that the Closing does not occur on the Closing Date or it is terminated in accordance with Section 3.5 or 4.1 above; provided that, notwithstanding anything herein set forth to the contrary, the obligations of the Parties with respect to Confidential Information more particularly described herein shall survive any termination of this Agreement.

# ARTICLE VII

## NOTICES

7.1   <u>Notices</u>.  Any and all notices, elections and communications required or permitted by this Agreement shall be made or given in writing and shall be delivered (i) in person, (ii) sent next day delivery by a nationally recognized overnight courier such as FedEx or UPS, (iii) sent by facsimile or email, or (iv) sent by postage prepaid United States mail, certified or registered, return receipt requested, to the other **Parties** at the addresses set forth below, or such other address as may be furnished by notice in accordance with this section. The date of notice given by personal delivery shall be the date of such delivery. The effective date of notice by facsimile or email shall be the date of facsimile or email confirmation receipt and by mail shall be one (1) business day after the date such notice is deposited with a nationally recognized overnight courier or two business (2) days after the date such notice is deposited with the United States Postal Service.  Buyer agrees that if it gives or receives notice of any matter that is within the purview of the Observation Committee, then it shall deliver a copy of such notice to the Observation Committee promptly upon Buyer's receipt or delivery of the same.

If to **Sellers**:

> Korea Technology Industry America, Inc.
> 1245 East Brickyard Rd., Suite 110
> Salt Lake City, Utah 84106
> Attn:   Soung Joon Kim
> Fax:   801-466-4132
> Email: soungjoonkim@gmail.com
>
> Uintah Basin Resources, LLC
> 1245 East Brickyard Rd., Suite 110
> Salt Lake City, Utah 84106
> Attn:   Soung Joon Kim
> Fax:   801-466-4132
> Email: soungjoonkim@gmail.com
>
> Crown Asphalt Ridge, LLC

1245 East Brickyard Rd., Suite 110
Salt Lake City, Utah 84106
Attn:   Soung Joon Kim
Fax:    801-466-4132
Email: soungjoonkim@gmail.com

with a copy to:

Durham Jones & Pinegar
111 East Broadway, #900
Salt Lake City, Utah 84111
Attn:    Steven J, McCardell
and Kenneth L. Cannon II
Fax:    801-415-3500
Email:  smccardell@djplaw.com
       kcannon@djplaw.com

If to **Buyers**:

Rutter and Wilbanks Corporation
301 South Main Street, Suite A (Overnight delivery only)
P.O. Box 3186
Midland, Texas 79702
Attn:   A.W. Rutter, III
Fax:    432-683-1732
Email: grinndog@aol.com
       B3Rutter@gmail.com

with a copy to:

Miller Guymon, P.C.
165  Regent Street
Salt Lake City, Utah 84111
Attn:    Blake D. Miller
and Bill Gray
Fax:    801-363-5601
Email:  miller@millerguymon.com

## ARTICLE VIII

### INDEMNIFICATION

8.1     Survival.     The representations and warranties of **Sellers** contained herein shall
survive the Closing and shall remain in full force and effect until the date that is two years from
the Closing Date.   All covenants and agreements of **Sellers** contained herein shall survive the
Closing until the date that is two years from the Closing Date.   Notwithstanding the foregoing,

any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from **Buyer** to **Sellers** prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation, warranty, covenant or agreement and all such claims shall survive until finally resolved.

8.2     Indemnification by Seller.    Subject to the other terms and conditions of this Article VIII, **Seller** shall indemnify and defend **Buyer** and each of its affiliates, representatives, agents, officers, directors, managers and employees (collectively, the "Buyer Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all liabilities, claims, damages, losses, fees or penalties incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)   any material inaccuracy in or material breach of any of the representations or warranties of **Sellers** contained in this Agreement, or in any certificate, document or instrument delivered by or on behalf of Sellers pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date;

(b)     any material breach or non-fulfillment of any covenant, agreement or obligation to be performed by **Sellers** pursuant to this Agreement or any certificate, document or instrument delivered by or on behalf of **Sellers** pursuant to this Agreement; or

(c)   any material third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of **Sellers** conducted, existing or arising on or prior to the Closing Date and that are not  bound by an order of the Bankruptcy Court, including an order confirming a Plan of Reorganization.

8.3     Effect of Investigation.   The representations, warranties and covenants of **Sellers**', and **Buyer's** right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of **Buyer** (including any of its representatives, agents, attorneys, employees, or consultants) or by reason of the fact that **Buyer** or any of its representatives knew or should have known that any such representation or warranty is, was, or might be inaccurate or by reason of **Buyer's** waiver of any condition.

8.4     Remedies and Right to Off Set.   **Buyer** shall have all remedies available to it at law or in equity in the event of the breach by **Sellers** of any of their representations, warranties, or covenants.  In addition to all other remedies available to **Buyer**, **Buyer** may offset any losses sustained by it and arising out of or in connection with any **Seller's** material breach of any representation, warranty or covenant against amounts that **Buyer** owes to **KTIA** pursuant to the Mineral Royalty Conveyance.

## **ARTICLE IX**

## **MISCELLANEOUS**

24

9.1     Time is of the Essence.   **Sellers** and **Buyer** expressly agree that time is of the essence for each and every provision of this Agreement.

9.2     Fees and Taxes. Except as otherwise specifically provided, all fees, costs, expenses and taxes incurred by **Sellers** and **Buyer** in negotiating this Agreement or in conducting Due Diligence and consummating the Transaction contemplated by this Agreement shall be paid by the **Party** incurring the same, including without limitation, legal and accounting fees, costs and expenses.

9.3     Amendments.   This Agreement may not be amended except by a written instrument signed by each of the **Sellers** and by **Buyer** and approved by the **Bankruptcy Court**.

9.4     Preparation of Agreement.   **Sellers** and **Buyer** and their respective legal counsel participated in the preparation and review of this Agreement. In the event of any ambiguity in this Agreement, no presumption shall arise in favor of any **Party**.

9.5     Headings.   The headings of the articles, paragraphs and sections of this Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any of the terms or provisions of this Agreement.

9.6     Counterparts.   This Agreement may be executed by **Sellers** and **Buyer** in any number of counterparts, each of which and a facsimile or PDF copy thereof, shall be deemed an original instrument, but all of which together shall constitute but one and the same instrument.

9.7     Governing Law.   This Agreement and the transactions contemplated hereby shall be construed in accordance with, and governed by, the laws of Utah without giving effect to the conflicts of laws rules. Any disputes concerning this Agreement or its subject matter shall be adjudicated in the **Bankruptcy Court**.

9.8     Entire Agreement.   Unless otherwise expressly agreed or acknowledged in writing by the **Party** to be charged, this Agreement, including any Exhibits hereto, constitutes the entire understanding of the **Parties** with respect to the subject matter hereof, superseding all negotiations, prior discussions and prior agreements and understandings relating to such subject matter.

9.9     Parties in Interest.   This Agreement shall be binding upon, and shall inure to the benefit of, the **Parties** and their respective heirs, successors and assigns. This Agreement is not intended to, and shall not, confer any rights or remedies upon any person other than the **Parties** and their respective successors and permitted designees or assigns.

9.10    Remedies.   Each of the **Parties** hereby agrees that, in the event of a breach of this Agreement, the remedies at law available to the **Sellers** or **Buyers**, as applicable, may be inadequate.  In such event, the **Sellers** or **Buyers**, as applicable, shall have the right, in addition to all other rights and remedies, to specific performance and/or injunctive or other equitable relief (including rights of rescission) to enforce or prevent any violations by the other **Party** to this Agreement.

9.11    Disputes; Attorneys' Fees.   In any action arising out of this Agreement the prevailing **Party** shall be entitled to attorneys' fees and costs.  A **Party** shall be deemed the prevailing **Party** if the judgment is rendered in its favor or where the litigation is dismissed in its favor prior to or during the trial, unless the **Parties** otherwise agree in settlement or compromise.

9.12    Assignments.   This Agreement and the rights and obligations created hereunder may not be assigned by **Buyer** in whole or in part, without the prior written consent of **Sellers** and the **Bankruptcy Court**, which consent shall not be unreasonably withheld.  The **Parties** expressly acknowledge and agree that Rutter and Wilbanks Corporation may assign this Agreement and all of **Buyer's** rights and obligations hereunder to an entity formed by Rutter & Wilbanks and its investors and partners to consummate the Transaction.  Upon such assignment, Rutter and Wilbanks will have no liabilities, rights or obligations hereunder and Sellers shall look solely to such assignee for the performance of Buyer's obligations hereunder.  Upon such assignment, Buyer shall notify the Observation Committee and shall provide such committee with reasonable evidence of the assignment and the assignee's assumption of Buyer's obligations under this Agreement.

9.13    Severability.   If a court of competent jurisdiction makes the final determination that any term or provisions of this Agreement is invalid or unenforceable, all other terms and provisions shall remain in full force and effect and the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and comes closest to expressing the intention of the invalid term or provision.

9.14    Further Assurances.   As approved by the **Bankruptcy Court, Sellers** and **Buyer** shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, such documents, consents and instruments and take such other actions as may be necessary or advisable to confirm their respective obligations or rights under this Agreement and under any Exhibit, document, certificate or other instrument delivered pursuant hereto.

9.15    Press Release.   There shall be no press release or public communication concerning this Agreement or the Transaction by **Sellers** or **Buyer** or by any of their respective officers or representatives, except with the written consent of each **Party** not originating said release or communication, with the exception being those reports required by applicable state or federal laws or regulations or approved by the **Bankruptcy Court**.

[ The remainder of this page intentionally left blank ]

IN WITNESS WHEREOF, this Agreement has been executed effective as of the date first written above.

**SELLERS**

KOREA TECHNOLOGY INDUSTRY AMERICA, INC.

Dated: _____     By: _____
                                    Its:

UINTAH BASIN RESOURCES, LLC

Dated: _____     By: _____
                                    Its:

CROWN ASPHALT RIDGE, LLC

Dated: _____     By: _____
                                    Its:

**BUYER**

RUTTER AND WILBANKS CORPORATION

Dated: _____     By: _____
                                    Its:

## EXHIBIT "A"
to
### ASSET PURCHASE AGREEMENT

### PROPERTY AND ASSETS

### Part "I" – South A Tract

Township 4 South, Range 21 East, SLM

Section 30: W1/2SE1/4, SE1/4SE1/4; <u>less</u> that portion of the SE1/4SE1/4 of said Section 30, more particularly described as follows:

BEGINNING at a point which is on the East line of said Section 30, said point is North 02°2722" West along Section line 333.65 feet from the Southeast corner of said Section 30, thence along East line of said Section North 02°2722" West 50.00 feet; thence North 81°34'31" West 101.83 feet; thence South 02°27'22" East parallel with and 100.00 feet West of said East line for a distance of 68.73 feet; thence North 87°49'42" East 100.00 feet to the East line of said Section and point of beginning (containing 0.1363 acres, more or less).

TOGETHER with a 40' access right of way described as follows:

BEGINNING at a point which is on the East line of said Section 30, said point is North 02°27'22" West along Section line 383.65 feet from the Southeast corner of said Section 30, thence continuing along Section line North 02°27'22" West 40.73 feet; thence North 81°34'31" West 101.83 feet; thence South 02°27'22" East 40.73 feet to the Northwest corner of said property; thence along North line of said property South 81°34'31" East 101.83 feet to the point of beginning (containing 0.0952 acres, more or less).

Section 31: NE1/4NE1/4 (except coal), W1/2NE1/4, SE1/4NE1/4

Section 32: SW1/4

### Part "II" – D Tract

Township 4 South, Range 20 East, SLM

Section 23:      S1/2NE1/4, N1/2SE1/4
Section 24:      S1/2NW1/4, N1/2SW1/4

### Part "III" – Production Facility

The "modified hot water process" and related information, an exclusive license agreement covering the Asphalt Ridge Designated Tar Sands Area for Advanced Solvent Technology (Publication No. US-2009-0294332-A1, PCT Publication Number WO2009/147622), equipment, goods, and machinery located on the Property.

A complete list of all machinery, equipment, fixtures and personal property items owned by **Sellers** at the Production Facility and on the Property will be provided to **Buyer** during Due Diligence.

**EXHIBIT "B"**
to
ASSET PURCHASE AGREEMENT

**PRE-PETITION CLAIMS, DEBTS, TAXES, EXPENSES AND LITIGATION**

The claim amounts listed below represents total verified and expected amount as of September 30, 2011, and are inclusive of accrued interest, attorneys' fees, and all other claimed and approved fees. Except where contract default interest rates apply, interest calculation is applied only to secured creditors at the statutory interest rate of 10% from February 1, 2010 through December 1, 2010; thereafter interest is calculated at the same statutory interest rate of 10% for all secured creditors through September 30, 2011 except Raven Mining Company, LLC which rate is 18% from August 15, 2011.

| A. Trust Deeds | | Amounts Owed[1] |
|---|---|---|
| 1) | Western Energy Partners, LLC | $ 15,971,144 |
| 2) | Raven Mining Company, LLC | 2,527,703 |
| | Trust Deeds Sub-Total : | **$ 18,498,847** |

| B. Trade Debts | | |
|---|---|---|
| 1) | Elgin Services Company, Inc. | $ 8,237,431 |
| 2) | Christofferson Welding, Inc. | 880,889 |
| 3) | Gavilan Petroleum, LLC | 732,457 |
| 4) | B. H., Inc. | 633,832 |
| 5) | Rocky Mountain Fabrication, Inc. | 409,613 |
| 6) | WGC, LLC | 395,564 |
| 7) | Precision Systems Engineering, Inc. | 389,442 |
| 8) | Wollam Construction Company, Inc. | 251,054 |
| 9) | REDD Engineering & Construction, Inc. | 240,307 |
| 10) | Industrial Piping Products, Inc. | 218,259 |
| 11) | Power Service of Utah, Inc. | 210,006 |
| 12) | Lawrence K. Deppe, d/b/a Process Engineered Products | 186,515 |
| 13) | Mountain Insulation, Inc | 181,750 |
| 14) | WesTech Engineering, Inc. | 161,845 |
| 15) | Endress + Hauser, Inc. | 149,573 |
| 16) | Barclay Mechanical Services of Utah, Inc. | 133,150 |
| 17) | Jam Industrial, Inc. | 115,080 |
| 18) | GEA Westfalia Separator, Inc. | 102,694 |
| 19) | Kwak, Jae-Yong | 100,000 |
| 20) | Komax Systems, Inc. | 98,421 |
| 21) | Red Valve Company, Inc. | 80,757 |
| 22) | Ernst & Young, LLP | 73,966 |
| 23) | Petrochem Insulation, Inc. | 68,409 |
| 24) | CBIZ Accounting Tax & Advisory Services, LLC | 58,175 |
| 25) | Process Engineers and Equipment Corporation | 55,535 |
| 26) | Hychem, Inc | 53,071 |

UNDER SIGNED

| 27) | Harper Engineering, Inc. | 51,583 |
| 28) | Nuquest | 49,506 |
| 29) | Selway Corporation | 48,835 |
| 30) | Tech Flow, LLC | 45,697 |
| 31) | Rust Automation & Controls Inc | 42,870 |
| 32) | P&H Mining Equipment, Inc. d/b/a P&H Minepro Services | 35,873 |
| 33) | Kim, Ju-Hee (c/o Yeoup Ryu) | 35,000 |
| 34) | J. M. Canty c/o Latech Equipment, Inc. | 34,413 |
| 35) | Rocky Mountain Power, a division of PacifiCorp | 32,986 |
| 36) | Amezquita, Juan | 32,651 |
| 37) | C.H.Spencer And Company | 32,508 |
| 38) | Casadei, Diego | 31,818 |
| 39) | Perez, Nicholas | 30,750 |
| 40) | D. J. Kim c/o Korea Technology Industry Phils, Inc. | 30,000 |
| 41) | Zimmerman Engineering Company, Inc. | 29,930 |
| 42) | Lewis-Goetz and Company, Inc. | 27,793 |
| 43) | Howcroft Field Services, Inc. | 26,923 |
| 44) | HICO, LLC | 25,903 |
| 45) | Rock Law Office, P.C. | 25,629 |
| 46) | Airgas Intermountain, Inc. | 25,608 |
| 47) | Contreras, Juan J. | 25,119 |
| 48) | Siemens Industry, Inc. | 23,163 |
| 49) | McJunkin Red Man Corporation | 21,832 |
| 50) | Haynie & Company | 19,901 |
| 51) | Zions Bank | 19,023 |
| 52) | Expro Meters, Inc. d/b/a Cidra Corporation | 17,399 |
| 53) | Hayward Gordon Limited | 16,391 |
| 54) | Ricardo C. Mendoza d/b/a RMC Welding | 15,882 |
| 55) | Shin, Bae-Gyun | 15,000 |
| 56) | PPI, Inc. | 14,312 |
| 57) | AAA Manufacturing, Inc. | 12,876 |
| 58) | CiDRA Oilsands, Inc | 12,249 |
| 59) | PCE Pacific, Inc. | 11,935 |
| 60) | Hanks, Shaun | 10,752 |
| 61) | Long Building Technologies, Inc. | 10,496 |
| 62) | Questar Gas Company | 10,495 |
| 63) | WestRoc Trucking, Inc. | 9,527 |
| 64) | Ronan Engineering Company c/o Disco Associates, Inc. | 9,103 |
| 65) | Basin Rentals, Inc. | 9,077 |
| 66) | J-Bar LLC | 8,713 |
| 67) | Crozier Oilfield Services, Inc | 8,408 |
| 68) | United Health Care | 8,329 |
| 69) | Williams Scotsman, Inc. | 8,132 |
| 70) | Codale Eletric Supply, Inc. | 8,104 |
| 71) | The Protectoseal Company | 7,969 |

ORDER SIGNED

| | | |
|---|---|---|
| 72) | Q.C. Testing, Inc. | 7,791 |
| 73) | EML Manufacturing, LLC | 7,184 |
| 74) | W.S. Tyler Canada Ltd. | 6,999 |
| 75) | Midwest Hose & Specialty, Inc. | 6,819 |
| 76) | Catey Controls, Inc. | 6,594 |
| 77) | Construction Plus, Inc. | 5,931 |
| 78) | Industrial & Metallurgical Solutions, Inc. | 5,858 |
| 79) | Advanced Fluid Solutions | 5,376 |
| 80) | North-Monsen Company | 4,910 |
| 81) | GB Collects, LLC | 4,646 |
| 82) | Mcintosh Communications, LLC | 4,612 |
| 83) | G&H Garbage Service, Inc. | 4,610 |
| 84) | Utah Inspection, LLC | 4,609 |
| 85) | JMC Instruments and Controls, LLC | 3,711 |
| 86) | Cardwell Distributing, Inc. Dba Hutchinson Oil | 3,614 |
| 87) | Industrial Repair Service, Inc. | 3,514 |
| 88) | Kent Biesinger Construction | 3,300 |
| 89) | Fastenal Company | 3,171 |
| 90) | Wells Fargo Equipment Finance, Inc. | 2,927 |
| 91) | Waste & Water Logistics, LLC | 2,881 |
| 92) | Geotechnical Design Systems, Inc. | 2,800 |
| 93) | Clayburn, Travis | 2,727 |
| 94) | Ashley Valley Water & Sewer Improvement District | 2,461 |
| 95) | Express Recovery Services, Inc. | 2,450 |
| 96) | Varec, Inc. c/o Current Systems Integration, LLC | 2,358 |
| 97) | Alsco, Inc. | 2,322 |
| 98) | Lear & Lear, LLP | 2,166 |
| 99) | Strata Netoworks | 2,164 |
| 100) | Continental Crushing & Conveying, Inc. | 2,139 |
| 101) | Hazen Research, Inc | 2,100 |
| 102) | GEA PHE Systems North America, Inc. | 1,902 |
| 103) | Western Petroleum, Inc. | 1,819 |
| 104) | Protection Consultants, Inc. | 1,801 |
| 105) | Aramark Uniform Services, LLC | 1,575 |
| 106) | Integra Telecom, Inc. | 1,530 |
| 107) | Conveyor Components Co. c/o Conveyors Equipment, Inc. | 1,520 |
| 108) | Searl Gas Co Inc d/b/a Sav On Propane | 1,198 |
| 109) | CEI Enterprises, Inc | 1,050 |
| 110) | Disco Associates, Inc. | 1,035 |
| 111) | Delta Dental of California | 1,029 |
| 112) | Codale Electric Supply, Inc. | 1,006 |
| 113) | Folsom Associates | 994 |
| 114) | Action Hot Oil Service, Inc | 928 |
| 115) | Davis Repair | 882 |
| 116) | Tu and Frum, Inc. | 625 |

| | | |
|---|---|---:|
| 117) | Industrial Solutions,Inc. | 601 |
| 118) | AT&T | 527 |
| 119) | Holme Roberts & Owen LLP | 511 |
| 120) | Burdick Materials | 479 |
| 121) | Stampede Construction, Inc. | 400 |
| 122) | WestRoc Oilfield Service, Inc | 204 |
| 123) | National Benefit Services, LLC | 200 |
| 124) | Alltell Communications, LLC | 181 |
| 125) | Mobile Mini,Inc. | 146 |
| 126) | Orkin, Inc. | 144 |

Trade Debts Sub-Total:   **$ 15,393,289**

C. Other Debts and Liabilities

| | | |
|---|---|---:|
| 1) | Property Tax – Uintah County Treasurer | 101,752 |
| 2) | Labor Claims and Unpaid Wages | 490,180 |

Other Debts and Liabilities Sub-Total:   **$ 591,932**

GRAND TOTAL:   **$ 34,484,068**

In addition to the pre-petition claims, administrative expenses of the Sellers' bankruptcy cases will be incurred, including, without limitation: (i) operating expenses; (ii) allowed professional fees and costs; (iii) allowed fees and expenses of any appointed examiner; (iv) allowed costs of any official committee of creditors appointed by the United States Trustee; (v) fees payable to the Clerk of the Bankruptcy Court; (vi) quarterly expenses owed to the Office of the United States Trustee; and (vii) allowed administrative expenses for approved DIP loans, adequate protection amounts, or other allowed administrative expenses.

D. Litigation

1) Industrial Piping Products, Inc. v. Korea Technology America, Inc.; Crown Asphalt Ridge, LLC; and Uintah Basin Resources, LLC, Civil No. 100500320

2) Christofferson Welding, Inc. v. Korea Technology Industry America, Inc.; Crown Asphalt Ridge, LLC; Uintah Basin Resources, LLC; and Roberts & Schaefer Company; (3rd party defendants: Western Energy Partners; Raven Mining Company; Oilsand Technology Industry, et al.), Civil No. 100800360

3) Westech Engineering, Inc. v. Crown Asphalt Ridge, LLC; Uintah Basin Resources, LLC; Korea Technology Industry Co. Ltd.; Korea Technology Industry America, Inc.; Western Energy Partners, LLC; and John Does, Civil No. 100800520

4) Rocky Mountain Fabrication, Inc. v. Christofferson Welding; Crown Asphalt Ridge, LLC; Uintah Basin Resource, LLC; Roberts & Schaefer Company; WGC LLC; and Korea Technology Industry America, Inc., Civil No. 100800584

5) Lawrence K. Deppe dba Process Engineered Products v. Roberts & Schaefer Company; Crown Asphalt Ridge, LLC; Uintah Basin Resources, LLC; Korea Technology

Industry America, Inc.; Buenaventura Resources Corporation; and John Does 1-50, Civil No. 100800931

6)    B H, Inc. v. Roberts & Schaefer; Crown Asphalt Ridge, LLC; Uintah Basin Resources, LLC; Korea Technology Industry Co.; Korea Technology Industry America, Inc.; WEMBCO, Inc.; and Western Energy Partners, LLC, Civil No. 100801151

7)    Gavilan Petroleum, LLC v. Crown Asphalt Ridge, LLC, Civil No. 100919639

8)    Mountain Insulation, Inc. v. Korea Technology Industry America, Inc.; Crown Asphalt Ridge, LLC; and Uintah Basin Resources, LLC, Civil No. 100801328

9)    JAM Industrial, Inc. v. Crown Asphalt Ridge, LLC.; Korea Technology Industry America, Inc.; Uintah Basin Resources, LLC; Western Energy Partners, LLC; and Brent A. Andrewsen, Civil No. 100801433

10)    Express Recovery Services v. Crown Asphalt Ridge, LLC, Civil No. 100423455CV

11)    Red Valve Company, Inc. v. Crown Asphalt Ridge, LLC, Civil No. 100425562

12)    Stephen W. Rupp, Trustee v. Korea Technology Industry America, Inc. (In re: Daniel Evans Schwendiman), Adv. Pro. No. 10-03001 RKM (BR Case No. 10-30897 RKM)

13)    REDD Engineering & Construction, Inc. v. Korea Technology Industry America, Inc.; Crown Asphalt Ridge, LLC; Uintah Basin Resources, LLC; and John Does 1-20, Civil No. 100801300

14)    Precision Systems Engineering v. Uintah Basin Resources, LLC, Civil No. 100800987

15)    Western Energy Partners, LLC v. Uintah Basin Resources, LLC; Crown Asphalt Ridge, LLC, et al., Civil No. 110800149

E.   Administrative Actions (Labor Commission)

1)    Shannon D. Johnson v. Crown Asphalt Ridge, LLC, et al., Claim No. 10-01708

2)    Billy G. Wardle v. Crown Asphalt Ridge, LLC, et al., Claim No. 10-01845

3)    Michael A. Banks v. Crown Asphalt Ridge, LLC, et al., Claim No. 10-01933

4)    Matthew L. Miller v. Crown Asphalt Ridge, LLC, et al., Claim No. 10-01934

5)    Michael E. Dofelmire v. Crown Asphalt Ridge, LLC, et al., Claim No. 10-01939

6)    Clark F. Miller v. Crown Asphalt Ridge, LLC, et al., Claim No. 10-01961

7)    Nathan A. Davis v. Crown Asphalt Ridge, LLC, et al., Claim No. 10-01963

F.   Others

1)    2010 income tax returns for KTIA, UBR and CAR have not been filed but have been extended to September 15, 2011; however, no taxes are owed.

[1]  Represents total verified and expected amount as of September 30, 2011, and is inclusive of accrued interest, attorneys' fees, and all other claimed and approved fees. Except where contract default interest rates apply, interest calculation is applied only to secured creditors at the statutory interest rate of 10% from February 1, 2010 through December 1, 2010; thereafter interest is calculated at the same statutory interest rate of 10% for all secured creditors through September 30, 2011 except Raven Mining Company, LLC which rate is 18% from August 15, 2011.



**EXHIBIT "C"**

to

ASSET PURCHASE AGREEMENT


**PERMITTED ENCUMBRANCES**


1. Mineral Royalty Conveyance for a 30 year term from Wembco, Inc. to Lorin N. Pace, G. Randal Climt, William B. Parsons, III, and Eric W. Bjorklund covering all of the Real Property, dated August 12, 1986 and recorded December 9, 1986 in Book 420, Page 185, Uintah County Records.

2. Mineral Royalty Conveyance (perpetual) from Wembco, Inc. to William Seltzer covering all of the Real Property, dated August 12, 1098 and recorded August 13, 1986 in Book 412, Page 857, Uintah County Records.

3. Tax Deed from Uintah County to Pope Development Company reserving the right to mine tar sands in the S1/2 SE1/4 of Section 30, Township 4 South, Range 21 East, SLM, dated July 18, 1945 and recorded February 7, 1946 in Book 35, Page 285, Uintah County Records.

4. Quit Claim Deed from Vernal City to Pope Development Company reserving the right to mine tar sands in the NE1/4 NE1/4 of Section 31, Township 4 South, Rage 21 East, SLM, dated October 5, 1942 and recorded November 23, 1942 in Book 33, Page 320, Uintah County Records.

5. Oil, Gas and Minerals Lease from Wembco, Inc., Lessor, to Crown Asphalt Ridge, LLC Lessee dated effective May 1, 2008 and recorded as entry number 2008004641 in Book 1090, at Page 166, Uintah County Records; Amendment and Ratification of Oil, Gas and Minerals Lease dated effective May 1, 2011 and recorded as entry number 2011003533 in Book 1233, at Page 111, Uintah County Records.

6. All easements, rights-of-way, servitudes, permits, telephone lines, power lines and other easements and rights-of-way, on, over, or in respect to the Real Property or other Assets, and any other encumbrances as set forth in title documentation provided to Buyer.

7. Rights reserved to or vested in any municipality, governmental, statutory, or public authority to control or regulate the Real Property or other Assets in any manner, and all applicable laws, rules, and orders of governmental authorities.

EXHIBIT "D"

to

ASSET PURCHASE AGREEMENT

## DRY FROTH CIRCUIT AND PRODUCTION PROGRAM

### Part "I". Dry Froth Plant Description

The dry froth process at the Asphalt Ridge facility is currently designed to produce 800 barrel per day of natural polymer asphalt ("dry froth") suitable for road paving and maintenance from naturally occurring oil sands (or "tar sands") to be mined from the Real Property. Oil sand ore is typically constituted of 8 – 12% natural asphalt oil (bitumen), 2 – 5% water, and the remainder sand and clays. The dry froth product is constituted of approximately 80% bitumen and 20% clay.

In the process, oil sand ore is delivered from the mine to a crushing and screening process to provide ore that is less than ¾ inch in size. The sized ore is then blended with hot water and steam in agitating vessels to produce a sand and water mixture at 175°F. The agitated mixture is then placed in a separation vessel where the oil floats and the sand sinks. Floated oil is skimmed as an intermediate product referred to as "froth" which is typically constituted of 60% bitumen, 25% water, and 15% clay. Froth is further processed to remove the water by boiling it away. Once the water has been removed, the resulting material is "dry froth" which is then loaded into trucks for sale.

Sand from the separation vessel is dewatered and returned to the mine as dry backfill material. A water and clay mixture is removed from the middle section of the separation vessel (referred as "middlings"). Unfloated oil is separated from the middlings and then clay is separated and concentrated. The concentrated clay is combined with the dry backfill sand. The cleaned water is heated and recycled to the front end of the process to produce more hot sand and water mixture.

The major equipment required for this process are:
- Crusher and Screen
- Blade Mill
- Sand Heater
- Extraction Tank(s)
- Primary Separation Tank
- Flotation Cells
- Secondary Separation Tank
- Thickener
- Clarifier
- Water Centrifuges
- Sand Classifier(s)
- Recycle Water Tank
- Heat Exchangers
- Steam Boiler

1

- Froth Tank(s)
- Froth Evaporator and Expansion Module
- Dry Froth Tank(s)

## Part "II".  Dry Froth Production Schedule & Action Items

Weeks 1 through 6: Mobilization and Engineering Update
- Select process team, contractor(s) and site personnel
- Inspect plant and equipment and update engineering designs
- Identify status of key procurement items and purchase order requirements
- Develop capital cost estimate and confirm budget

Estimated Budget (Weeks 1-6):  **$ 106,250**

Weeks 7 through 9: Procurement
- Develop detailed execution plan and begin placing purchase orders for key equipment, materials and services

Estimated Budget (Weeks 7-9):  **$ 893,750**

Weeks 10 through 19: Construction and Pre-Commissioning
- Install secondary separation tank
- Install water centrifuges
- Install nitrogen generator
- Fabricate and install evaporator heat exchanger
- Fabricate and install expansion module for evaporation circuit
- Relocate refinery heat exchanger and re-install for water treatment process
- Perform piping construction, electrical construction and instrumentation (90% completion target)
- Install electrical heat tracing and insulation
- Perform programming (PLC) for process automation
- Perform pre-commissioning activities

Estimated Budget (Weeks 10-19):  **$ 2,381,250**

Weeks 20 through 24: Commissioning and Wet Froth Production
- Complete construction activities in all areas
- Commence mechanical commissioning and water commissioning
- Complete PLC programming (through end of commissioning and production)
- Produce wet froth and verify plant throughput capacity and stability
- Introduce wet froth to evaporator process

Estimated Budget (Weeks 20-24):  **$ 943,750**

2

Weeks 25 through 28: Dry Froth Production
- Produce dry froth and test product specifications
- Test dry froth production ramp-up capabilities and perform marketing activities

Estimated Budget (Weeks 25-28)**: $ 681,250**

### Part "III".  Dry Froth Budget (CAPEX)

Engineering
- Process Engineering                                       $ 150,000
- Process Engineering Support                                 150,000
- Detailed Engineering and Project Management Support         150,000
- Field Mechanical/Electrical Engineering                     100,000
- Programming                                                  15,000

Materials / Equipment Procurement
- Evaporator Heat Exchanger                                 $ 220,000
- Evaporator Expansion Module                                 150,000
- Hot Oil Boiler – 5 MMBTU (Additional)                       100,000
- Piping Materials                                            400,000
- Electrical Heat Tracing & Insulation                        300,000
- Mechanical Maintenance                                       35,000
- Consumables (welding, etc.)                                 160,000

Construction and Commissioning
- Evaporator Heat Exchanger Installation                   $   10,000
- Evaporator Expansion Module Installation                     50,000
- Hot Oil (Additional) Boiler Installation                      5,000
- Secondary Separation Tank Installation                       35,000
- Water Centrifuge Installation                                15,000
- Water Treatment Heat Exchanger Installation                  15,000
- Piping Construction                                         350,000
- Electrical and Instrumentation                             650,000
- PLC Programming (Control Room)                             200,000
- Commissioning Staff & Personnel                            250,000
- Mining, Ore Preparation & Handling                         120,000
- Utilities                                                  200,000
- Environmental Compliance                                    25,000

|  |  |
|---|---|
| TOTAL: | $ 4,005,000 |
| Contingency @ 25%: | 1,001,250 |
| TOTAL w/ Contingency: | **$ 5,006,250** |

3



EXHIBIT "E"
to
ASSET PURCHASE AGREEMENT


## MINERAL ROYALTY CONVEYANCE


Rutter and Wilbanks Corporation [or its Assignee], a corporation organized and existing under the laws of _____, with its principal office at _____, **Grantor**, effective _____, 2012, hereby assigns and conveys to Korea Technology Industry America, Inc., a corporation organized and existing under the laws of the State of Delaware, with its principal office at 1245 East Brickyard Tower, Suite 110, Salt Lake City, Utah 84106, as agent for itself, Uintah Basin Resources, LLC ("UBR"), Crown Asphalt Ridge, L.L.C. ("CAR"), and holders of claims (including administrative expenses) against these entities, or to a representative thereof appointed for such entities, each under a plan of reorganization confirmed under chapter 11 of title 11 of the United States Code to be filed by KTIA, UBR, and CAR, **Grantee**, for the sum of TEN DOLLARS ($10.00) and other good and valuable consideration, the following described royalty interest covering certain lands in Uintah County, State of Utah.

A mineral royalty interest which shall be (a) Fifty Six percent (56%) until April __, 2016, and (b) thereafter Eighty Five percent (85%), of any land owner's royalty under all mineral leases now in existence or hereafter granted by said **Grantors**, or their successors and assigns, covering the following described lands, or any part thereof:

Township 4 South, Range 21 East, SLM

Section 30: W1/2SE1/4, SE1/4SE1/4; less that portion of the SE1/4SE1/4 of said Section 30, more particularly described as follows:

BEGINNING at a point which is on the East line of said Section 30, said point is North 02°2722" West along Section line 333.65 feet from the Southeast corner of said Section 30, thence along East line of said Section North 02°2722" West 50.00 feet; thence North 81°34'31" West 101.83 feet; thence South 02°27'22" East parallel with and 100.00 feet West of said East line for a distance of 68.73 feet; thence North 87°49'42" East 100.00 feet to the East line of said Section and point of beginning (containing 0.1363 acres, more or less).

TOGETHER with a 40' access right of way described as follows:

1

BEGINNING at a point which is on the East line of said Section 30, said point is North 02°27'22" West along Section line 383.65 feet from the Southeast corner of said Section 30, thence continuing along Section line North 02°27'22" West 40.73 feet; thence North 81°34'31" West 101.83 feet; thence South 02°27'22" East 40.73 feet to the Northwest corner of said property; thence along North line of said property South 81°34'31" East 101.83 feet to the point of beginning (containing 0.0952 acres, more or less).

Section 31: NE1/4NE1/4 (except coal), W1/2NE1/4, SE1/4NE1/4
Section 32: SW1/4

Township 4 South, Range 20 East, SLM

Section 23:     S1/2NE1/4, N1/2SE1/4
Section 24:     S1/2NW1/4, N1/2SW1/4

**Grantor** expressly reserves and excepts the executive right to lease any of the above described lands; provided that any such leases shall be negotiated at arm's length and shall fully protect the royalty interest hereby created. **Grantors** acknowledge that they owe a duty of good faith and fair dealing in respect of the same. In the event that **Grantor** shall not lease all or any portion of such lands but shall exploit the same, the royalties payable hereunder to **Grantee** shall be calculated as if **Grantor** had entered into a lease as provided above but which royalty provision and rate shall not result in a royalty payable to **Grantee** which would be more or less than that set forth in the Oil, Gas and Minerals Lease identified in the following sentence. By accepting this conveyance, **Grantee** hereby acknowledges its satisfaction and approval of the royalty provisions contained in that certain Oil, Gas and Minerals Lease dated effective May 1, 2008 and recorded as entry number 2006004641 in Book 1092, at Page 166 with the Uintah County Recorder's office. **Grantor's** obligations to pay the royalty to **Grantee** hereunder are subject to **Grantor's** right of offset under Section 2.2(c) of the Asset Purchase Agreement dated November __, 2011 between, among others, **Grantor** and **Grantee** (the "APA"), pursuant to which **Grantor** shall offset payments due to **Grantee** hereunder against payment of the Purchase Price Difference (as such term is defined in the APA) and interest accrued on the Purchase Price Difference at the rate of ten percent (10%) per year. Any amounts that are offset by **Grantor** pursuant to this paragraph shall be applied first to accrued and unpaid interest on the Purchase Price Difference and then to the principal balance of the Purchase Price Difference. Until such Purchase Price Difference, and accrued interest, is paid in full, **Grantor** shall not have any obligation to pay **Grantee** any amounts owing under this Mineral Royalty Conveyance.

The above royalty shall apply to all minerals of every kind and character, including oil, gas, asphalt, bitumen or any other hydrocarbon substance and metalliferous and precious metal minerals as well as nonmetalliferous minerals of all kinds which are or may be included in any lease and which may occur on the surface of said lands or at any depth under said lands.

It is the intent of the parties hereto that the conveyance hereby made shall be in perpetuity.

All lessees of leases to which this royalty attaches are hereby instructed to pay said royalties herein assigned and conveyed directly to the named **Grantee**.

This conveyance shall be binding upon and shall inure to the benefit of the parties hereto and their heirs, successors and assigns.

The officer who signs this conveyance hereby certifies that this conveyance and the transfer represented hereby was duly authorized and approved by **Grantor**.

Dated this _____ day of _____, 2012.

RUTTER AND WILBANKS CORPORATION

By: _____
Name:
Its:

STATE OF _____)
                       : ss.
COUNTY OF _____)

The foregoing instrument was acknowledged before me this _____ day of _____, 2012, by _____, the _____ of Rutter and Wilbanks Corporation, a _____ corporation, who acknowledged to me that said _____ corporation executed the same.

_____
Notary Public

3



**EXHIBIT "G"**

to

ASSET PURCHASE AGREEMENT

## DEBTOR IN POSSESSION WARRANTY DEED

Uintah Basin Resources, LLC, Grantor, of _____ (address), hereby conveys and warrants to Rutter and Wilbanks Corporation [or its assignee], Grantee, of_____, for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency is hereby acknowledged, the following described tracts of land in Uintah County, Utah, to wit:

(See Exhibit "A" attached hereto by this reference incorporated herein.)

together with all appurtenances, rights, and privileges belonging to the Property. The Special Warranty Deed is made pursuant to Utah Code, Section 57-1-12.5.

Dated effective _____ day of _____ 2012.


(Signature Line of Grantor)

State of Utah              )

              :ss

County of Salt Lake    )

The foregoing Special Warranty Deed was acknowledged before me on this _____ day of _____ 2012 by _____ as the Manager of _____.


(Seal)

_____

Title:_____ _____

My commission expires: _____

1

**EXHIBIT "H"**
to
ASSET PURCHASE AGREEMENT

**LEASE ASSIGNMENT**

**Assignment of Oil, Gas and Minerals Lease**


Crown Asphalt  Ridge, LLC of 1245 East Brickyard Road, Brickyard Tower, Suite 110, Salt Lake City, Utah 84106, hereinafter called Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby assign, transfer, sell and convey unto Rutter and Wilbanks Corporation located at _____, hereinafter called Assignee, all of its right, title and interest in and to the Oil, Gas and Minerals Lease dated effected May 1, 2008 and recorded as entry number 2008004641 in Book 1090, at Page 166 with the Uintah County Recorder's office and the Amendment and Ratification of Oil, Gas and Minerals Lease dated effective May 1, 2011 and recorded as entry number 2011003533 in Book 1233, at Page 111 with the Uintah County Recorder's office covering the following described land, to wit:


(See Exhibit "A" attached hereto by this reference incorporated herein.)

together with all of Assignor's rights incident thereto, and personal property thereon, appurtenant thereto, or used or obtained in connection therewith.


For the same consideration, the Assignor covenants with the Assignee, its heirs, successors, legal representatives and assigns that the Assignor is the lawful owner of and has good title to the interest herein assigned in and to said Lease, estate, rights and property, free and clear from any liens, encumbrances or adverse claims created by Assignor and has good right and authority to sell and convey the same, that said Lease is a valid and subsisting Lease on the lands above-described, and that all rentals and royalties due thereunder have been paid, and all conditions necessary to keep said Lease in full force and effect have been duly performed.


Dated this _____ day of _____ 2012.


CROWN ASPHALT RIDGE, LLC


_____
By: Soung Joon Kim
    Chief Operating Officer of
    Utah Hydrocarbon, Inc, Manager

1

State of _____ )
                                 ) ss.
County of _____ )

        The foregoing instrument was acknowledged before me on this ___ day of _____ 2011, by _____ as _____ of _____.

(Seal)                                    _____
                                          Title: _____

                     My commission expires: _____

ORDER SIGNED

**EXHIBIT "I"**
to
ASSET PURCHASE AGREEMENT

**ASSIGNMENT, BILL OF SALE AND CONVEYANCE**

This Assignment, Bill of Sale and Conveyance ("Conveyance") dated effective_____, 2012 is by and between Korea Technology Industry America, Inc., 1245 East Brickyard Road, Brickyard Tower, Suite 110, Salt Lake City, Utah 84106 ("**KTIA**"), Uintah Basin Resources, LLC, 1245 East Brickyard Road, Brickyard Tower, Suite 110, Salt Lake City, Utah 84106 ("**UBR**"), and Crown Asphalt Ridge, LLC, 1245 East Brickyard Road, Brickyard Tower, Suite 110, Salt Lake City, Utah 84106 ("**CAR**"), herein referred to as "**Grantors**", and Rutter and Wilbanks Corporation, P.O. Box 3186, Midland Texas 79702, hereinafter referred to as "**Grantee**", with **Grantors** and **Grantee** hereinafter sometimes being referred to jointly as "**Parties**".

WITNESSETH:

WHEREAS, **Grantors** are the owners of the Property and Assets listed on Exhibit "A" attached herein and made a part hereof ("Property").

WHEREAS, **Grantors** have agreed to assign, transfer and convey to **Grantee**, all of their right, title and interest in the Property to **Grantee** as set forth herein.

CONVEYANCE:

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration received, the sufficiency of which is hereby acknowledged for all purposes, **Grantors** do hereby bargain, sell, transfer, assign and convey all of their right, title and interest in the Property to **Grantee**.

**Grantors** make a special warranty of title only to **Grantee** as to matters by, through and under **Grantors** but not otherwise.

THIS ASSIGNMENT IS BEING MADE WITHOUT WARRANTY OF ANY KIND, EXPRESS, IMPLIED IN FACT OR AT LAW, WHETHER OF TITLE OR REGULATORY OR OTHERWISE EXCEPT FOR A SPECIAL WARRANTY OF TITLE.   **GRANTORS** EXPRESSLY DISCLAIM ALL OTHER EXPRESS OR IMPLIED WARRANTIES.

**GRANTORS** EXPRESSLY DISCLAIM AND NEGATE ANY WARRANTY AS TO THE CONDITION OF ANY PERSONAL PROPERTY, EQUIPMENT, FIXTURES AND ITEMS OF MOVABLE PROPERTY COMPRISING ANY PART OF THE ASSETS, IT BEING EXPRESSLY UNDERSTOOD THAT SAID PERSONAL PROPERTY, FIXTURES, EQUIPMENT AND ITEMS ARE BEING CONVEYED TO **GRANTEE** "AS IS" AND "WHERE IS" AND WITHOUT WARRANTY OF MERCHANTABILITY, OPERATING CONDITION, SAFETY, CONDITION OR FITNESS FOR A PARTICULAR PURPOSE,

1

COMPLIANCE WITH GOVERNMENTAL REGULATIONS, ENVIRONMENTAL, OR OTHER CONDITION OR OTHERWISE, EITHER EXPRESS OR IMPLIED. [Same as prior point]

This Conveyance is made subject to the terms and conditions of the following:

(a) Oil, Gas and Minerals Lease granted by Wembco, Inc., now known as Uintah Basin Resources, LLC, dated effective May 1, 2008 and recorded as entry number 2008004641 in Book 1090, at Page 166 with the Uintah County Recorder's office and the Amendment and Ratification of Oil, Gas and Minerals Lease dated effective May 1, 2011 and recorded as entry number 2011003533 in Book 1233, at Page 111 with the Uintah County Recorder's office covering the Property (the "Lease");

(b) All regulatory permits and conditions pertaining to oil sands operations on the Property;

(c) Permitted Encumbrances identified in Exhibit "B" attached hereto and made a part hereof.

This Conveyance shall be binding upon, and shall inure to the benefit of, **Grantors** and **Grantee** and their respective successors and assigns.

This Conveyance may be executed in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, this Assignment, Bill of Sale and Conveyance is executed on the respective dates indicated in the acknowledgments set forth below, but shall be effective as between the **Parties** for all purposes as of 12:01 A.M. Mountain Time on _____, 2011 (the "Effective Date").

**"GRANTORS"**

KOREA TECHNOLOGY INDUSTRY AMERICA, INC.

_____

By:
Its:

2

UINTAH BASIN RESOURCES, LLC

_____

By:

Its:


CROWN ASPHALT RIDGE, LLC


_____

By:

Its:


**"GRANTEE"**

RUTTER AND WILBANKS CORPORATION

_____

By:

Its:


State of _____ )

                               ) ss.

County of _____ )


       The foregoing instrument was acknowledged before me on this ___ day of _____ 2011, by _____ as _____ of _____.


(Seal, if any)                                        _____

                                         Title _____

                                         My commission expires: _____

**EXHIBIT "J"**
to
ASSET PURCHASE AGREEMENT

**LICENSES AND PERMITS**

1. License
   a. <u>Business License</u>.        Crown Asphalt Ridge, LLC obtained its business license as an operating company from Uintah County, UT, which has been annually renewed.  The most recent license was acquired as of February 16, 2011, effective from January 1, 2011.  License NO. 2011482
   b. <u>Technology License</u>.  Korea Technology Industry America, Inc. and Crown Asphalt Ridge, LLC ("CAR") executed exclusive technology license agreement as of July 1, 2010.  This license allows CAR to use U.S. Patent Application No. 12/476,729, 'System for Separating Bitumen From Oil Sands,' in the entire Asphalt Ridge Designated Tar Sand Area, Uintah County, Utah, as established by the Department of Interior, Bureau of Land Management.

2. Permits
   a. <u>Air Permits</u>
      i. Administrative Amendment for Approval Order DAQE-AN0117160001-08 for Name and Contact Information Update, and Production and Equipment Corrections, DAQE-AN0117160001-08)
      ii. Experimental Approval Order, DAQE-AN0117160003-09
      iii. Fugitive Dust Control Plan

   b. <u>Water Permits</u>
      i. Pilot Plant for Tar Sands Bitumen Extraction Asphalt Ridge Mine, Uintah County, Utah Ground Water Discharge Permit-By-Rule, effective from May27, 2008.
      ii. Storm Water Pollution Prevention Plan, prepared by JBR Environmental Consultants, Inc, and effective from April 15, 2009.
      iii. Utah Pollutant Discharge Elimination system (UPDES) Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, Coverage No. UTR000861, effective from February 10, 2010.

   c. <u>Large Mining Operation Permit</u>
      i. Posting of Reclamation Surety and Final Approval, Crown Asphalt Corporation (Crown), Asphalt Tar Sands Mine, M/047/032, Uintah County, Utah, effective from November 10, 1998.

   d. <u>Conditional Use Permit</u>
      i. Initial conditional use permit was approved on April 4, 2008 from Uintah County Commissioner.
      ii. Expanded operation scope was additionally approved on April 1, 2009 from the said authority.

**EXHIBIT "K"**
to
ASSET PURCHASE AGREEMENT

**INSURANCE**

| Coverage | Company | Policy Number | Effective Date |
|---|---|---|---|
| General Liability | USF Insurance Association International | CIP105294 | 01/19/2011 to 01/19/2012 |
| General Liability Umbrella | USF Insurance Association International | CIP105294 | 01/19/2011 to 01/19/2012 |

SLC_976417.1
SLC_977747.1