**The below described is SIGNED.**



Dated: October 23, 2012 _____
R. KIMBALL MOSIER
U.S. Bankruptcy Judge

_____

Steven J. McCardell (2144)
smccardell@djplaw.com
Kenneth L. Cannon II (3705)
kcannon@djplaw.com
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone: (801) 415-3000
Facsimile: (801) 415-3500

Attorneys for the Debtors

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>KOREA TECHNOLOGY INDUSTRY AMERICA, INC. et al.,<br><br>Debtors. | Bankruptcy Case No. 11-32259<br>Jointly Administered<br><br>Chapter 11<br>Honorable R. Kimball Mosier<br><br>[FILED ELECTRONICALLY] |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
### CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT
### PLAN OF REORGANIZATION DATED JULY 25, 2012

The First Amended Joint Plan of Reorganization of Debtors' Korea Technology America,

Inc., Uintah Basin Resources, LLC, and Crown Asphalt Ridge, L.L.C. dated July 25, 2012 (the

"Plan"),[1] a copy of which is attached hereto as Exhibit A, came on for confirmation hearing as

---

[1] All capitalized terms not defined in these Findings of Fact and Conclusions of Law shall have
the same meaning ascribed to them in the Plan.

continued on Wednesday, October 3, 2012.   Appearances of counsel were made as noted on the

record of the hearing.  The Court, having reviewed and considered the Plan; the declaration of

Kenneth L. Cannon II regarding ballot tabulation and voting; the declaration of Soung Joon Kim

in support of confirmation of the Plan, as amended on the record of the Confirmation Hearing to

correct certain typographical errors (as thus corrected, the "Kim Declaration"); the certificate of

service for the "Solicitation Package" (ECF No. 415); the arguments of counsel; other evidence

proffered and/or presented, and other matters presented to the Court, and after due deliberation

thereon and good and sufficient cause appearing therefore,

**THE COURT FINDS AND CONCLUDES THAT:**[2]

A.      Confirmation Hearing.  On October 3, 2012, the Court concluded a hearing to

consider confirmation of the Plan pursuant to Section 1128 of the Bankruptcy Code and

Bankruptcy Rule 3020(b)(2).

B.      Ballot Report.  On September 6, 2012, the Debtors submitted the "Declaration of

Kenneth L. Cannon II Regarding the Tabulation of Votes with Respect to the Debtors' First

Amended Joint Plan of Reorganization Dated July 25, 2012" (the "Ballot Report"), certifying the

method and results of the ballot tabulation for each Class entitled to vote to accept or reject the

Plan under Bankruptcy Rule 3018.

C.      Jurisdiction and Venue. The Court has jurisdiction over the Debtors' jointly-

administered chapter 11 cases under 18 U.S.C. §§ 157 and 1334. This matter constitutes a core

---

[2] These findings of fact and conclusions of law shall constitute findings of fact and conclusions of
law pursuant to Federal Rule of Bankruptcy Procedure 7052 (the "Bankruptcy Rules"), made applicable
to this proceeding by Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a
conclusion of law, it shall be so deemed, and vice versa.

2

proceeding under 28 U.S.C. § 157(b)(2). Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

D.    <u>Judicial Notice</u>. The Court takes judicial notice of the docket of the Debtors' jointly administered chapter 11 cases maintained by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at, the hearings held before the Court during the pendency of these chapter 11 cases.

E.    <u>Objections</u>.  No Objections to confirmation of the Plan were filed.

F.    <u>Kim Declaration</u>.  At the Confirmation Hearing, the Debtors proffered, and the Court received into evidence, the Kim Declaration.  No other party in interest objected to the proffer or submitted other evidence.  The evidence included within the Kim Declaration, as corrected on the record of the Confirmation Hearing, is incorporated herein as part of the Court's findings of fact.

G.    <u>Oral Findings of Fact Incorporated</u>. All oral findings of fact and conclusions of law entered by the Court at the Confirmation Hearing are incorporated herein by this reference, in accordance with Bankruptcy Rule 7052(a).

H.    <u>Transmittal and Mailing of Materials; Notice</u>. In accordance with Bankruptcy Rule 2002, the Court finds and concludes that sufficient notice of the hearing on confirmation of the Plan and of the time for filing objections to the Plan was provided to holders of Claims and Interests and to the Debtors in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.  The Disclosure Statement for the Plan (the "<u>Disclosure Statement</u>"), which was approved by the Court by Order entered July 26, 2012 (the "<u>Disclosure Statement and</u>

3

Voting Procedures Order"), the Plan, the Disclosure Statement and Voting Procedures Order, Ballots, and the Notice of Hearing on confirmation of the Plan and deadlines related thereto were transmitted and served in compliance with the Bankruptcy Code and the Bankruptcy Rules, and such transmittal and service were adequate and sufficient.

I.      Solicitation.  In accordance with Section 1126(b) of the Bankruptcy Code, the Court finds and concludes that:  (a) the solicitation of votes to accept or reject the Plan complied with applicable law governing the adequacy of disclosure in connection with the solicitation; and (b) the solicitation was conducted after disclosure of adequate information, as defined in Section 1125(a) of the Bankruptcy Code.

J.      Ballots.  All procedures used to distribute Ballots to holders of Claims and Interests and to tabulate the Ballots were conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the local rules of this Court.

K.      The Plan Reasonably Classifies Claims and Interests (Section 1122(a)).  The classification of Claims and Interests under the Plan complies with Section 1122(a) of the Bankruptcy Code.

L.      The Plan Designates all Classes (Section 1123(a)(1)).  The Plan properly designates all Classes of Claims and Interests in accordance with the requirements of Section 1123(a)(1) of the Bankruptcy Code.

M.      Specification of Unimpaired Classes (Section 1123(a)(2)).  The Plan specifies the Classes of Claims and Interests which are unimpaired or impaired in accordance with the requirements of Section 1123(a)(2) of the Bankruptcy Code.

4

N.      <u>Specification of Treatment of Impaired Classes (Section 1123(a)(3))</u>.  The Plan

specifies the treatment of each Class of Claims and Interests in accordance with the requirements

of Section 1123(a)(3) of the Bankruptcy Code.

O.      <u>No Discrimination (Section 1123(a)(4))</u>.  The Plan provides the same treatment

for each Claim and Interest in a particular Class, unless the holder of a particular Claim or

Interest in such a Class has agreed to a less favorable treatment of such Claim or Interest.

Therefore, the Plan complies with and satisfies the requirements of Section 1123(a)(4) of the

Bankruptcy Code.

P.      <u>Implementation of the Plan (Section 1123(a)(5))</u>.  The Plan provides adequate,

proper, and legal means for its implementation including, without limitation, provisions of the

Plan which provide for the sale of substantially all of the Debtors' assets, either pursuant to a sale

to Rutter and Wilbanks Corporation ("<u>R&W</u>"), or, if the sale to R&W does not timely close,

pursuant to an Alternative Sale or Auction, as provided under the Plan.  The Plan also provides

for the sale to R&W of the sale of the ownership interests in CAR and permits the sale of the

ownership interests in CAR pursuant to an Alternative Sale or Auction.  Therefore, the Plan

complies with and satisfies the requirements of Section 1123(a)(5) of the Bankruptcy Code.

Q.      <u>Assumption or Rejection of Executory Contracts and Unexpired Leases (Section</u>

<u>1123(b)(2))</u>.  Article VIII of the Plan identifies executory contracts and unexpired leases to be

assumed.  The Debtors' assumption of executory contracts and unexpired leases, to the extent not

previously approved, is approved.  Any executory contracts and unexpired leases not assumed by

the Debtors shall be automatically rejected unless R&W or the purchaser under an Alternative

Sale or Auction identifies such an executory contract or unexpired lease not previously assumed

5

or assigned as one the purchaser elects to have assumed and assigned to it. The Debtors may at any time prior to Closing modify the list of executory contracts and unexpired leases.

R.    <u>The Plan Complies with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. The Plan complies with all applicable provisions of the Bankruptcy Code, and, as required pursuant to Bankruptcy Rule 3016(a), is dated and identifies the Debtors as the proponents of the Plan. Therefore, the Plan satisfies the requirements of Section 1129(a)(1) of the Bankruptcy Code.

S.    <u>Plan Proponents' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Debtors have complied with the applicable provisions of the Bankruptcy Code, including, without limitation, Sections 1125 and 1126 of the Bankruptcy Code and have satisfied the requirements of Section 1129(a)(2) of the Bankruptcy Code.

T.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Plan was proposed in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code.

U.    <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. Any payment made or to be made by the Debtors or on behalf of the Debtors for services or for costs and expenses in connection with these jointly-administered chapter 11 cases, including all administrative expense claims under Section 503 of the Bankruptcy Code, or in connection with the Plan and incident to these chapter 11 cases, has been approved by, or is subject to, the approval of the Court as reasonable, thereby satisfying Section 1129(a)(4) of the Bankruptcy Code.

SLC_1223399.2

V.      No Government Regulation of Rates (11 U.S.C. § 1129(a)(6)). Section 1129(a)(6)

of the Bankruptcy Code is satisfied because the business of the Debtors is not subject to

governmental regulation of rates.

W.      Best Interests Test (11 U.S.C. § 1129(a)(7)). The liquidation analysis contained in

the Disclosure Statement and in other evidence proffered or adduced at or prior to the hearing on

confirmation, including the Kim Declaration, has not been contradicted by other evidence.  The

methodology used and assumptions made in connection with the liquidation analysis are

reasonable.  With respect to each Class of impaired Claims or Interests, each holder of a Claim

or Interest in such Class has either (a) accepted the Plan or (b) will receive or retain under the

Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the

Plan, that is not less than the amount that such holder would so receive or retain if the Debtors

were liquidated on such date under chapter 7 of the Bankruptcy Code.  Therefore, the Plan

satisfies the requirements of Section 1129(a)(7) of the Bankruptcy Code.

X.      Acceptance and Deemed Acceptance of Plan (11 U.S.C. § 1129(a)(8)).  As further

described in the Ballot Report, all Classes of Claims or Interests voting on the Plan other than

Class 1 have accepted the Plan.  Of those Classes in which no vote was submitted, Classes 3E,

3G, 3H, 3I, 3K, 3L, and 5, are deemed to have accepted the Plan under *Heins v. RUTI-*

*Sweetwater, Inc.* (*In re RUTI-Sweetwater, Inc.*), 836 F.2d 1263, 1267-68 (10th Cir. 1988),

because they are classes of secured claims which received the Plan and a Ballot and did not vote

on, or object to, the Plan.  Class 11 is a class of unsecured claims that did not vote on the Plan

and may not be deemed to have accepted the Plan under *RUTI-Sweetwater*.  Because the Plan

complies with and satisfies the requirements of Section 1129(b) of the Bankruptcy Code, as

7

discussed below, the Plan may be confirmed notwithstanding Section 1129(a)(8) of the

Bankruptcy Code.

Y.      Treatment of Administrative and Priority Tax Claims and Other Priority Claims
(11 U.S.C. § 1129(a)(9)). The treatment of Administrative Claims and other Priority Claims

under the Plan satisfies the requirements of Section 1129(a)(9)(A) and (B) of the Bankruptcy

Code, and the treatment of Priority Tax Claims under the Plan complies with and satisfies

Section 1129(a)(9)(C) of the Bankruptcy Code.

Z.      Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10)).  As further described

in the Ballot Report, at least one Class of Impaired Claims has accepted the Plan.  All Classes

except Class 6 are impaired and twenty-one impaired Classes have voted to accept the Plan.  The

requirements of Section 1129(a)(10) of the Bankruptcy Code are, therefore, satisfied.

AA.     Feasibility (11 U.S.C. § 1129(a)(11)).  The evidence proffered and/or presented

by the Debtors with respect to feasibility of the Plan is persuasive and credible and has not been

controverted by other evidence.  Confirmation of the Plan is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the Debtors, unless such

liquidation or reorganization is proposed in the Plan, and the Plan therefore satisfies Section

1129(a)(11).

BB.     Payment of Fees (11 U.S.C. § 1129(a)(12)). To the extent that all fees payable to

the United States Trustee under 28 U.S.C. § 1930(a)(6) have not been paid, the Plan provides for

the payment of all such fees within thirty (30) days after the Effective Date of the Plan, and as

they come due thereafter.  Accordingly, the Plan satisfies Section 1129(a)(12) of the Bankruptcy

Code.

8

CC.     Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(l3)). No retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, are currently owing or will be owing by the Debtors in these chapter 11 cases, thereby making Section 1129(a)(13) of the Bankruptcy Code inapplicable.

DD.     Cramdown (Section 1129(b)).  With respect to the holder of Claims in Class 1, which voted to reject the Plan, and to the holder of the Claims in Class 11, the Plan does not discriminate unfairly and is fair and equitable to these Classes.  Therefore, the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code.  .

        1.      Class 1.  The Plan and is fair and equitable with respect to Class 1 because the Plan provides for the sale free and clear of the collateral securing the Class 1 Claims, the holder of the Class 1 Claims will retain its liens on the collateral until sale, and after the sale of the collateral, on the proceeds from the sale to the extent of the allowed amount of the Class 1 Claims, and the holder of the Class 1 Claims will be paid the value of its Class 1 Claims as of the Effective Date of the Plan.

        2.      Class 11.  The Plan is fair and equitable with respect to Class 11 because the Plan provides that no holder of any interest that is junior to Class 11 will receive or retain under the Plan any property on account of such junior interest.

EE.     No Other Plan (Section 1129(c)).  Other than the Plan (including previous versions thereof filed by the Debtors), no plan has been filed in the Debtors' chapter 11 cases. The requirements of Section 1129(c) of the Bankruptcy Code have been satisfied.

FF.     Principal Purpose of Plan (11 U.S.C. § 1129(d)). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the

9

Securities Act of 1933, and there has been no objection filed by any governmental unit asserting

such avoidance.  The Plan complies with Section 1129(d) of the Bankruptcy Code.

GG.   <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>. The Debtors and their attorneys

and advisers have solicited votes to accept or reject the Plan in good faith and in compliance with

the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and are, therefore,

entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code.

HH.   <u>In "Producing Status"</u>.  As set forth in Paragraphs 26 and 27 of the Kim

Declaration, the Debtors believe that their tar sands Production Facility is in "Producing Status"

as defined in Section 1.51 of the Plan.  No other party in interest submitted evidence or argument

to the contrary, and accordingly, the Court finds that the Debtors' Production Facility is in

"Producing Status" as defined in the Plan.

II.   <u>Releases, Exculpations and Injunction</u>.  The release, exculpation, and injunction

provisions set forth in Sections 14.2, 14.3, and 14.4 of the Plan (i) are within the jurisdiction of

the Court under 28 U.S.C. §§ 1334(a), (b) and (d); (ii) are an essential means of implementing

the Plan pursuant to Section 1123(a)(5) of the Bankruptcy Code; (iii) confer material benefits on,

and thus are in the best interests of, the Debtors' estate; and (iv) are, in the facts and

circumstances of the chapter 11 cases, consistent with and permitted pursuant to Sections 105,

524, 1123, 1129 and all other applicable provisions of the Bankruptcy Code.

JJ.   <u>Executory Contracts</u>. The Debtors have exercised reasonable business judgment

in determining whether the Debtors should assume or reject each of the executory contracts and

unexpired leases, as set forth on Exhibit 7 to the Disclosure Statement.

10

KK.    <u>Conditions to Confirmation</u>.  Upon entry of this Order and its becoming a Final

Order, all conditions to Confirmation of the Plan set forth in Section 11.1 of the Plan have been

satisfied or waived.

LL.    <u>Retention of Jurisdiction</u>. The Court's retention of jurisdiction as set forth in

Article XIII of the Plan comports with applicable law, including 28 U.S.C. § 157.

*   *   *   *   **END OF DOCUMENT**   *   *   *   *

SLC_1223399.2

## <u>ATTORNEY CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of *FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION DATED JULY 25, 2012* were served on this 15th day of October, 2012, via CM/ECF notification and/or first-class mail upon the following:

James W. Anderson
Miller Guymon, P.C.
165 Regent Street
Salt Lake City, UT 84111-1903
anderson@mmglegal.com

Brian J. Babcock
Babcock Scott & Babcock, P .C.
505 East 200 South, Suite 300
Salt Lake City, UT 84102-2055

Laurie A. Cayton
United States Trustees Office
405 South Main Street, Suite 300
Salt Lake City, UT  84111-3402
laurie.a.cayton @usdoj.gov

Darwin H. Bingham
Scalley Reading Bates Hansen &
Rasmussen
15 West South Temple, Suite 600
P O Box 11429
Salt Lake City, UT  84147-0429
dbingham@scalleyreading.net

Joseph M.R. Covey
Parr Brown Gee & Loveless
185 South State Street, Suite 800
Salt Lake City, UT  84111-1548
calendar@parrbrown.com

David E. Leta
Snell & Wilmer
15 West South Temple, Suite 1200
Salt Lake City, UT  84101-1547
dleta@swlaw.com

Mark L. Poulsen
10885 South State Street
Sandy, UT  84070

Robert S. Prince
Kirton & McConkie
60 East South Temple, Suite 1800
P.O. Box 45120
Salt Lake City, UT 84124
rprince@kmclaw.com

Jeremy C. Sink
McKay Burton & Thurman
170 South Main Street, Suite 800
Salt Lake City, UT  84101-1656
jeremy@mbt-law.com

    */s/ Kristin Hughes*
Durham Jones & Pinegar, P.C.

SLC_1223399.2

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of ***FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION DATED JULY 25, 2012*** were served on this _____ day of October, 2012, via CM/ECF notification and/or first-class mail upon the following:

Steven J. McCardell
Durham Jones & Pinegar, P.C.
111 East Broadway, Suite 900
P O Box 4050
Salt Lake City, UT  84110-4050
smccardell@djplaw.com

Kenneth L. Cannon II
Durham Jones & Pinegar, P.C.
111 East Broadway, Suite 900
P O Box 4050
Salt Lake City, UT  84110-4050
kcannon@djplaw.com

James W. Anderson
Miller Guymon, P.C.
165 Regent Street
Salt Lake City, UT 84111-1903
Anderson@mmglegal.com

Brian J. Babcock
Babcock Scott & Babcock, P .C.
505 East 200 South, Suite 300
Salt Lake City, UT 84102-2055

Laurie A. Cayton
United States Trustees Office
405 South Main Street, Suite 300
Salt Lake City, UT  84111-3402
laurie.a.cayton@usdoj.gov

Darwin H. Bingham
Scalley Reading Bates Hansen & Rasmussen
15 West South Temple, Suite 600
P O Box 11429
Salt Lake City, UT  84147-0429
dbingham@scalleyreading.net

Joseph M.R. Covey
Parr Brown Gee & Loveless
185 South State Street, Suite 800
Salt Lake City, UT  84111-1548
calendar@parrbrown.com

David E. Leta
Snell & Wilmer
15 West South Temple, Suite 1200
Salt Lake City, UT  84101-1547
dleta@swlaw.com

Mark L. Poulsen
10885 South State Street
Sandy, UT  84070

Robert S. Prince
Kirton & McConkie
60 East South Temple, Suite 1800
P.O. Box 45120
Salt Lake City, UT 84124
rprince@kmclaw.com

Jeremy C. Sink
McKay Burton & Thurman
170 South Main Street, Suite 800
Salt Lake City, UT  84101-1656
Jeremy@mbt-law.com

_____
Deputy Clerk

13

SLC_1223399.2

# EXHIBIT A



Steven J. McCardell (2144)
smccardell@djplaw.com
Kenneth L. Cannon II (3705)
kcannon@djplaw.com
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone: (801) 415-3000
Facsimile: (801) 415-3500

Attorneys for the Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>KOREA TECHNOLOGY INDUSTRY AMERICA, INC. et al.,<br><br>Debtors. | Bankruptcy Case No. 11-32259<br>Jointly Administered<br><br>Chapter 11<br>Honorable R. Kimball Mosier<br><br>[FILED ELECTRONICALLY] |

## FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS KOREA TECHNOLOGY INDUSTRY AMERICA, INC., UINTAH BASIN RESOURCES, LLC, AND CROWN ASPHALT RIDGE, L.L.C. DATED JULY 25, 2012

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ........................................................................................................... 1

   ARTICLE I. - Definitions ............................................................................... 2

   ARTICLE II. - Treatment of Administrative Expense and Priority Tax Claims ............. 15

   ARTICLE III. - Designation of Claims and Interests ....................................... 17

      3.1    Secured Claims. ............................................................................ 17

            a.    Class 1 ...................................................................... 17

            b.    Class 2 ...................................................................... 17

            c.    Class 3 ...................................................................... 17

            d.    Class 4 ...................................................................... 19

            e.    Class 5 ...................................................................... 19

            f.    Class 6 ...................................................................... 19

            g.    Class 7 ...................................................................... 19

            h.    Class 8 ...................................................................... 19

      3.2    Priority Claims – Class 9 ............................................................. 19

            a.    Class 9A ................................................................... 19

            b.    Class 9B ................................................................... 19

            c.    Class 9C ................................................................... 19

      3.3    Unsecured Claims - Class 10 ....................................................... 20

            a.    Class 10A ................................................................. 20

            b.    Class 10B ................................................................. 20

            c.    Class 10C ................................................................. 20

      3.4    Subordinated Unsecured Claims of R&W – Class 11 ............................. 20

      3.5    Insider Unsecured Claims – Class 12 ........................................... 20

            a.    Class 12A ................................................................. 20

            b.    Class 12B ................................................................. 20

            c.    Class 12C ................................................................. 20

      3.6    Interests .................................................................................... 20

            a.    Class 13A ................................................................. 20

            b.    Class 13B ................................................................. 20

i

       c.      Class 13C ........................................................................21

ARTICLE IV. - Claims and Interests Impaired Under the Plan ........................................21

ARTICLE V. - Treatment of and Methods of Distribution to Classes under the
Plan ........................................................................21

   5.1    General Provisions Applicable to All Classes ...........................................21

       a.      R&W Sale Plan Provisions ...........................................22

       b.      Alternative Plan Provisions..........................................22

   5.2    Secured Claims – Classes 1, 2, 3, 4, 5, 6, 7, and 8....................................26

       a.      Class 1 Claim of Raven....................................................27

       b.      Class 2 Claim of Western .................................................28

       c.      Class 3A Claim of Elgin ..................................................29

       d.      Class 3 Claims Other than Elgin (Classes 3B-3M)......................31

       e.      Class 4 Claims of Uintah County......................................33

       f.      Class 5 Claims of R&W...................................................33

       g.      Class 6 Claim of Utah DOGM..........................................35

       h.      Class 7 Claims of Gavilan Petroleum, LLC...................................35

       i.      Class 8 Claims...............................................................36

   5.3    Priority Claims - Class 9 .................................................................37

   5.4    Unsecured Claims - Class 10. ...........................................................37

       a.      Class 10A Claims ...........................................................37

       b.      Class 10B Claims ...........................................................38

       c.      Class 10C Claims ...........................................................38

   5.5    Subordinated Unsecured Claims of R&W– Class 11 ...............................39

   5.6    Insider Unsecured Claims – Class 12. ................................................40

       a.      Class 12A Claims ...........................................................40

       b.      Class 12B Claims ...........................................................41

       c.      Class 12C Claims ...........................................................41

   5.7    Interests - Class 13. ......................................................................42

       a.      Class 13A Interest. .........................................................42

       b.      Class 13B Interest. .........................................................42

       c.      Class 13C Interest ...........................................................44

SLC_1125653.7

ARTICLE VI. - Distributions under the Plan, Objections to Claims, and Disputed
Claims ............................................................................................................44

    6.1    Distributions of Cash ...........................................................44

    6.2    Distributions Free and Clear .................................................44

    6.3    Timing of Distributions........................................................45

    6.4    Delivery of Distributions .....................................................45

    6.5    Distributions to Holders as of Record Date ...............................45

    6.6    Undeliverable and Unclaimed Distributions...............................46

    6.7    Setoffs ...........................................................................46

    6.8    Objections to Claims and Resolution of Disputed Claims...............47

    6.9    Disputed Claims................................................................48

ARTICLE VII. - Means for Execution of the Plan........................................49

    7.1    Funds Available for Distribution under the Plan ........................49

          a.    Sale Proceeds from the Sale.........................................50

          b.    Sale Proceeds from an Alternative Sale or Auction.....................50

          c.    Other Funds............................................................50

    7.2    *Force Majeure* ...............................................................51

    7.3    Reorganized Debtor. ..........................................................51

          a.    Reorganized Articles of Organization and Reorganized
              Operating Agreement..................................................51

          b.    Director and Officers of the Reorganized Debtor........................51

          c.    Equity Interests in the Reorganized Debtor ...............................51

ARTICLE VIII. - Executory Contracts........................................................52

    8.1    Executory Contracts and Unexpired Leases ..............................52

    8.2    Rejected Contracts and Leases...............................................53

    8.3    Rejection Damages Bar Date .................................................54

    8.4    Assumed Contracts and Leases..............................................55

    8.5    Payments Related to Assumption of Executory Contracts and
           Unexpired Leases..........................................................56

ARTICLE IX. - Discharge of the Debtors ...................................................57

ARTICLE X. - Administrative Expense Claims Bar Dates, Administrative
Functions of the Reorganized Debtor, Continued Existence of Estate, and
Post-Confirmation Date Expenses ...........................................................57

iii

10.1    Administrative Functions of the Reorganized Debtor ...............................57

10.2    Continued Existence of the Estate ...........................................................58

10.3    Post-Confirmation Date Expenses ...........................................................58

10.4    Administrative Expense Claims Bar Date ................................................58

ARTICLE XI. - Conditions Precedent..................................................................59

11.1    Conditions to Confirmation .....................................................................59

ARTICLE XII. - Alternative if the Sale Does Not Close .....................................59

ARTICLE XIII. - Retention of Jurisdiction..........................................................59

ARTICLE XIV. - General Provisions....................................................................62

14.1    Time Limit for Filing Objections to Claims ............................................62

14.2    Releases....................................................................................................62

14.3    Exculpations.............................................................................................63

14.4    Injunction .................................................................................................64

14.5    Modification of the Plan ..........................................................................64

14.6    Withdrawal or Revocation of the Plan.....................................................64

14.7    Effectuating Documents and Further Transactions...................................65

14.8    Section 1146 Exemption ..........................................................................65

14.9    Dissolution of the Creditors' Committee .................................................65

14.10   Severability ..............................................................................................66

14.11   Governing Law .........................................................................................66

14.12   Binding Effect...........................................................................................66

14.13   Payment of Statutory Fees .......................................................................67

14.14   Notices ......................................................................................................67

14.15   Retention of Causes of Action/Reservation of Rights ..............................68

14.16   Section 506(c) Reservation ......................................................................69

14.17   Confirmation Request ..............................................................................69

### INTRODUCTION

Debtors Korea Technology Industry America, Inc. ("KTIA"), Uintah Basin Resources, LLC ("UBR"), and Crown Asphalt Ridge, L.L.C. ("CAR"), debtors and debtors in possession (together, KTIA, UBR, and CAR are sometimes referred to as the "Debtors"), hereby propose the following joint plan of reorganization pursuant to section 1121(c) of the Bankruptcy Code. Reference is made to the Disclosure Statement (as defined herein) for the background, assets, prior results of operations, risk factors, a summary and analysis of the Plan (as defined herein) and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code (as defined herein).

The Debtors' cases are consolidated for procedural purposes only and are being jointly administered pursuant to order of the United States Bankruptcy Court for the District of Utah, Central Division (ECF 20).[1]

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from a holder of a Claim or Interest until such time as the Disclosure Statement has been approved by the Bankruptcy Court and distributed to holders of Claims and Interests.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Rule 3019 of the Bankruptcy Rules (as defined herein) and the Plan, the Debtors expressly reserve the right to alter, amend, or modify the Plan, one or more times, in

---

[1] References to "ECF" are references to the number designated by the Court's PACER or Case Management/Electronic Case Files (CM/ECF) system for docket entries in the jointly administered Bankruptcy Case, Case Number 11-32259.

1

accordance with Section 14.5 herein, before its substantial consummation; provided however, that any amendment or modification made after the Voting Deadline that materially and adversely alters the treatment of any Class entitled to a distribution under the Plan shall require the approval of either (i) the Bankruptcy Court or (ii) the affected Class.

## ARTICLE I.
### Definitions

The following terms shall have the respective meanings set forth below. In all references herein to any parties, persons, entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text may require. Any term not defined herein which is defined by the Bankruptcy Code shall have the meaning ascribed to it in the Bankruptcy Code, and otherwise shall have the meaning ascribed to it in the Disclosure Statement.

1.1 "<u>Administrative Expense Claim</u>" means a Claim (which is not a Secured Claim) for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, or preserving the estates and operating the business of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Bankruptcy Case, Professional Claims, and all fees and charges assessed against the estates under chapter 123 of title 28, United States Code, accruing from and after the Petition Date to and including the Confirmation Date. Such expenses after the Confirmation Date are defined as Post-Confirmation Date Expenses and will be paid as set forth in this Plan.

SLC_1125653.7

1.2    "Administrative Expense Claims Bar Date" means the date fixed pursuant to

Section 10.3 of the Plan by which certain Administrative Expense Claims must be filed.  This

date is thirty (30) days after the Confirmation Date.

1.3    "Allowed Claim" means a Claim or any portion thereof (a) that has been allowed

by a Final Order, (b) as to which, on or by the Effective Date (i) no proof of claim has been filed

with the Bankruptcy Court and (ii) the liquidated and noncontingent amount of which is

Scheduled, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed,

(c) for which a proof of claim in a liquidated amount has been filed pursuant to the Bankruptcy

Code or any order of the Bankruptcy Court and as to which either (x) no objection to its

allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code

or any order of the Bankruptcy Court or (y) any objection to its allowance has been settled,

waived through payment or withdrawn, or has been denied by a Final Order or (d) that is

expressly allowed in a liquidated amount in the Plan.

1.4    "Allowed . . . Claim" means an Allowed Claim of the particular type or Class

described.

1.5    "Alternative Plan Provisions" means those provisions of this Plan which apply if

the Sale of the Debtors' Assets to R&W pursuant to the Asset Purchase Agreement does not

close by the Sale Deadline.

1.6    "Alternative Sale" means a private sale by the Debtors which occurs after the Sale

of the Debtors' Assets to R&W pursuant to the Asset Purchase Agreement does not close by the

Sale Deadline.

3

1.7      "Asset Purchase Agreement" means the Asset Purchase Agreement dated

December 23, 2011 between the Debtors and the Purchaser, which was approved by the

Bankruptcy Court by order entered January 11, 2012 (ECF 261), as amended by the Debtors and

the Purchaser, which amendments were approved by the Bankruptcy Court by orders entered

July 12, 2012 (ECF 394 and 395), and as the same may be further amended, upon adequate

notice, opportunity for hearing and objection, and entry of a further order of the Bankruptcy

Court.  Except as Section 1.62 of this Plan might modify the Asset Purchase Agreement, this

Plan does not supersede, modify, or amend the Asset Purchase Agreement.

1.8      "Assets" means all property of the Estate as defined in section 541 of the

Bankruptcy Code including, without limitation, any causes of action commenced by the Debtors

on or before the Confirmation Date and any causes of action arising in favor of the Debtors'

estate under chapter 5 of the Bankruptcy Code.

1.9      "Auction" means the auction provided for under the Alternative Plan Provisions

of this Plan under Section 5.1.b.

1.10     "Ballot" means each of the ballot forms distributed to each holder of an impaired

Claim or Interest on which the holder of such Claim or Interest is to indicate acceptance or

rejection of this Plan.

1.11     "Bankruptcy Case" depending on context, means the chapter 11 reorganization

cases of the Debtors and/or the post-Confirmation Date chapter 11 reorganization case of the

Reorganized Debtor.

1.12     "Bankruptcy Code" means Title 11, United States Bankruptcy Code, 101 *et seq.*,

commonly referred to as the Bankruptcy Code.

4

1.13    "Bankruptcy Court" means the United States Bankruptcy Court for the District of

Utah, Central Division or such other court as may have jurisdiction over the Debtors' chapter 11

bankruptcy cases.

1.14    "Bar Date" means October 15, 2011, the deadline established by order of the

Bankruptcy Court entered August 25, 2011 (ECF 21) for filing proofs of claim for Claims

described in that order.

1.15    "Business Day" means any day other than a Saturday, Sunday or legal holiday as

defined in Bankruptcy Rule 9006(a)

1.16     "CAR" means Crown Asphalt Ridge, LLC, one of the Debtors.

1.17    "Claim" means a claim against one or more of the Debtors as defined in section

101(5) of the Bankruptcy Code.

1.18    "Class" means a group of claims or interests, consisting of Claims or Interests

which are substantially similar to each other, as classified pursuant to the Plan.

1.19    "Closing" means the Closing of a sale of the Debtor's Assets, whether pursuant to

the Sale, an Alternative Sale, or an Auction.

1.20    "Confirmation Date" means the date the Confirmation Order is entered on the

docket of the Bankruptcy Court.

1.21    "Confirmation Order" means the order of the Bankruptcy Court approving the

Plan pursuant to section 1129 of the Bankruptcy Code and related sections thereof.

1.22    "Creditors' Committee" means the Official Committee of Unsecured Creditors in

KTIA's cases appointed by the United States Trustee on or about October 12, 2011.

1.23    "Cure Claim" has the meaning ascribed to it in Section 8.5 of the Plan.

5

1.24    "Debtors" means KTIA, UBR, and CAR.

1.25    "Debtors' Assets" means those assets of the Debtors which are sold to the

Purchaser.

1.26    "Disclosure Statement" means the Disclosure Statement with Respect to Plan of

Reorganization of Debtors Korea Technology Industry America, Inc., Uintah Basin Resources,

LLC, and Crown Asphalt Ridge, L.L.C. Dated February 17, 2011.

1.27    "Disputed Claim" means (a) any Claim as to which the Debtors or any other party

in interest has interposed a timely objection or request for estimation in accordance with the

Bankruptcy Code or the Bankruptcy Rules, or any claim otherwise disputed by the Debtors, the

Creditors' Committee, or the Reorganized Debtor or other party in interest in accordance with

applicable law, which objection has not been withdrawn or determined by a Final Order, and

(b) any Claim scheduled by any of the Debtors as contingent, unliquidated or disputed, where a

proof of claim has not been timely filed.

1.28    "Effective Date" means the first business day after the Confirmation Order

becomes a Final Order.  The Reorganized Debtor will give notice of the Effective Date as early

as possible after that date.

1.29    "Elgin" means Elgin Services Company, Inc.

1.30    "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy

Code.

1.31    "Estate" means the property of a Debtor as defined in section 541 of the

Bankruptcy Code.

1.32    "Final Order" means an order or a judgment as to which (i) the time to appeal or

to seek review, rehearing or certiorari has expired pursuant to Rule 8002 of the Bankruptcy Rules

and (ii) (a) no appeal or petition for review, rehearing or certiorari is pending or (b) in the case of

appeal, the enforceability of such order or judgment has not been stayed, or any such stay is no

longer in effect

1.33    "General Unsecured Claim" means a Claim, which is not entitled to priority under

section 507(a) of the Bankruptcy Code and which is not secured by a valid, perfected security

interest or lien and including a Claim, if any, arising from the rejection of an executory contract.

1.34    "Impaired" when used with respect to any Claim, Interest or Class, has the same

meaning as that contained in section 1124 of the Bankruptcy Code.

1.35    "Insider Unsecured Claim" means a Claim against a Debtor held by KTIA,

KTIL, or an Entity that is a wholly-owned direct or indirect subsidiary of KTIA.

1.36    "Interests" means the rights of the equity interest holders in the Debtors prior to

the Confirmation Date.

1.37    "KTIA" means Korea Technology Industry America, Inc., one of the Debtors.

KTIA is the owner of 100% of the Interests in the non-Debtor UHI.

1.38    "KTIL" means Korea Technology Industry Company, Ltd., the non-Debtor which

owns 100% of the equity in KTIA.

1.39    "Lease" means that certain Oil, Gas and Minerals Lease granted by Wembco, Inc.

(prior land owner to UBR) dated effective May 1, 2008, and recorded as entry number

2008004641 in Book 1090, at Page 166, Uintah County Records covering the Real Property, as

amended by Amendment and Ratification of Oil, Gas and Minerals Lease dated April 29, 2011

7

(effective May 1, 2011) and recorded as entry number 2011003533 in Book 1233, at Page 111,

Uintah County Records.  Pursuant to the Asset Purchase Agreement, all of CAR's rights in the

Lease will be assigned to the Purchaser.

    1.40    "Mechanic's Lien" means a mechanic's lien asserted against some or all of the

Property for goods delivered and services provided.

    1.41    "Mineral Royalty Conveyance" means the conveyance of a mineral royalty to

KTIA in the form attached as Exhibit E to the Asset Purchase Agreement on account of KTIA's

Class 13B interest, as described in Section 5.7(b) of the Plan.

    1.42    "Non-Producing Status" means, under the Alternative Plan Provisions, that the

Debtors' Production Facility has not met the standards (as set forth in Section 1.51 of this Plan)

to be in "Producing Status."

    1.43    "Original DIP Financing Facility" means the debtor in possession financing

facility in the amount of $300,000 under which R&W is the lender and the Debtors are the

borrowers, which has been used by the Debtors to pay certain operating expenses and

professional fees.  The Original DIP Financing Facility was approved by order of the Bankruptcy

Court entered October 5, 2011 (ECF 124).  This Plan does not supersede, modify, or amend the

terms of the Original DIP Financing Facility.

    1.44    "Person" shall have the meaning as set forth in section 101(41) of the Bankruptcy

Code.

    1.45    "Petition Date" means August 22, 2011, the date on which the Debtors filed their

chapter 11 petitions.

SLC_1125653.7

1.46    "Plan" means this plan of reorganization, and all exhibits hereto, as the same may

be modified or amended from time to time as and to the extent permitted herein or by the

Bankruptcy Code.

1.47    "Plan Proponents" means the Debtors.

1.48    "Post-Confirmation Date Expense" means an expense incurred after the

Confirmation Date by the Reorganized Debtor or its representatives, including, but not limited

to, the actual, necessary costs and expenses of preserving the estates and operating the business

of the Debtors, including wages, salaries or commissions for services rendered after the

Confirmation Date, claims of the Debtors' Professionals, and all fees and charges assessed

against the estates under chapter 123 of title 28, United States Code.

1.49    "Priority Claim" means the portion of a Claim entitled to priority under section

507(a) of the Bankruptcy Code, but excluding Administrative Expense Claims, Priority Tax

Claims, and Post-Confirmation Date Expenses.

1.50    "Priority Tax Claim" means a claim of a governmental unit of the kind specified

in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.51    "Producing Status" means that the Production Facility meets the following

standards as of the Sale Deadline:

(a)    Feed Rate and Sustainability of the Production Facility.  The "feed rate" of

tar sands ore being fed into the Seller's Production Facility has reached up to seventy (70) tons

of ore per hour, producing approximately 600-800 barrels of froth per day, and the sustainability

of the Production Facility shall have been established by operating at this feed rate for a

continuous five (5) days; and

9

(b)    <u>Reserves</u>.  Core drilling of the South A Tract has indicated to the reasonable satisfaction of the Debtors at least 10 million barrels of mineable reserves in the South A Tract.

1.52    "<u>Production Facility</u>" shall have the same meaning as such term is defined in the Asset Purchase Agreement, and generally, means the Debtors' production facility consisting of structures, equipment, goods, and machinery constructed and assembled on the Property and utilizing the "modified hot water process" and related information, an exclusive license agreement covering the Asphalt Ridge Designated Tar Sands Area for Advanced Solvent Technology (Publication No. US-2009-0294332-A1, PCT Publication Number WO2009/147622).

1.53    "<u>Professional</u>" means a person retained by order of the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code and whose compensation is governed by section 330 of the Bankruptcy Code.

1.54    "<u>Professional Claims</u>" means the Allowed Claims of a Professional retained in these bankruptcy cases for compensation for services rendered or reimbursement of costs, expenses, or other charges and expenses incurred on or after the Petition Date and prior to and including the Confirmation Date.

1.55    "<u>Property</u>" means the real property and Production Facility owned and leased by the Debtors located in Vernal, Utah.  This is included in the definition of Assets above.

1.56    "<u>Purchaser</u>" means Rutter and Wilbanks Corporation, who is the Court-approved purchaser of the Debtors' Property pursuant to the Sale Order.

1.57    "<u>Raven</u>" means Raven Mining Company, LLC.

10

1.58    "Record Date" means March 27, 2012, the date set by the Bankruptcy Court

closing the claims register for purposes of determining the identity of holders of Claims and

Interests entitled to vote to accept or reject the Plan.

1.59    "Reorganized Debtor" means KTIA after the Effective Date.  UBR will either be

wound up and dissolved or merged into KTIA. CAR will be sold in the Sale and may be sold in

an Alternative Sale or Auction.

1.60    "R&W" means Rutter and Wilbanks Corporation, the Purchaser of Assets

pursuant to the Sale Order.

1.61    "Sale" means the sale of substantially all of the Debtors' Assets to the Purchaser

pursuant to the Sale Order.

1.62    "Sale Deadline" means the deadline by which the Sale shall have closed under the

terms of the Asset Purchase Agreement, including any extensions of the same pursuant to

Section 4.6 of the Asset Purchase Agreement due to a *force majeure* event or pursuant to a

written agreement of the Debtors and the Purchaser approved by the Court.[2]  The Asset Purchase

Agreement governs the sale of the Debtors' Assets to the Purchaser, including the deadline to

close a sale thereunder, but pursuant to this Plan, the Debtors shall follow certain procedures in

seeking an extension of the Sale Deadline under the Asset Purchase Agreement.  These

procedures are as follows:  the Sale Deadline may not be extended unless  (a) the Bankruptcy

Court enters a final, appealable and enforceable order granting a motion seeking the extension

filed prior to the Sale Deadline, and after an opportunity for a hearing on the motion seeking the

extension, (b) for cause, other than cause arising from the actions or inactions of the Purchaser or

---

[2] As noted above, the defined term in the Asset Purchase Agreement is "Closing Date."  Sale
Deadline under this Plan and Closing Date under the Asset Purchase Agreement have the same meaning.

the Debtor, that does not exceed the period of time reasonably necessary to remedy such cause,

and (c) at least 21 days prior notice of a hearing on a motion seeking the extension is provided to

all creditors in the case, with objections to be filed at least 10 days prior to the hearing, and with

any reply to be filed at least 5 days prior to the hearing.  If the motion is filed before the

scheduled Sale Deadline, but is heard after the Sale Deadline, the requested extension runs from

the scheduled Sale Deadline, not from the date of the hearing or the date an order is entered

approving the extension.  In fact, the Debtors followed these procedures and filed a motion to

extend the Sale Deadline on June 8, 2012, which the Bankruptcy Court, by Order entered

July 12, 2012, approved, extending the Sale Deadline through October 31, 2012.  Under their

agreement with major secured creditors, which is included in this Plan, the Debtors may only

obtain a maximum of one additional extension of the Sale Deadline, not to exceed 30 additional

days, upon notice and motion, heard and approved by the Bankruptcy Court prior to October 31,

2012, and a demonstration that (i) the need for the additional extension was due to unforeseen

circumstances as of the Confirmation Date, and (ii) there is a high probability that the Sale will

close during the period of the additional extension.

     1.63    "<u>Sale Order</u>" means the findings of fact and conclusions of law and the order of

the Court entered November 15, 2011 Approving the Sale or Sales of Substantially All of the

Debtors' Assets and Approving the Assumption and Assignment of Contracts and Leases

(ECF 203, 204) as supplemented by the order of the Court entered January 11, 2012, Approving

Modified Asset Purchase Agreement Dated December 23, 2011 (ECF 261).

     1.64    "<u>Scheduled</u>" means, with respect to any Claim or Interest, the status and amount,

if any, of such Claim or Interest as set forth in the Schedules.

1.65    "Schedules" means the schedules of assets and liabilities filed by the Debtors on

September 6, 2011 in accordance with Bankruptcy Rule 1007(b) (as they may be amended from

time to time in accordance with Bankruptcy Rule 1009).

1.66    "Secured Claim" means a Claim secured by a valid, perfected, and enforceable

lien on some or all of the Assets, to the extent of the value of the interest of the holder of such

Secured Claim in such Assets as determined by the Bankruptcy Court pursuant to section 506(a)

of the Bankruptcy Code.

1.67    "Secured Creditor" means the holder of a claim which is secured by a valid,

perfected and enforceable lien on property of a Debtor, to the extent of the value of the interest

of the holder of such secured claim in such property as determined by the Bankruptcy Court

pursuant to section 506(a) of the Bankruptcy Code or as acknowledged in writing by the Debtor.

1.68    "SITLA Lease" means that certain Industrial Special Use Lease Agreement No.

1363 between CAR and the State of Utah acting by and through the School and Institutional

Trust Lands Administration pursuant to which CAR leased real property on which certain

portions of its mining facilities are constructed.

1.69    "South A Tract" means that portion of the Property identified as the "South A

Tract" located in Uintah County, Utah, and more particularly described in Part "I" of

Exhibit "A" attached to the Asset Purchase Agreement, a copy of which is attached as Exhibit 3

to the Disclosure Statement.

1.70    "Startup DIP Financing Facility" means the debtor in possession financing facility

which, as amended, provides for up to $6,500,000 under which R&W is the lender and the

Debtors are the borrowers and the proceeds of which are to be used only for costs associated

SLC_1125653.7

with the completion of construction and commissioning of the hot water extraction and

evaporation process portions of the Debtors' tar sands processing facility and operation of the

"dry froth" circuit, except that up to $550,000 may be used to pay for costs of extraction of tar

sands to be sold for road construction paving purposes.  The Startup DIP Financing Facility and

amendments thereto have been approved by orders of the Bankruptcy Court entered December 1,

2011, January 11, 2012, April 24, 2012, May 13, 2012, June 19, 2012, and July 12, 2012

(ECF 216, 259, 353, 357, 378, and 396).  This Plan does not supersede, modify, or amend the

terms of the Startup DIP Financing Facility, as amended.

    1.71    "UBR" means Uintah Basin Resources, LLC, one of the Debtors.  UBR is the

owner of 100% of the Interests in CAR.

    1.72    "UBR-CAR Lease" means that certain Oil, Gas and Minerals Lease between UBR

as lessor, and CAR as lessee, dated effective May 1, 2008, pursuant to which the mining property

owned by UBR was leased to CAR, as operator.

    1.73    "UHI" means Utah Hydrocarbon, Inc., a non-Debtor party.  UHI is the owner of

100% of the Interests in UBR.

    1.74    "Utah DOGM" means the Utah Division of Oil, Gas, and Mining, which is part of

the Department of Natural Resources of the State of Utah.

    1.75    "Western" means Western Energy Partners, LLC.

    1.76    "Western/Elgin Agreement" means that agreement entered into by Western,

Elgin, the Purchaser, and the Debtors dated December 19, 2011, which was approved by order of

the Bankruptcy Court entered January 11, 2012 (ECF 260), which, among other things, fixes the

Allowed Claims of Western and Elgin, provides for the sale of Tar Sands for use in road

14

construction paving, provides for the extended use of cash collateral by the Debtors from

proceeds of the sale of Tar Sands, resolves issues with respect to priming of liens in favor of the

Purchaser for amounts it advances pursuant to the Startup DIP Financing.

### ARTICLE II.
### Treatment of Administrative Expense and Priority Tax Claims

2.1     With respect to Administrative Expense Claims, and except to the extent that a

holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Allowed

Administrative Expense Claims shall be paid by the Reorganized Debtor (i) in the ordinary

course of business, or (ii) on the Effective Date (or as soon as practicable thereafter) if not an

ordinary course claim, or (iii) within ten (10) days of entry of a Final Order allowing such

Administrative Expense Claim.  In the event that the Sale closes, Allowed Administrative

Expense Claims will be paid by the Purchaser, *provided however*, (i) in the event that the Sale

does not close, Allowed Administrative Expense Claims will be paid from the Debtors' funds,

including proceeds from sales of PMOSA, tar sands, and dry froth, and from the proceeds of an

Alternative Sale or Auction, after payment of all Allowed Secured Claims.  Western and Elgin

will consent to the Debtors' use of such proceeds for the payment of Allowed Administrative

Expense Claims, but reserve their respective rights to object to any applications for allowance of

any such Administrative Expense Claims.

2.2     As provided in Section 10.4 below, any unpaid Administrative Expense Claim,

other than ones arising in the ordinary course of business, arising through the Confirmation Date

must be filed with the Court by the Administrative Expense Claims Bar Date, or be forever

barred from receiving any distribution on account such unpaid Administrative Expense Claim.

15

With respect to Professional Claims, Professionals must file final fee applications by this

Administrative Expense Claims Bar Date.

2.3     Post-Confirmation Date Expenses will be paid, in the event that the Sale closes,

by the Purchaser.  In the event that the Sale does not close, the Post-Confirmation Date Expenses

will be funded from the Debtors' funds, including proceeds from sales of PMOSA, tar sands, and

dry froth.  Post-Confirmation Date Expenses will be paid from funds of the Debtors, including

proceeds from the sale of PMOSA, tar sands, and dry froth.  Western and Elgin will consent to

the Debtors' use of such proceeds for the payment of reasonable and necessary Post-

Confirmation Date Expenses.

2.4     With respect to the Administrative Expense Claim of the United States Trustee,

the Debtors or the Reorganized Debtors, as appropriate, shall pay all fees due and payable under

section 1930 of Title 28 within ten (10) days after the Effective Date.  In addition, the

Reorganized Debtor shall pay the United States Trustee quarterly fees due and payable on all

disbursements, including plan payments and disbursements in and outside of the ordinary course

of business until entry of a Final Decree, dismissal of the Bankruptcy Case, or conversion of the

Bankruptcy Case to a case under chapter 7, as such obligations become due.

2.5     With respect to Priority Tax Claims, except to the extent that a holder of an

Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority

Tax Claim shall, at the option of the Debtors, (a) receive payment in full of payable Allowed

Priority Tax Claims on the Effective Date with applicable interest, or (b) receive equal quarterly

Cash Payments over a period not exceeding five (5) years from the Petition Date, with the first

payment to occur on the first business day of the third month after the Effective Date, at the rate

of interest determined under applicable nonbankruptcy law and calculated as specified in section

511(b) of the Bankruptcy Code.

2.6    All Allowed Priority Tax Claims that are not due and payable on or before the

Effective Date shall be paid in the ordinary course of business as such obligations become due.

## ARTICLE III.
## Designation of Claims and Interests

The following Classes of Claims and Interests are designated pursuant to and in

accordance with section 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in

a particular Class only to the extent that the Claim or Interest qualifies within the description of

the class and is classified in a different Class to the extent that the Claim or Interest qualifies

within the description of that different class.  A Claim or Interest is in a particular Class only to

the extent that the Claim or Interest is an Allowed Claim or Interest in that Class and has not

been paid, released, withdrawn, waived, settled, or otherwise satisfied.  Unless the Plan expressly

provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all

purposes under the Bankruptcy Code, including, without limitation, voting and distribution.

3.1    Secured Claims.

a.    Class 1.  Class 1 consists of the Allowed Secured Claims of Raven.

b.    Class 2.  Class 2 consists of the Allowed Secured Claims of Western.

c.    Class 3.  Class 3 consists of the Allowed Secured Claims of Mechanic's

Lien Holders.

1.    Class 3A.  Class 3A consists of the Allowed Secured Claims of

Elgin.  Claims of certain subcontractors who did not file a separate Mechanic's Lien on

17

the Property are included in Class 3A.  Subcontractors who filed separate Mechanic's

Liens on the Property are separately classified.

       2.    <u>Class 3B</u>.  Class 3B consists of the Allowed Secured Claims of

Mountain Insulation, Inc.

       3.    <u>Class 3C</u>.  Class 3C consists of the Allowed Secured Claims of

Christoffersen Welding Incorporated.

       4.    <u>Class 3D</u>.  Class 3D consists of the Allowed Secured Claims of

Industrial Piping Products, Inc.

       5.    <u>Class 3E</u>.  Class 3E consists of the Allowed Secured Claims of

Lawrence K. Deppe, dba Process Engineered Products.

       6.    <u>Class 3F</u>.  Class 3F consists of the Allowed Secured Claims of

WesTech Engineering, Inc.

       7.    <u>Class 3G</u>.  Class 3G consists of the Allowed Secured Claims of

Precision Systems Engineering, Inc.

       8.    <u>Class 3H</u>.  Class 3H consists of the Allowed Secured Claims of

Rocky Mountain Fabrication.

       9.    <u>Class 3I</u>.  Class 3I consists of the Allowed Secured Claims of

Selway Corporation.

       10.    <u>Class 3J</u>.  Class 3J consists of the Allowed Secured Claims of

B.H. Inc. dba BHI.

       11.    <u>Class 3K</u>.  Class 3K consists of the Allowed Secured Claims of

REDD Engineering & Construction, Inc.

SLC_1125653.7

12.    <u>Class 3L</u>.  Class 3L consists of the Allowed Secured Claims of JAM Industrial, Inc.

13.    <u>Class 3M</u>.  Class 3M consists of all other Allowed Mechanic's Lien Claims not classified above, if any, each of which shall be a separate class.

d.    <u>Class 4</u>.  Class 4 consists of the Allowed Secured Claims of Uintah County for unpaid property taxes.

e.    <u>Class 5</u>.  Class 5 consists of the Allowed Secured Claims of R&W for repayment of amounts advanced to the Debtors under the Original DIP Financing Facility and the Startup DIP Financing Facility.

f.    <u>Class 6</u>.  Class 6 consists of the Allowed Secured Claim of the Utah DOGM related to its rights with respect to a certificate of deposit which secures reclamation obligations of the Debtors related to mining operations.

g.    <u>Class 7</u>.  Class 7 consists of the Allowed Secured Claim of Gavilan Petroleum, LLC based on a judgment dated November 8, 2010.

h.    <u>Class 8</u>.  Class 8 consists of all other Allowed Secured Claims not classified above, if any, each of which shall be a separate class.

3.2    <u>Priority Claims – Class 9</u>.  Class 9 consists of all Allowed Priority Claims allowed under section 507(a) of the Bankruptcy Code other than subsections 507(a)(1), (a)(2), and (a)(8).

a.    <u>Class 9A</u>.  Class 9A consists of all Allowed Priority Claims against KTIA, if any.

b.    <u>Class 9B</u>.  Class 9B consists of all Allowed Priority Claims against UBR.

c.    <u>Class 9C</u>.  Class 9C consists of all Allowed Priority Claims against CAR.

19

3.3     <u>Unsecured Claims - Class 10</u>.  Class 10 consists of all Allowed Unsecured Claims which are not Administrative Expense Claims, Administrative Expense Claims of Professionals, Priority Claims, or Allowed Insider Unsecured Claims.

a.      <u>Class 10A</u>.  Class 10A consists of all Allowed Unsecured Claims against CAR.

b.      <u>Class 10B</u>.  Class 10B consists of all Allowed Unsecured Claims against UBR.

c.      <u>Class 10C</u>.  Class 10C consists of all Allowed Unsecured Claims against KTIA.

3.4     <u>Subordinated Unsecured Claims of R&W – Class 11</u>.  Class 11 consists of the Allowed Subordinated Unsecured Claim of R&W.

3.5     <u>Insider Unsecured Claims – Class 12</u>.  Class 12 consists of Allowed Insider Unsecured Claims.

a.      <u>Class 12A</u>.  Class 12A consists of all Allowed Insider Unsecured Claims against CAR.

b.      <u>Class 12B</u>.  Class 12B consists of all Allowed Insider Unsecured Claims against UBR.

c.      <u>Class 12C</u>.  Class 12C consists of all Allowed Insider Unsecured Claims against KTIA.

3.6     <u>Interests</u>.  Class 13 consists of all Allowed Interests.

a.      <u>Class 13A</u>.  Class 13A consists of UBR's Allowed Interest in CAR.

b.      <u>Class 13B</u>.  Class 13B consists of UHI's Allowed Interest in UBR.

SLC_1125653.7

      c.     <u>Class 13C</u>.  Class 13C consists of KTIL's allowed Interest in KTIA.

**ARTICLE IV.**
**<u>Claims and Interests Impaired Under the Plan</u>**

4.1     All Classes of Claims and Interests other than Class 6 Claims are impaired under the Plan (at least under the "Alternative Plan" provisions) and are, therefore, entitled to vote on the Plan.  Class 6 (the Allowed Secured Claim of the Utah Division of Oil, Gas and Mining) is unimpaired under the Plan.  Under the R&W Sale provisions, Class 5 Claims are unimpaired, but because of the Alternative Plan provisions, the holder of these Claims may be impaired under those Alternative Plan provisions.

**ARTICLE V.**
**<u>Treatment of and Methods of Distribution to Classes under the Plan</u>**

5.1     <u>General Provisions Applicable to All Classes</u>.  Holders of Allowed Claims for which more than one of the Debtors is liable shall be entitled only to a single satisfaction under the Plan.  The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, settled, or otherwise satisfied or paid as of the date when distribution is provided under this Plan.  Except for obligations of payment assumed by such third party, the Plan will not provide any distributions on account of a Claim, the payment of which has been assumed by a third party.  Except as otherwise expressly provided in the Plan or by further order of the Court, all treatments, allowances, or payments of Claims, contracts, and leases which have been specified or otherwise fixed or required by order of the Court shall not be impaired by the Plan, the rights of the holders of such Claims or parties to such contracts or leases as provided in such orders shall not be altered by the Plan, and the holders of such Claims and the parties to such contracts shall retain such rights and shall receive such treatments as provided in such orders in lieu of any other treatment provided in the Plan,

21

including without limitation the following:  (a) prepetition Claims that have been paid,

postpetition, with Court authorization, provided that the Plan may discontinue such payments;

(b) the assumption of or entering into contracts or leases, provided that the Plan may assign or

provide for the termination of such contracts or leases; and (c) settlements or compromises of

Claims.  Any holder of a Claim in any Class may agree, pursuant to Bankruptcy Code section

1123(a)(4), to a treatment of such Claim that is less favorable than any other Claim in such

Class.

        a.      <u>R&W Sale Plan Provisions</u>.  The Asset Purchase Agreement (and,

consistent with the Asset Purchase Agreement, the Plan) contemplate the Sale of the Debtors'

Assets to the Purchaser by the Sale Deadline for a sale price sufficient to pay Allowed Claims in

full, with Allowed Secured Claims to be paid in full with interest.

        b.      <u>Alternative Plan Provisions</u>.  If the Sale Deadline passes without the Sale

to the Purchaser closing, the following will occur regardless of whether the Effective Date has

occurred.

        1.      <u>If the Production Facility Is in "Producing Status."</u>   If the

Production Facility has been placed into "Producing Status," by the Sale Deadline, then

the Debtors shall have a period of 180 days after the Sale Deadline within which to close

an Alternative Sale to a buyer, so long as the net sales proceeds from such an Alternative

Sale equal or exceed the aggregate amount of all Allowed Secured Claims as of the

closing date of such an Alternative Sale, including accrued interest and attorney's fees on

such secured claims under the Plan (or unless the holders of at least 90% in amount of all

Allowed Secured claims consent, in writing, to a sale in a lesser amount).  In the event

SLC_1125653.7

that the Sale Deadline is extended beyond August 29, 2012, the number of days beyond

this date will count against the 180-day period to effectuate an Alternative Sale under

Section 5.1.b.1. below and against the 120-day period for conducting an Auction under

Section 5.1.b.2. below.[3]  R&W will be permitted to purchase the Assets through such a

private sale but only if the purchase price totals the sum of at least (a) the purchase price

under the Asset Purchase Agreement, including interest from the Petition Date to the Sale

Deadline, and (b) interest at 10% per annum on the purchase price under the Asset

Purchase from the Sale Deadline to the date of the closing of the Alternative Sale.  If the

Debtors are unable to close such a sale within such time, or if, in the exercise of their

sole, good faith business judgment, the Debtors elect not to proceed with such a private

sales effort, or elect to terminate the private sales effort for any reason, including the

Debtor's determination that the Debtors' Production Facility and other Assets are  not

economically practical, then all of the Debtor's assets will be sold at an Auction in

accordance with the notice and auction procedures outlined below, *provided, however,*

that the time periods set forth below for such Auction, shall be reduced proportionately

by the number of days that the Debtors attempted to sell the assets under this paragraph,

but, in no event, shall the Auction be held more than 180 days after the Sale Deadline.  If

the Debtors' Assets are sold at an Alternative Sale, the proceeds from the sale of the

Assets (except for proceeds and accounts receivable from the sales of tar sands, PMOSA,

and dry froth, and other cash from operations or prior loans, which will be used to pay

Post-Confirmation Date Expenses until those Post-Confirmation Date Expenses are paid)

---

[3] The Court has approved an approximately 120-day extension of the Sale Deadline, from
June 30, 2012 through October 31, 2012.  Because of this, the 180-day period within which to seek an
Alternative Sale or at the end of which an Auction would be held begins from August 29, 2012.

23

will be distributed first to the holders of Allowed Secured Claims, in accordance with

their respective priorities under State law, and then to the holders of other Allowed

Claims, in accordance with priorities established by the  Bankruptcy Code.  The 180-day

deadline for closing either an Alternative Sale or for completing an Auction may not be

further extended.  The Assets would be sold where-is, as-is, by appropriate assignments,

bills of sale, and special warranty deeds, but free and clear of all claims and interests

except debts assumed by the purchaser with the written consent of the respective

creditors, and unexpired leases and executory contracts that the purchaser desired to

acquire would be assumed and assigned to the purchaser.

   2. <u>If the Production Facility Is in "Non-Producing Status</u>."  If the

Production Facility is in "Non-Producing Status" as of the Sale Deadline, then the

Debtors' Assets will be sold pursuant to the notice and auction procedures set forth

below.  If the Debtors' Assets are sold pursuant to an Auction, the proceeds from the sale

of the Assets (except for accounts receivable from the sales of tar sands PMOSA, and dry

froth and proceeds of such sales and other cash from operations or prior loans, which will

be used first to pay Post-Confirmation Date Expenses until those Post-Confirmation Date

Expenses are paid in full) will be distributed first to the holders of Allowed Secured

Claims, in accordance with their respective priorities under State law, and then to the

holders of other Allowed Claims, in accordance with priorities established by the

Bankruptcy Code.

   (a) the Debtors will schedule an Auction of the Assets on the

date that is 120 days after the Sale Deadline Date;

24

(b)      notice of the Auction would be sent to

(1)      all creditors in the case;

(2)      all third parties from whom the Debtors received solicitations of interest, or offers, in the past two years;

(3)      R&W;

(4)      any other potential bidders to whom the Debtors choose to give notice.

(c)      notice of the Auction would be published at least three times, during the notice period, in each of

(1)      the *Wall Street Journal*;

(2)      a trade publication with an international circulation;

(3)      a local newspaper with a statewide circulation.

(d)      the form of the notice would include a general description of the assets and the Auction, explain how bidders could obtain further information about the assets, contain the date, time and place of the Auction sale, explain the pre-bidding qualifications, and explain the bidding requirements;

(e)      all bidders would be required to sign a non-disclosure agreement before obtaining any specific, proprietary information about the assets;

(f)      all contracts that the Debtors cure and assume pursuant to the Plan also would be assignable to and assumable by the successful bidder at the Auction;

(g)      the Debtors would establish a document room for physical and electronic access to records by bidders, and also would permit physical inspections, at prescribed times, of the facilities;

25

(h)     at the Auction, all holders of Allowed Secured Claims would be permitted to credit bid their respective claims for the assets that secure those claims up to the allowed amounts of their claims, including accrued interest and attorney's fees, as established by the prior Settlement Agreement between the Debtors / Western / Elgin, or as otherwise determined by court order.

(i)     other than credit bids, all other bids would be for cash only, to be paid within three business days after the Auction, and with back-up bids to be accepted in the event the successful, high bidder fails to close;

(j)     The Assets would be sold where-is, as-is, by appropriate assignments, bills of sale and special warranty deeds, but free and clear of all claims and interests except debts assumed by the bidder with the written consent of the respective creditors, and unexpired leases and executory contracts that the purchaser desired to acquire would be assumed and assigned to the purchaser.

5.2     Secured Claims – Classes 1, 2, 3, 4, 5, 6, 7, and 8.  Classes 1, 2, 3 (including all subclasses), 4, 5, 6, 7, and 8 (if any, including all subclasses) consist of Secured Claims. Treatment of Allowed Secured Claims under the Plan does not resolve the disputes over priority which existed before the Petition Date.  All Allowed Secured Claims will be paid in full under the proposed Sale to the Purchaser (although, in certain instances, in agreed-to, compromised amounts and, possibly, in the event of objections to Claims are successfully prosecuted, in reduced amounts for Claims that have not been allowed earlier by Final Order or approved settlement).  It is possible also that proceeds from the sale of the Assets to an alternative purchaser under an Alternative Sale or pursuant to the Auction will not provide sufficient

26

proceeds to pay Allowed Claims in full.  In the event that a sale closes with sufficient proceeds

to pay Allowed Claims in full, it will not be necessary to resolve these priority disputes.  If,

however, Assets are sold to an alternative purchaser under an Alternative Sale or pursuant to an

Auction, and the sale proceeds are insufficient to pay all Allowed Secured Claims in full, the

priorities of Secured Claims may affect the amount that is distributed to the holder of an Allowed

Secured Claim under the Plan.

    a.  <u>Class 1 Claim of Raven</u>.  In the event that the Sale closes (or if the

proceeds from an Alternative Sale, or, if an Auction is held, the proceeds from an Auction, are

sufficient to pay the Allowed Secured Claim of Raven in full), the maturity of obligations to

Raven shall be extended until date of payment, all defaults on obligations to Raven and any other

defaults under agreements with Raven will be deemed cured and waived, and the Allowed

Secured Claim of Raven against all the Debtors shall be paid in full, with payment in cash of all

principal and accrued interest at the non-default contractual rate (8.25% per annum), plus

reasonable attorney's fees to the extent allowable under applicable law, up to the date of

payment.  Payments made to Raven from cash collateral prior to distributions pursuant to this

Plan, if any, will be credited against amounts owed on account of Raven's Allowed Secured

Claims.

    If the proceeds from an Alternative Sale are insufficient to pay Raven's Allowed

Secured Claim in full, Raven will receive the proceeds of such an Alternative Sale up to the

principal amount of its Allowed Secured Claim with accrued interest, plus reasonable attorney's

fees to the extent allowable under applicable law, after payment in full of Allowed Secured

Claims with superior priority, if any.  If no Alternative Sale closes, an Auction will be conducted

consistent with the procedures set forth in Section 5.1.b.2 above, and Raven will be permitted to credit bid its Allowed Secured Claim at the Auction, consistent with its priority in the Assets. Raven will receive the proceeds of such an Auction up to the principal amount of its Allowed Secured Claim with accrued interest, plus reasonable attorney's fees to the extent allowable under applicable law after payment in full of Allowed Secured Claims with superior priority, if any.  In any of these events, Raven will retain its liens against Assets of the Debtors to the same extent, with the same validity, and in the same priority that they held before the Petition Date until the Allowed Secured Claim of Raven is paid in full, or until there is no remaining collateral to which those liens can attach.  The Debtors believe that, under the Sale, by curing the default in its obligations to Raven through full cash payment if the Sale closes, Raven should not be entitled to contractual default interest.  In the event of the Sale closing, if the matter of default interest is disputed, the Allowed Secured Claim of Raven will be paid in full on the later of the date when other Allowed Secured Claims are paid or the date on which it is Allowed.  Class 1 is impaired by the Plan.

        b.    <u>Class 2 Claim of Western</u>.  In the event that the Sale closes (or if the proceeds from an Alternative Sale, or, if an Auction is held, the proceeds from an Auction, are sufficient to pay the Allowed Secured Claim of Western in full), the Allowed Secured Claim of Western against all the Debtors shall be paid, with payment in cash in the amount of $18,500,000, plus interest at the rate of 10% per annum from the Petition Date until paid in full. The amount of the Allowed Claim and the interest rate applicable thereto from the Petition Date were fixed pursuant to the Western/Elgin Agreement.  Payments made to Western from cash collateral prior to distributions under this Plan, if any, will be credited against amounts owed on

SLC_1125653.7

account of Western's Allowed Secured Claims, unless they are in repayment of unpaid amounts

advanced by Western to Tar Sands Holdings, LLC.  If the proceeds from an Alternative Sale are

insufficient to pay Western's Allowed Secured Claim in full, Western will receive the proceeds

of such an Alternative Sale up to the principal amount of its Allowed Secured Claim with

accrued interest, after payment in full of any Allowed Secured Claims with superior priority.  If

no Alternative Sale closes, an Auction will be conducted consistent with the procedures set forth

in Section 5.1.b.2 above, and Western will be permitted to credit bid its Allowed Secured Claim

at any Auction of the Assets, consistent with its priority in the Assets.  Western will receive the

proceeds of such an Auction up to the principal amount of its Allowed Secured Claim with

accrued interest after payment in full of any Allowed Secured Claims with superior priority.  In

any of these events, Western will retain its liens against Assets of the Debtors to the same extent,

with the same validity, and in the same priority that they held before the Petition Date until the

Allowed Secured Claim of Western is paid in full, or until there is no remaining collateral to

which those liens can attach.

       Unpaid amounts advanced by Western to Tar Sands Holdings, LLC, which are to

be paid from cash collateral, are not included in the primary Allowed Claim and shall be paid

separately under the Plan, if not paid before from cash collateral.  Class 2 is impaired by the

Plan.

       c.    Class 3A Claim of Elgin.  In the event that the Sale closes (or if the

proceeds from an Alternative Sale, or, if an Auction is held, the proceeds from an Auction, are

sufficient to pay the Allowed Secured Claim of Elgin), the Allowed Class 3 Claim of Elgin will

be paid in full as set forth herein.  The principal amount of Elgin's Allowed Class 3A Secured

SLC_1125653.7

Mechanic's Claim is, pursuant to the Western/Elgin Agreement, $12,070,316.11 as to all the

Debtors in the aggregate, exclusive of unreimbursed advances by Elgin to Tar Sands Holdings,

LLC, if any remain as of the date distributions are made under this Plan, plus simple interest at

the rate of 10% per annum from the Petition Date until paid in full.  Elgin's Class 3A Claim has

included in it the claims of its subcontractors, some of whom have filed separate Secured

Mechanic's Lien Claims.  The Allowed Claim of Elgin and its subcontractors will only be paid

once.  No duplicative payments will be made under the Plan.  If individual subcontractors can

establish a valid higher contractual rate of interest (up to 18% per annum), they will receive that

higher rate of interest and, if a subcontractor is paid through Elgin, Elgin's Claim will be

increased by that amount.  If an individual subcontractor whose claim is included in Elgin's

Claim has filed a separate proof of claim, and if that subcontractor is paid under the Plan rather

than Elgin being paid for that Claim under the Plan, Elgin's Claim shall be reduced in the

amount included for that subcontractor in Elgin's Claim.  If a claim of a subcontractor included

in Elgin's Claim is reduced or disallowed, Elgin's Claim will be reduced by the amount of the

reduction or disallowance of that subcontractor Claim. If the proceeds from an Alternative Sale

are insufficient to pay Elgin's Allowed Secured Claim in full, Elgin will receive the proceeds of

such an Alternative Sale up to the principal amount of its Allowed Secured Claim with Allowed

accrued interest, after payment in full of any Allowed Secured Claims with superior priority.  If

no Alternative Sale closes, an Auction will be conducted consistent with the procedures set forth

in Section 5.1.b.2 above.  Elgin will be permitted to credit bid its Allowed Secured Claim at any

Auction of the Assets, consistent with its priority in the Assets.  Elgin will receive the proceeds

SLC_1125653.7

of such an Auction up to the principal amount of its Allowed Secured Claim with Allowed

accrued interest, after payment in full of any Allowed Secured Claims with superior priority.

Payments made to Elgin from cash collateral prior to distributions under this Plan,

if any, will be credited against amounts owed on account of Elgin's Allowed Secured Claims,

unless they are in repayment of unpaid amounts advanced by Elgin to Tar Sands Holdings, LLC.

Elgin will retain its liens against the Debtor's Assets in the same priority that they held before

the Petition Date until the Allowed Secured Claim of Elgin is paid in full, or until there is no

remaining collateral to which those liens can attach.  If Elgin's Claim includes an amount for a

subcontractor who has filed a separate proof of claim and if that subcontractor's Claim is

objected to, Elgin will be paid undisputed portions of its Claim pending resolution of that

subcontractor's Claim.  Class 3A is impaired by the Plan.

d.    Class 3 Claims Other than Elgin (Classes 3B-3M).  In the event that the

Sale closes (or if the proceeds from an Alternative Sale  or, if an Auction is held, the proceeds

from an Auction, are sufficient to pay the Allowed Secured Class 3 Claims other than Elgin

against all the Debtors), the Allowed Secured Class 3 Claims other than Elgin shall be paid all

principal and accrued interest at the contractual rate until paid in full, plus reasonable attorney's

fees to the extent allowable under applicable law, up to date of payment, after payment in full of

any Allowed Secured Claims with superior priority.  Allowed Secured Mechanic's Lien Claims

against all of the Debtors other than the Class 3A Claim of Elgin shall be paid, with accrued

interest at 10% per annum unless a valid higher contractual rate of interest, up to 18% per

annum, in which event the Allowed Secured Mechanic's Lien Claim will accrue interest at that

higher contractual rate of interest, and reasonable attorney's fees to the extent allowable under

31

applicable law incurred up to date of payment.  If an Allowed Secured Mechanic's Lien Claim

has been asserted duplicatively against more than one of the Debtors and/or is included in the

Allowed Secured Claim of Elgin in Class 3A, it will be Allowed against only one Debtor and

paid only once.  A Secured Mechanic's Lien Claim will be reduced by payments received after

the Petition Date, including through the purchase by the Debtors of equipment that served as

collateral to secure the Mechanic's Lien Claim.  The Debtors, the Reorganized Debtor, or the

Purchaser may object to Mechanic's Lien Claims based on principal amount, lien defect, failure

to timely file a lien enforcement action, or any other basis.  If some or all of a Mechanic's Lien

Claim is successfully objected to, such Claim will be disallowed, Allowed in a Secured amount

and Allowed in an Unsecured amount, or reduced, as determined by the Court.  Payments made

to the holder of a Mechanic's Lien Claim from cash collateral prior to distributions under this

Plan, if any, will be credited against amounts owed on account of that Mechanic's Lien Claim.

If the proceeds from an Alternative Sale are insufficient to pay Allowed Class 3

Claims other than Elgin in full, the holder of an Allowed Class 3 Mechanic's Lien Claim other

than Elgin will receive the proceeds of such an Alternative Sale up to the principal amount of its

Allowed Secured Claim with accrued interest, plus reasonable attorney's fees to the extent

allowable under applicable law, after payment in full of any Allowed Secured Claims with

superior priority.  If no Alternative Sale closes, an Auction will be conducted consistent with the

procedures set forth in Section 5.1.b.2 above.  The holder of an Allowed Class 3 Mechanic's

Lien Claim will be permitted to credit bid its Allowed Secured Claim at any Auction of the

Assets, consistent with its priority in the Assets.  The holder of an Allowed Class 3 Mechanic's

Lien Claim will receive the proceeds of such an Auction Sale up to the principal amount of its

Allowed Class 3 Mechanic's Lien Claim with accrued interest, plus reasonable attorney's fees to

the extent allowable under applicable law, after payment in full of any Allowed Secured Claims

with superior priority.

The holder of an Allowed Class 3 Mechanic's Lien Claim will retain its liens

against Assets of the Debtors to the same extent, with the same validity, and in the same priority

that they held before the Petition Date until that Allowed Class 3 Mechanic's Lien Claim is paid

in full, or until there is no remaining collateral to which those liens can attach.  Class 3B-3M

subclasses are impaired by the Plan.

e.      Class 4 Claims of Uintah County.  Allowed Class 4 Claims of Uintah

County for property taxes against all of the Debtors shall be paid in cash in full on the later of the

date distributions are made under this Plan or on the date Allowed, with all principal and accrued

interest at the legal rate to the date of distributions.  Uintah County will retain its liens against the

Debtor's Assets to the same extent, with the same validity, and in the same priority that they held

before the Petition Date until such Allowed Class 4 Claims are paid in full.  Class 4 is impaired

by the Plan.

f.      Class 5 Claims of R&W.  In the event  the Sale to R&W closes, the

Allowed Class 5 Secured Claims of R&W for amounts advanced in the Original DIP Financing

Facility and the Startup DIP Financing Facility shall be treated as follows:  (a) amounts advanced

by R&W under the Original DIP Financing Facility will be treated as amounts paid by R&W as

Purchaser for the Debtors' Assets and no repayment by the Debtors is required; (b) amounts

advanced by R&W under the Startup DIP Financing Facility, other than to pay for costs of

extraction of tar sands for sale as paving material in road construction, will be treated as amounts

33

paid by R&W as Purchaser for the Debtors' Assets and no repayment by the Debtors is required.

Amounts advanced for costs of extracting tar sands for sale (with a limit of $550,000), to the

extent not earlier paid from the proceeds of the sale of the tar sands, will be paid in cash in full,

with interest, to the date of payment.   R&W will retain its lien on the extracted tar sands and

proceeds therefrom until amounts advanced for extraction of those tar sands are paid in full.

   In the event the Sale to R&W does not close, if the proceeds from an Alternative

Sale are sufficient to pay Allowed Secured Claims in full, R&W will receive from the proceeds

of such an Alternative Sale up to an amount equal to the principal amount of its Allowed Secured

Claim with accrued interest, plus reasonable attorney's fees to the extent allowable under

applicable law until they are paid in full after payment in full of any Allowed Secured Claims

with superior priority.  If no Alternative Sale closes, an Auction will be conducted consistent

with the procedures set forth in Section 5.1.b.2 above.  R&W will be permitted to credit bid its

Allowed Secured Claim at any Auction of the Assets, consistent with its priority in the Assets.

In the event that the proceeds from an Alternative Sale or Auction of the Debtors' Assets are

insufficient to pay Allowed Secured Claims in full, R&W will receive payment to the extent

proceeds are available to pay those Claims based on the priority of R&W's security interests.  In

any of these events, R&W will retain its liens against Assets of the Debtors to the same extent,

with the same validity, and in the same priority as provided in orders of the Bankruptcy Court

approving the Original DIP Financing Facility and Startup DIP Financing Facility (as amended)

until the Allowed Secured Claim of R&W is paid in full, or until there is no remaining collateral

to which those liens can attach.  Class 5 is unimpaired under the Plan if the Sale to R&W closes.

Class 5 is impaired under the Alternative Plan Provisions.

g.      Class 6 Claim of Utah DOGM.  The Allowed Class 6 Secured Claim of

Utah Division of Oil, Gas & Mining ("DOGM") shall be treated by leaving unaltered the legal

(including statutory and regulatory), equitable, and contractual rights to which Utah DOGM is

entitled with respect to the certificate of deposit pledged by CAR to secure reclamation

obligations related to CAR's mining operations.  Class 6 is unimpaired by the Plan.

h.      Class 7 Claims of Gavilan Petroleum, LLC.  In the event that the Sale

closes (or if the proceeds from an Alternative Sale, or, if an Auction is held, from proceeds from

an Auction, are sufficient to pay the Allowed Secured Claim of Gavilan Petroleum, LLC in full),

that Claim shall be paid all principal and accrued interest at the contractual rate until paid in full,

plus reasonable attorney's fees to the extent allowable under applicable law.  If the proceeds

from an Alternative Sale are insufficient to pay Allowed Secured Claims in full, the holder of the

Class 7 Claims of Gavilan Petroleum, LLC will receive from the proceeds of such an Alternative

Sale an amount up to the principal amount of the Class 7 Allowed Secured Claim with accrued

interest, plus reasonable attorney's fees to the extent allowable under applicable law, after

payment in full of any Allowed Secured Claims with superior priority.  If no Alternative Sale

closes, an Auction will be conducted consistent with the procedures set forth in Section 5.1.b.2

above.  The holder of the Class 7 Claims of Gavilan Petroleum, LLC will be permitted to credit

bid the Allowed Class 7 Secured Claim at any Auction of the Assets, consistent with the priority

of that Claim in the Assets.  Gavilan Petroleum, LLC will retain its liens against the Debtor's

Assets to the same extent, with the same validity, and in the same priority that they held before

the Petition Date until such Allowed Class 7 Claim is paid in full, or until there is no remaining

collateral to which those liens can attach.  Class 7 is impaired by the Plan.

35

i.      Class 8 Claims.  All other Allowed Secured Claims not otherwise

classified or treated, if any, shall be classified and treated in a separate subclass of Class 8.  In

the event that the Sale closes (or if the proceeds from an Alternative Sale, or, if an Auction is

held, the proceeds from an Auction, are sufficient to pay the Allowed Class 8 Secured Claim,

LLC in full), that Claim shall be paid, with payment in cash of all principal and accrued interest

at the non-default contractual rate until paid in full, plus reasonable attorney's fees to the extent

allowable under applicable law, up to the date of payment.  If the proceeds from an Alternative

Sale are insufficient to pay Allowed Secured Claims in full, the holder of an Allowed Class 8

Secured Claim will receive from the proceeds of such an Alternative Sale an amount up to the

principal amount of its Allowed Secured Claim with accrued interest, plus reasonable attorney's

fees to the extent allowable under applicable law after payment in full of any Allowed Secured

Claims with superior priority until there is no remaining collateral to which those liens may

attach.  If no Alternative Sale closes, an Auction will be conducted consistent with the

procedures set forth in Section 5.1.b.2 above.  The holder of an Allowed Class 8 Secured Claim

will be permitted to credit bid its Allowed Secured Claim at any Auction of the Assets,

consistent with its priority in the Assets.  The holder of an Allowed Secured Class 8 Secured

Claim will retain its liens against the Debtor's Assets to the same extent, with the same validity,

and in the same priority that they held before the Petition Date until such Allowed Class 8 Claim

is paid in full, or until there is no remaining collateral to which those liens can attach.  Class 8 is

impaired by the Plan.

5.3    <u>Priority Claims - Class 9</u>.  Allowed Class 9 Priority Claims shall be paid in full in cash on the Effective Date of the Plan or, if later, on the date Allowed, with interest at the rate of 10% per annum from the Petition Date until paid.  Class 9 is impaired by the Plan.

5.4    <u>Unsecured Claims - Class 10</u>.

a.    <u>Class 10A Claims</u>.  In the event that the Sale closes (or if the proceeds from an Alternative Sale, or if an Auction is held, the proceeds from an Auction, are sufficient to satisfy in full or that makes adequate provision for satisfaction in full of all Allowed Administrative Expense Claims, including Post-Confirmation Date Expenses, Allowed Priority Claims, and Allowed Class 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10A Claims, Allowed Class 10A Unsecured Claims against CAR will be paid on the later of (1) a date as soon as practicable after Allowed Claims with superior priority are paid, and (2) the date on which the Class 10A Unsecured Claim is Allowed.  If the proceeds from an Alternative Sale or, if an Auction is held, the proceeds of an Auction, are insufficient to pay all Allowed Claims with priority over Allowed Class 10A Unsecured Claims and Allowed Class 10A Claims, in full, holders of Allowed Class 10A Unsecured Claims will receive no distribution until Allowed Claims with priority over Class 10A are paid in full, and adequate provisions for Post-Confirmation Date Expenses are made, pursuant to the terms of this Plan.  If Allowed Claims in those Classes are paid in full and adequate provisions for payment of Post-Confirmation Date Expenses are made, holders of Allowed Class 10A Claims will receive from the proceeds of such an Alternative Sale or Auction up to an amount equal to the principal amount of their Allowed Unsecured Claims. Class 10A is impaired by the Plan.

SLC_1125653.7

b.     <u>Class 10B Claims</u>.  In the event that the Sale closes (or if the proceeds

from an Alternative Sale, or, if an Auction is held, the proceeds from an Auction, are sufficient

to satisfy in full or that to make adequate provision for satisfaction in full of all Allowed

Administrative Expense Claims, including Post-Confirmation Date Expenses, Allowed Priority

Claims, and Allowed Class 1, 2, 3, 4, 5, 6, 7, 8, 9, 10A, and 10B Claims),  Allowed Class 10B

Unsecured Claims against UBR will be paid on the later of (1) a date as soon as practicable after

Allowed Claims with superior priority are paid, and (2) the date on which the Class 10B

Unsecured Claim is Allowed.  If the proceeds from an Alternative Sale or, if an Auction is held,

the proceeds of an Auction, are insufficient to pay all Allowed Claims with priority over

Allowed Class 10B Unsecured Claims and Allowed Class 10B Unsecured Claims, in full,

holders of Allowed Class 10B Unsecured Claims will receive no distribution until Allowed

Claims with priority over Class 10B are paid in full, and adequate provisions for payment of

Post-Confirmation Date Expenses are made, pursuant to the terms of this Plan.  If Allowed

Claims in those Classes are paid in full, and adequate provisions for payment of Post-

Confirmation Date Expenses are made, holders of Allowed Class 10B Unsecured Claims will

receive from the proceeds of such an Alternative Sale up to an amount equal to the principal

amount of their Allowed Unsecured Claims. Each holder of an Allowed Class 10B Claim whose

Claim is also Allowed against CAR will credit amounts received on account of its Allowed Class

10A Claims against amounts owed on account of its Allowed Class 10B Claim.  Class 10B is

impaired by the Plan.

c.     <u>Class 10C Claims</u>.  In the event that the Sale closes (or if the proceeds

from an Alternative Sale, or, if an Auction is held, the proceeds from an Auction, are sufficient

to satisfy in full or that makes adequate provision for satisfaction in full of all Allowed

Administrative Expense Claims, including Post-Confirmation Date Expenses, Allowed Priority

Claims, and Allowed Class 1, 2, 3, 4, 5, 6, 7, 8, 9, 10A, 10B, and 10C Claims, Allowed Class

10C Unsecured Claims against KTIA will be paid on the later of (1) a date as soon as practicable

Allowed Claims with superior priority are paid, and (2) the date on which the Class 10C

Unsecured Claim is Allowed.  If the proceeds from an Alternative Sale or, if an Auction is held,

the proceeds of an Auction, are insufficient to pay all Allowed Claims with priority over

Allowed Class 10C Unsecured Claims and Allowed Class 10C Unsecured Claims, in full,

holders of Allowed Class 10C Unsecured Claims will receive no distribution until Allowed

Claims with priority over Class 10C are paid in full, and adequate provisions for payment of

Post-Confirmation Date Expenses are made, pursuant to the terms of this Plan.  If Allowed

Claims in those Classes are paid in full and adequate provisions for payment of the Post-

Confirmation Date Expenses are made, holders of Allowed Class 10C Unsecured Claims will

receive from the proceeds of such an Alternative Sale up to an amount equal to the principal

amount of their Allowed Unsecured Claims. Each holder of an Allowed Class 10C Claim whose

Claim is also Allowed against CAR and/or UBR will credit amounts received on account of its

Allowed Class 10A and 10B Claims against amounts owed on account of its Allowed Class 10C

Claim.  Class 10C is impaired by the Plan.

  5.5  <u>Subordinated Unsecured Claims of R&W– Class 11</u>.  If the Sale to R&W closes,

the Allowed Subordinated Unsecured Claims of R&W against the Debtors will receive no

distribution and the Startup DIP Financing Facility by R&W that gave rise to the Allowed

Subordinated Unsecured Claims of R&W will be treated as a part of R&W's purchase of the

Debtors' Assets.  If the Sale to R&W does not close, but the proceeds from an Alternative Sale,

or, if an Auction is held, the proceeds from an Auction, are sufficient to satisfy in full or make

adequate provision for satisfaction in full of all Allowed Administrative Expense Claims,

including Post-Confirmation Date Expenses, Allowed Priority Claims, and Allowed Class 1, 2,

3, 4, 5, 6, 7, 8, 9, 10, and 11 Claims, the Allowed Class 11 Unsecured Claim of R&W will be

paid the remaining sale proceeds up to the Allowed Amount of its Class 11 Claim.  If the

proceeds from an Alternative Sale an Auction are insufficient to pay all Allowed Claims with

priority over the Allowed Class 11 Unsecured Claim and the Allowed Class 11 Unsecured

Claim, in full, R&W will receive no distribution until Allowed Claims with priority over

Class 11 are paid in full, and adequate provisions for payment of Post-Confirmation Date

Expenses are made, pursuant to the terms of this Plan.  If Allowed Claims in those Classes are

paid in full, R&W will receive from the proceeds of such an Alternative Sale up to an amount

equal to the principal amount and interest of its Allowed Class 11 Subordinated Unsecured

Claim.  Class 11 is impaired by the Plan.

      5.6      <u>Insider Unsecured Claims – Class 12</u>.

      a.      <u>Class 12A Claims</u>.  Allowed Insider Unsecured Claims against CAR will

receive no distributions on account of such Claims, which will be subordinated, on the

Confirmation Date, to all other Classes of Claims (other than other Class 12 Claims), except that,

if the Sale closes (or if the proceeds from an Alternative Sale, or, if an Auction is held, the

proceeds from an Auction, are sufficient to make a distribution to holders of Allowed Insider

Unsecured Claims against CAR), proceeds therefrom need to be distributed from one Debtor to

another Debtor to provide sufficient funds for that Debtor to make payments to holders of Claims

40

pursuant to this Plan, such transfer shall be made.  In the event that the Sale closes or if the

proceeds from an Alternative Sale, or, if an Auction is held, the proceeds from an Auction, are

sufficient that Allowed Class 10 and 11 Unsecured Claims are paid in full and adequate

provisions for payment of Post-Confirmation Date Account are made, holders of Allowed Insider

Unsecured Claims will permit the conveyance to the Reorganized Debtor of the Mineral Royalty

pursuant to the Plan.  Class 12A is impaired by the Plan and may be deemed to reject the Plan.

    b.  <u>Class 12B Claims</u>.  Allowed insider Unsecured Claims against UBR will

receive no distributions on account of such Claims, which will be subordinated, on the

Confirmation Date, to all other Classes of Claims (other than other Class 12 Claims), except that,

if the Sale closes or if the proceeds from an Alternative Sale, or, if an Auction is held, the

proceeds therefrom need to be distributed from one Debtor to another Debtor to provide

sufficient funds for that Debtor to make payments to holders of Claims pursuant to this Plan,

such transfer shall be made..  In the event that the Sale closes or if the proceeds from an

Alternative Sale, or, if an Auction is held, from the proceeds from an Auction, are sufficient that

Allowed Class 10 and 11 Unsecured Claims are paid in full and adequate provisions for payment

of Post-Confirmation Date Expenses are made, holders of Allowed insider Unsecured Claims

will permit the conveyance to the Reorganized Debtor of the Mineral Royalty pursuant to the

Plan.  Class 12B is impaired by the Plan and may be deemed to reject the Plan.

    c.  <u>Class 12C Claims</u>.  Allowed insider Unsecured Claims against KTIA will

receive no distributions on account of such Claims, which will be subordinated, on the

Confirmation Date, to all other Classes of Claims (other than Class 12 Claims). To the extent that

they would receive a distribution, holders of Allowed Insider Unsecured Claims will permit the

SLC_1125653.7

conveyance to the Reorganized Debtor of the Mineral Royalty pursuant to the Plan. Class 12C is

impaired by the Plan and is deemed to reject the Plan.

    5.7    <u>Interests - Class 13</u>.

    a.    <u>Class 13A Interest</u>.  UBR owns 100% of the Interest in CAR.  In the event

that the Sale Closes, UBR's Class 13A Interest in CAR will be sold to the Purchaser as part of

the Sale.  In the event that the Sale closes (or if the proceeds from an Alternative Sale, or, if an

Auction is held, the proceeds from an Auction, are sufficient to satisfy in full or that makes

adequate provision for satisfaction in full of all Allowed Claims and for Post-Confirmation Date

Expenses), UBR will receive, either for the sale of its Interest in CAR or as a distribution from

CAR, an amount sufficient to pay Allowed Claims against UBR and KTIA that are not paid by

CAR.  The Class 13A Interest is impaired by the Plan.

    b.    <u>Class 13B Interest</u>.  In the event that the Sale closes (or if the proceeds

from an Alternative Sale, or, if an Auction is held, the proceeds from an Auction, are sufficient

to satisfy in full or that makes adequate provision for satisfaction in full of all Allowed Claims),

KTIA will receive a dividend from UBR through UHI in a sufficient amount to pay Allowed

Claims against KTIA that are not paid by CAR or UBR.  After all Allowed Claims against UBR

are paid or after adequate provision is made for payment of all Allowed Claims against UBR is

made, UHI, which owns 100% of the Interest in UBR, and UBR will either be wound up and

dissolved or merged into KTIA, which will be the Reorganized Debtor.  In addition, in the event

that the Sale closes, as set forth in the Asset Purchase Agreement, KTIA as Reorganized Debtor

and in further satisfaction of Class 13A and 13B Interests, shall receive a perpetual royalty

initially as a portion of the 10% net royalty set forth in the Lease or an equivalent amount under

42

any future royalties established by Purchaser under a future minerals lease.  This royalty shall be

transferred to KTIA at the closing of the Sale pursuant to the Mineral Royalty Conveyance.  The

Purchaser shall have the right to offset from any royalty payment owed to the Reorganized

Debtor under the Mineral Royalty Conveyance, in addition to its right of offset under Section 8.4

of the Asset Purchase Agreement, an amount equal to the difference between the cash portion of

the Purchase Price paid by the Purchaser under Section 2.2(a)(3) of the Asset Purchase

Agreement and the sum of $34,484,068.00 plus interest of $8,742.00 per day from September 30,

2011 through the Closing Date (the "Purchase Price Difference") plus interest accrued on such

Purchase Price Difference at the rate of ten percent (10%) per year from the date of closing until

such Purchase Price Difference is paid in full.  The Purchaser's right to offset royalty payments

as described above shall be limited to 80% of each royalty payment subject to such right of offset

and the Purchaser shall pay 20% of each such royalty payment to the Reorganized Debtor for its

use to fund operations.  Any amounts that are offset by the Purchaser pursuant to the Asset

Purchase Agreement as described above shall be applied first to accrued and unpaid interest on

the Purchase Price Difference and then to the principal balance of the Purchase Price Difference.

Until such Purchase Price Difference, and accrued interest, is paid in full, the Purchaser shall not

have any obligation to pay the Reorganized Debtor any amounts under the Mineral Royalty

Conveyance, except for the 20% described above.  Notwithstanding any provision herein to the

contrary, if the Purchaser exercises its right to offset royalty payments under Section 8.4 of the

Asset Purchase Agreement, then it shall not be obligated to pay the Reorganized Debtor any

portion of the royalty payment subject to such right of offset.  The Purchaser shall provide

SLC_1125653.7

accountings in writing, at least quarterly, of all amounts necessary to calculate any royalty

payment owed under the Mineral Royalty Conveyance or any offset.

   In the event that the Sale does not close but an Alternative Sale or Auction results

in proceeds sufficient to satisfy in full or make adequate provision for satisfaction in full of all

Allowed Claims and the Post-Confirmation Date Expenses, KTIA will receive any remaining

proceeds after satisfaction in full of all Allowed Claims. The Class 13B Interest is impaired by

the Plan.

   c. <u>Class 13C Interest</u>.  KTIL will retain its Interest in KTIA, the Reorganized

Debtor under the Plan.  No distributions shall be made to KTIL unless and until all obligations

under this Plan to holders of Allowed Claims have been satisfied in accordance with this Plan

and provision has been made to satisfy Post-Confirmation Date Expenses.  The Class 13C

Interest is impaired by the Plan.

### ARTICLE VI.
### Distributions under the Plan, Objections to Claims, and Disputed Claims

  6.1 <u>Distributions of Cash</u>.  Any payment of Cash made by the Reorganized Debtor

pursuant to the Plan may be made at the option of such party either by check drawn on a

domestic bank or by wire transfer from a domestic bank.

  6.2 <u>Distributions Free and Clear</u>.  Except as otherwise provided in the Plan, any

distributions or transfers by or on behalf of the Reorganized Debtor under the Plan, including,

but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any

liens, claims, and encumbrances, and no other entity shall have any interest – legal, beneficial, or

otherwise – in assets transferred pursuant to the Plan.

SLC_1125653.7

6.3    <u>Timing of Distributions</u>.  Unless otherwise provided in the Plan, any distribution

to be made by the Reorganized Debtor shall be made as soon as practicable after the Sale closes,

or, in the event of an Alternative Sale or Auction, as soon as practicable after the closing of an

Alternative Sale or Auction.  In the event that any payment or act under the Plan is required to be

made or performed on a date that is not a Business Day, then the making of such payment or the

performance of such act may be completed on the next succeeding Business Day, but shall be

deemed to have been completed as of the required date.

6.4    <u>Delivery of Distributions</u>.  Subject to Bankruptcy Rule 9010, all distributions to

any holder of an Allowed Claim shall be made at the address of such holder as set forth on the

Schedules or on the books and records of the Debtors or their agents.  The holder of an Allowed

Claim must notify the Reorganized Debtor in writing of a change of address pursuant to the

notice requirements set forth in Section 14.14 of the Plan or, in the case of holders of transferred

Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e)

by such holder or transferee that contains an address for such holder different than the address of

such holder as set forth in the Schedules.  The Reorganized Debtor shall be liable for any

distribution sent to the address of record of a holder in the absence of the written change thereof

as provided herein or in the Plan.

6.5    <u>Distributions to Holders as of Record Date</u>.  As of the close of business on the

Record Date, the claims registers for the Debtors shall be closed pursuant to the order approving

the Disclosure Statement, and there shall be no further changes made to the identity of the record

holder of any Claim.  The Reorganized Debtor shall have no obligation to recognize any transfer

of any Claim occurring after the Record Date, *provided, however*, that the Reorganized Debtor

SLC_1125653.7

will recognize transfers of Claims made after the entry of the order approving the Disclosure

Statement but before the Confirmation Date for distribution purposes.

6.6     Undeliverable and Unclaimed Distributions.

a.     If the distribution to the holder of any Allowed Claim is returned as

undeliverable, no further distributions to such holder shall be made unless and until the holder

notifies the Reorganized Debtor in writing of such holder's then-current address, at which time

all missed distributions shall be made, subject to the provisions of subsection (c) of this Section

6.6, as soon as is practicable to such holder, without interest.

b.     Checks issued by the Reorganized Debtor in respect of Allowed Claims

shall be null and void if not negotiated within one hundred and twenty (120) days after the date

of issuance thereof.  Requests for re-issuance of any check shall be made in accordance with the

notice provisions of Section 14.14 of the Plan to the Reorganized Debtor by the holder of the

Allowed Claim to whom such check originally was issued.

c.     All claims for undeliverable distributions or voided checks shall be made

on or before one hundred and twenty (120) days after the date such undeliverable distribution

was initially made.  After such dates, all such distributions shall be deemed unclaimed property

under section 347(b) of the Bankruptcy Code and shall become unencumbered cash of the

Reorganized Debtor.  The holder of any Claim for which any undeliverable distribution has been

deemed unclaimed property under section 347(b) of the Bankruptcy Code shall not be entitled to

any other or further distribution under the Plan on account of such Claim.

6.7     Setoffs.  To the extent permitted under applicable law, the Reorganized Debtor

may offset against or recoup from the holder of any Allowed Claim and the distributions to be

SLC_1125653.7

made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on

account of such Allowed Claim), the claims, rights, and causes of action of any nature that the

Debtors have asserted in writing against the holder of such Allowed Claim, including, without

limitation, any rights under section 502(d) of the Bankruptcy Code and in the absence of a

written objection by such holder of an Allowed Claim within thirty (30) days of the delivery of

such a writing from the Reorganized Debtor, it will be conclusively presumed that the

requirements for disallowance of a Claim under section 502(d) of the Bankruptcy Code or setoff

or recoupment under applicable law have been satisfied.

6.8     <u>Objections to Claims and Resolution of Disputed Claims</u>.  The Debtors (prior to

the Effective Date) and the Reorganized Debtor (after the Effective Date) will have primary

responsibility (except as to applications for allowances of compensation and reimbursement of

expenses under sections 328, 330 and 503 of the Bankruptcy Code) to make, file, and prosecute

objections to Claims.  The Purchaser may object to Claims before the Sale occurs.  After the

Sale, no party other than the Debtors, the Reorganized Debtor, and the Purchaser may file an

objection to a Claim without leave of the Bankruptcy Court.  The Debtors or the Reorganized

Debtor, as appropriate, will: (a) provide the Purchaser with their/its evaluation of Claims and

potential objections to Claims, advance drafts of objections to Claims, and a reasonable

opportunity for advance comment; (b) consult with the Purchaser throughout the Claim

resolution process, and in advance, concerning objections to Claims, any litigation on objections

to Claims, and any settlements of objections to Claims; and (c) take all other reasonable and

necessary steps to assure that only valid Claims are Allowed and paid.  The objecting party shall

serve a copy of each objection upon the holder of the Claim to which the objection is made as

47

soon as practicable (unless such Claim was already the subject of a valid objection by the

Debtors), but in no event shall the service of such an objection be later than 120 days after the

Sale or an Alternative Sale closes or the Auction is held, unless such date is extended by order of

the Bankruptcy Court.  The Bankruptcy Court, for cause, may extend the deadline on the request

of R&W (if the Sale closes), the purchaser at an Alternative Sale (if an Alternative Sale closes),

or the Reorganized Debtor.  All objections shall be litigated to a Final Order except to the extent

that the objecting party elects to withdraw such objection, or the Claim of the holder of the

Disputed Claim is compromised, settled, or otherwise resolved with approval of the Bankruptcy

Court.

  6.9 <u>Disputed Claims</u>.

   a. In connection with distributions to be made in respect of Allowed Claims,

there shall be reserved from any distribution to the holder of a Disputed Claim the amount of

distribution which otherwise would be paid in respect to such Disputed Claim on the date

distributions are made to holders of Claims in the Class in which such Disputed Claim is

classified if the full amount of such Claim were deemed to be an Allowed Claim or such lesser

amount as the Bankruptcy Court may determine.

   b. Pending the determination of such Disputed Claim by the Bankruptcy

Court or resolution of such Dispute Claim through settlement, the Reorganized Debtor shall

deposit in a separate bank account funds equal to the amount so reserved or such lesser amount

as the Bankruptcy Court may have determined within fifteen (15) business days after the date on

which such amount would otherwise be distributed to the holder of such Claim.  Such funds shall

SLC_1125653.7

be held by the Reorganized Debtor in such separate bank account as long as such Claim remains

a Disputed Claim.

      c.     If, on or after the date distributions begin under this Plan, any Disputed

Claim becomes an Allowed Claim the Reorganized Debtor shall, as soon as practicable

following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise

provided in the Plan, distribute to the holder of such Allowed Claim an amount, with or without

interest thereon based on the approved Plan treatment as set forth herein, that provides such

holder with the same percentage recovery, as of such date, as holders of Claims in the Class that

were Allowed on the date distributions began under this Plan.

      d.     To the extent that a Disputed Claim is disallowed or reduced, the holder of

such Claim shall not receive any distribution on account of the portion of such Claim that is

disallowed.  Any Disputed Claim, for which a proof of claim has not been deemed timely filed as

of the Effective Date, shall be disallowed.

      e.     Any monies remaining on deposit with respect to any Disputed Claim

after its resolution or determination by the Bankruptcy Court shall be returned to the

Reorganized Debtor for further distribution in accordance with this Plan.

## ARTICLE VII.
## Means for Execution of the Plan

7.1    <u>Funds Available for Distribution under the Plan</u>.  The funds required for the

confirmation and performance of this Plan shall be provided from:  (a)(i) proceeds of the Sale of

the Debtors' Assets; (ii) proceeds from an Alternative Sale of the Debtors' Assets; or

(iii) proceeds from an Auction of the Debtors' Assets, if any; and (b) all other funds held by the

49

Debtors as property of the estate on the date distributions begin under this Plan, including

remaining proceeds of the sale of tar sands and other Assets prior to such date.

       a.     <u>Sale Proceeds from the Sale</u>.  The Debtors' Assets, including the mining

properties, the UBR-CAR Lease, and UBR's membership interests in CAR, are to be sold to the

Purchaser pursuant to the Sale Order.  The approved Sale under the Asset Purchase Agreement is

for an amount sufficient to pay all Allowed Claims in full (including Post-Confirmation Date

Expenses and interest on Allowed Claims, if any, as provided for in this Plan), plus the Mineral

Royalty, which the Reorganized Debtor will have conveyed to it, subject to the offsets related to

the Mineral Royalty described in the Asset Purchase Agreement and in the corresponding

Section 5.7(b) of the Plan above.

       b.     <u>Sale Proceeds from an Alternative Sale or Auction</u>.  If the Sale does not

close, an Alternative Sale or Auction of the Debtors' Assets will be completed as provided in this

Plan.  The proceeds from such an Alternative Sale or Auction may or may not be sufficient to

pay all Allowed Claims in full.  Proceeds will be distributed in accordance with the treatment

provisions of this Plan, with Allowed Secured Claims paid, together with interest, costs, and

attorney's fees, as Allowed pursuant to and in order of their respective priorities.

       c.     <u>Other Funds</u>.  The Debtors may hold funds from sales of tar sands,

remaining funds borrowed under the DIP Financing, and other miscellaneous funds.  In the event

the Sale closes, these funds may either be retained by the Reorganized Debtor to help pay Post-

Confirmation Date Expenses or may be transferred to the Purchaser and have the Purchaser fund

payment on Post-Confirmation Date Expenses on a periodic basis.  If the Sale does not close,

SLC_1125653.7

these funds may be used to pay Allowed Administrative, Priority Claims, and Post-Confirmation

Date Expenses.

7.2     *Force Majeure*.  The Asset Purchase Agreement at Section 4.6 provides for an

extension of the Sale Deadline based on certain "force majeure" events.  See the Asset Purchase

Agreement, which is attached as Exhibit 3 to the Disclosure Statement.  Section 1.62 of this Plan

addresses the procedures as to which the Debtors have agreed with certain major creditors that

the Debtors must follow in seeking an extension of the Sale Date if they believe a force majeure

event has occurred.  Nothing in this Plan modifies Section 4.6 of the Asset Purchase Agreement.

7.3     Reorganized Debtor.

a.     Reorganized Articles of Organization and Reorganized Operating

Agreement.  The Reorganized Debtor shall adopt Reorganized Articles of Organization and a

Reorganized Operating Agreement prior to, but effective as of, the Effective Date.  As required

by section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor's articles will include a

provision prohibiting the issuance of nonvoting equity securities.

b.     Director and Officers of the Reorganized Debtor.  The initial director and

officers of the Reorganized Debtor shall be:  Sung I. Lee, Director and President, Soung Joon

Kim, Chief Operating Officer, subject to substitution, which substitution, if any, will be

disclosed in a supplement to the Plan.

c.     Equity Interests in the Reorganized Debtor.  Pursuant to the Plan, if the

Sale closes, the equity in CAR will be sold to the Purchaser.  A purchaser at an Alternative Sale

or Auction may elect to structure the transaction in the same way and purchase the equity in

CAR, may choose to structure the transaction a different way, or may elect to purchase only the

51

Assets and assume some or all of the executory contracts and unexpired leases. Following the

sale of the Debtor's Assets, whether pursuant to the Sale, an Alternative Sale, or an Auction,

UBR and UHI will be wound up and dissolved or merged into KTIA. If the equity in CAR is not

acquired by the Purchaser under the Sale or by a purchaser at an Alternative Sale or Auction,

CAR will also be wound up and dissolved or merged into KTIA. Equity in the Reorganized

Debtor will be held by KTIL, but no distributions shall be made to KTIL as owner of the

Reorganized Debtor unless and until all obligations under this Plan to holders of Allowed Claims

have been satisfied in accordance with this Plan and provision has been made to satisfy Post-

Confirmation Date Expenses.

## ARTICLE VIII.
### Executory Contracts

8.1     <u>Executory Contracts and Unexpired Leases.</u>  Under section 365 of the Bankruptcy

Code, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject any

executory contracts or unexpired leases.  UBR (as lessor) and CAR (as lessee) previously

assumed the UBR-CAR Lease (as to which UBR and CAR believe no cure amount was due) and

CAR previously assumed the SITLA Lease and as to which CAR then made the advance lease

payment for the period October 1, 2011 through September 30, 2012 (and as to which CAR

believes no further cure payment is due).  The Debtors will assume only those executory

contracts and unexpired leases that R&W at the Sale or a purchaser at an Alternative Sale or

Auction instructs the Debtors to assume and assign to it in connection with the sale of the

Debtors' Assets.  If the Debtors reject an executory contract or unexpired lease that was entered

into before the Petition Date, the contract or lease will be treated as if it had been breached on the

date immediately preceding the Petition Date, and the other party to the agreement will have a

SLC_1125653.7

General Unsecured Claim against the Debtor(s) who was the party to the contract or lease for

damages incurred as a result of the rejection.  In the case of rejection of real property leases,

damages are subject to certain limitations imposed by section 502(b)(6) of the Bankruptcy Code.

      8.2    <u>Rejected Contracts and Leases</u>.

      a.    Each executory contract and unexpired lease to which any of the Debtors

is a party shall be deemed automatically rejected as of the date of the Sale, an Alternative Sale,

or an  Auction, unless such executory contract or unexpired lease (1) will have been previously

assumed by one or more of the Debtors, (2) is the subject of a motion to assume filed on or

before the Confirmation Date, (3) is listed on the schedule of assumed contracts and leases

attached as an Exhibit to the Disclosure Statement or a supplement thereto, or (4) is identified by

R&W, in the event the Sale closes, or by the purchaser at an Alternative Sale or Auction as a

contract or lease such purchaser elects to have assumed and assigned to it.  The Debtors may at

any time on or before Closing (or, with respect to any executory contract or unexpired lease for

which there is a dispute regarding the nature or the amount of any cure, at any time on or before

the entry of a Final Order resolving such dispute) modify the list of executory contracts and

unexpired leases to delete therefrom or add thereto any executory contract or unexpired lease, in

which event such executory contract or unexpired lease will be deemed to be rejected, assumed,

or assumed and assigned, as the case may be.

      b.    The Debtors will provide notice of any modifications to the list of

executory contracts and unexpired leases to the parties to the executory contracts or unexpired

leases affected thereby and their counsel (if known) and to R&W, in the case of the Sale or to a

purchaser at an Alternative Sale or Auction.  The fact that any contract or lease is listed in the list

of executory contracts and unexpired leases will not constitute or be construed as an admission

that such contract or lease is an executory contract or unexpired lease within the meaning of

section 365 of the Bankruptcy Code or that the Reorganized Debtor or the Purchaser at the Sale

or a purchaser at an Alternative Sale or Auction has any liability thereunder.

      c.     The Debtors reserve the right to file a motion on or before the Closing to

assume and assign or reject any executory contract or unexpired lease whether or not previously

identified in the list of executory contracts and unexpired leases.

      d.     The Confirmation Order will constitute an order of the Bankruptcy Court

approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective

Date, for executory contracts and unexpired leases identified as ones to be rejected prior to

Confirmation and a further Order of the Bankruptcy Court pursuant to section 365 of the

Bankruptcy Code approving the rejection of executory contracts and unexpired leases identified

thereafter will be entered in connection with the Closing and will be effective as of the Closing.

      8.3    <u>Rejection Damages Bar Date</u>.  If the rejection of an executory contract or

unexpired lease results in a Claim, then such Claim will be forever barred and will not be

enforceable for payment under this Plan or against the Debtors or the Reorganized Debtor unless

a proof of claim is filed with the Bankruptcy Court and served upon counsel to the Reorganized

Debtor, no later than thirty (30) calendar days after the later of Closing or the entry of an order of

rejection.  Nothing in the Plan will extend any prior deadline to file a proof of claim for damages

arising from the rejection of an executory contract or unexpired lease.  The Debtors, Reorganized

Debtor, and/or the Purchaser may object to a rejection damages Claim within the time period for

filing objections to Claims generally, provided, however, that no payment will be made on

account of rejection damages Claims until thirty (30) days after the bar date for filing Claims for

rejection damages.

 8.4 <u>Assumed Contracts and Leases</u>.

 a. Except as otherwise provided in the Plan or the Confirmation Order, all

executory contracts and unexpired leases identified in a motion by one or more of the Debtors, in

an exhibit to the Disclosure Statement, in a supplement to such an exhibit listing assumed

agreements, or in a motion associated with an Alternative Sale or Auction will be deemed

automatically assumed as of the date of the Closing and assigned to R&W if the Sale closes or

assigned to the purchaser at an Alternative Sale or Auction.

 b. Each executory contract and unexpired lease that is assumed and relates to

the use, or the ability to acquire or occupy, real property will include (1) all modifications,

amendments, renewals, supplements, restatements, or other agreements made directly or

indirectly by any agreement, instrument, or other documents that in any manner affect such

executory contract or unexpired lease, and (2) all executory contracts or unexpired leases

appurtenant to the premises, including all easements, licenses, permits, rights, privileges,

immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and

any other interests in real estate or rights in rem related to such premises, unless any of the

foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is

otherwise rejected as a part of the Plan.

 c. The Confirmation Order will constitute an order of the Bankruptcy Court

approving the assumption and assignment of executory contracts and unexpired leases identified

prior to the Confirmation Date, pursuant to section 365 of the Bankruptcy Code, as of the

Effective Date, and a further Order of the Bankruptcy Court pursuant to section 365 of the

Bankruptcy Code approving the assumption and assignment of executory contracts and

unexpired leases identified thereafter will be entered in connection with the Closing and become

effective as of the Closing.

8.5    <u>Payments Related to Assumption of Executory Contracts and Unexpired Leases</u>.

a.    Any monetary amounts by which each executory contract and unexpired

lease to be assumed under the Plan may be in default will be satisfied, under section 365(b)(1) of

the Bankruptcy Code by promptly curing same ("<u>Cure Claim</u>").  Non-Debtor parties to executory

contracts and unexpired leases that are assumed shall file a Cure Claim no later than twenty (20)

days from the time an order approving the assumption is entered, unless that date is extended by

the Bankruptcy Court.

b.    In the event of a dispute regarding (1) the nature or the amount of any

Cure Claim, (2) the ability of the Purchaser or assignee to provide "adequate assurance of future

performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or

lease to be assumed, or (3) any other matter pertaining to assumption, the amount of the Allowed

Cure Claim shall be paid no later than twenty (20) calendar days following the entry of a Final

Order resolving the dispute and approving the assumption, and as the case may be, the

assignment of the lease or contract.  No Cure Claim will be paid until twenty (20) calendar days

following the assertion of a Cure Claim to permit the Debtors, the Reorganized Debtor, and/or

the Purchaser (in the case of the Sale) or a purchaser at an Alternative Sale or Auction, to review

and object to it.

56

## ARTICLE IX.
### Discharge of the Debtors

9.1     The occurrence of distributions under this Plan shall discharge  pursuant to the

full extent of section 1141(d)(1) of the Bankruptcy Code, from any and all debts of and Claims

against the Debtors that arose prior to such distributions, and any kind of debt specified in

sections 502(g), (h) or (i) of the Bankruptcy Code, whether or not:  (i) a proof of Claim based on

such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (ii) such Claim is

allowed under section 502 of the Bankruptcy Code; or (iii) the holder of such Claim has accepted

the Plan.  On and after such date, as to every discharged debt and Claim, the Person or Entity that

held such debt or Claim shall be precluded from asserting any such debt or Claim against the

Debtors or the Reorganized Debtors or their property based upon any document, instrument, act,

omission, transaction or other activity of any kind or nature that occurred prior to the

Confirmation Date.

9.2     The rights and treatment of all Claims against and Interests in the Debtors shall be

in exchange for and in complete satisfaction and release of all Claims and Interests of any nature

whatsoever, including any interest accrued thereon from and after the Petition Date (if the

approved Plan treatment provides for the accrual of interest on that type of Claim), against the

Debtors, or their estates, Assets, Property, or interests in property.

## ARTICLE X.
### Administrative Expense Claims Bar Dates, Administrative Functions of the Reorganized
### Debtor, Continued Existence of Estate, and Post-Confirmation Date Expenses

10.1     <u>Administrative Functions of the Reorganized Debtor</u>.   In addition to operating the

business of the estate, if any, the Reorganized Debtor's responsibilities shall include holding and

depositing funds in one or more domestic bank accounts that are each federally insured to the

SLC_1125653.7

maximum amount allowed by law, with such funds to be used to make distributions under the

Plan, making distributions to holders of Allowed Claims, paying Post-Confirmation Date

Expenses, filing required periodic reports with the United States Trustee, paying quarterly fees to

the United States Trustee, and filing a final report and a request for entry of a final decree.

  10.2 <u>Continued Existence of the Estate</u>. The Estate shall continue in existence from

and after the Confirmation Date and until all payments and distributions to the holders of

Allowed Claims shall have been made under the Plan. From and after the Confirmation Date, the

Estate shall remain in existence and the Debtors (until the Effective Date) and, thereafter, the

Reorganized Debtor, shall administer the Estate in accordance with the provisions of the Plan,

the Bankruptcy Code, and the Bankruptcy Rules.

  10.3 <u>Post-Confirmation Date Expenses</u>.  All fees and expenses of the Debtors and the

Reorganized Debtor incurred in carrying out their responsibilities under the Plan will be paid

either by the Purchaser or from funds retained by the Debtors to pay Post-Confirmation Date

Expenses.  Fees and expenses of the Reorganized Debtor and fees and expenses of professionals

shall continue to be subject to application to the Bankruptcy Court.

  10.4 <u>Administrative Expense Claims Bar Date</u>.  Unpaid Administrative Expense

Claims arising prior to the Confirmation Date (other than ordinary course Administrative

Expense Claims and fees of the United States Trustee) shall be filed with the Bankruptcy Court

no later than thirty (30) days after the Confirmation Date or be forever barred from receiving any

distribution under the Plan.  Professionals shall file final fee applications for Administrative

Expense Claims arising prior to the Confirmation Date by this date to meet this requirement.

## ARTICLE XI.
## Conditions Precedent

11.1     Conditions to Confirmation.  The following are conditions precedent to

confirmation of the Plan.

      a.     The Bankruptcy Court shall have approved by Final Order a disclosure

statement with respect to the Plan.

      b.     The Confirmation Order shall be in form and substance reasonably

acceptable to the Debtors.

      c.     The Confirmation Order shall have been entered and have become a Final

Order.

## ARTICLE XII.
## Alternative if the Sale Does Not Close

12.1     If the Sale of the Assets to the Purchaser does not close on or before the Sale

Deadline, the Debtors will pursue an Alternative Sale or, if no Alternative Sale timely closes,

will schedule and obtain approval for an Auction all as set forth above in Section 5.1(b).

## ARTICLE XIII.
## Retention of Jurisdiction

13.1     The Bankruptcy Court shall retain exclusive jurisdiction of this case to the fullest

extent permitted by law for as long as necessary for the following purposes:

      a.     To determine any and all objections to the allowance, disallowance or

subordination of Claims or any controversy as to the classification of Claims.

      b.     To determine any and all applications for professional and similar fees and

for the reimbursement of disbursements and expenses.

      c.     To liquidate any disputed, contingent, or unliquidated Claims.

SLC_1125653.7

       d.      To determine any and all pending motions and applications for assumption or rejection of executory contracts and leases and the allowance and classification of any Claims resulting from the rejection of executory contracts and leases.

       e.      To determine any and all motions, applications, adversary proceedings, contested and litigated matters, or such other matters over which the Bankruptcy Court had jurisdiction prior to the Confirmation Date, including the enforcement, prosecution, litigation, settlement, and/or other disposition of claims and counterclaims of the Debtors and to recover preferences and fraudulent transfers.

       f.      To enforce the provisions of, and resolve any and all disputes under or pertaining to the Plan, or the Debtors' bankruptcy cases.

       g.      To modify the Plan or to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the order of the Bankruptcy Court confirming the Plan, or to enter such orders as may be necessary to effectuate the terms and conditions of the Plan to the extent authorized by the Bankruptcy Code as may be necessary to carry out the purpose and intent of the Plan.

       h.      To determine such other matters as may be provided for in the order of the Bankruptcy Court confirming the Plan or as may be authorized under the provisions of the Bankruptcy Code.

       i.      To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of this Court in the Bankruptcy Case;

       j.      To hear and determine any and all controversies and disputes arising under, or in connection with, the Plan or the order confirming the Plan;

60

k.     To adjudicate all controversies concerning the classification of any Claim;

l.     To liquidate damages in connection with any disputed, contingent, or unliquidated Claims;

m.    To adjudicate all Claims to a security or ownership interest in any Property of the Debtors or in any proceeds thereof;

n.     To adjudicate all Claims or controversies arising out of any purchases, sales, or contracts made or undertaken during the pendency of this bankruptcy case;

o.     To recover all assets and Property of the Debtors wherever located, including the prosecution and adjudication of all causes of action available to the Debtors as of the Confirmation Date;

p.     To determine all questions and disputes regarding recovery of, and entitlement to the Debtors' Assets and determine all claims and disputes between the Debtors and any other Entity, whether or not subject to an action pending as of the Confirmation Date;

q.     To enter any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtors and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary or appropriate;

r.     To enter an order or final decree closing and terminating the Bankruptcy Cases; and

s.     To make such orders as are necessary or appropriate to carry out the provisions of this Plan, including but not limited to orders interpreting, clarifying, or enforcing the provisions thereof and/or confirming the Plan.

## ARTICLE XIV.
## General Provisions

14.1    <u>Time Limit for Filing Objections to Claims</u>.  All objections to Claims shall be

commenced, filed, or asserted within 120 days after the Sale or an Alternative Sale closes or the

Auction is held.  This time limit may be extended by the Bankruptcy Court after notice and a

hearing.

**14.2    <u>Releases</u>.  Except as otherwise provided in the Plan or Confirmation Order,**

**as of the date of the Closing, the Debtors; the Reorganized Debtor; R&W (if the Sale**

**closes); any of such parties' respective present or former members, officers, directors,**

**employees, advisors, attorneys, representatives, financial advisors, and agents, any such**

**parties' successors and assigns; the Creditors' Committee and the members of the**

**Creditors' Committee in their respective capacity as such; and the Observation Committee**

**and the members of the Observation Committee in their respective capacity as such, shall**

**be released by the Debtors and any successors in interest of the Debtors from any and all**

**Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and**

**liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of**

**such date or thereafter arising, at law, in equity, or otherwise, that the Debtors would have**

**been legally entitled to assert in its own right (whether individually or collectively) or that**

**any holder of a Claim, Interest, or other person or entity would have been legally entitled**

**to assert on behalf of the Debtors or their estate, based in whole or in part upon any act or**

**omission, transaction, agreement, event, or other occurrence taking place before or on the**

**date of the Closing but occurring during the chapter 11 cases, except for acts constituting**

**willful misconduct, gross negligence, or bad faith and, in all respects such parties shall be**

62

entitled to rely upon the advice of counsel with respect to their duties and responsibilities

under the Plan.  Without limiting the generality of the foregoing, to the extent permitted by

law, the Debtors and any successors in interest of the Debtors shall waive all rights under

any statutory provision purporting to limit the scope or effect of a general release, whether

due to lack of knowledge or otherwise.

      14.3   <u>Exculpations</u>.  Except as otherwise provided in the Plan or Confirmation

Order, as of the date of the Closing, the Debtors; the Reorganized Debtor; R&W (if the

Sale closes); any of such parties' respective present or former members, officers, directors,

employees, advisors, attorneys, representatives, financial advisors, and agents, any such

parties' successors and assigns; and any property of or professionals retained by such

parties, or direct or indirect predecessor in interest to any of the foregoing persons, the

Creditors' Committee and the members of the Creditors' Committee in their respective

capacity as such; and the Observation Committee and the members of the Observation

Committee in their respective capacity as such shall not have or incur any liability to any

Person or Entity for any act taken or omission, after the Petition Date, in connection with

or related to these cases or the operations of the Debtors' business during the cases,

including but not limited to (i) formulating, preparing, disseminating, implementing,

confirming, consummating, or administrating the Plan (including soliciting acceptances or

rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release, or

other agreement or document entered into or any action taken or omitted to be taken in

connection with the Plan; or (iii) any distributions made pursuant to the Plan, except for

acts constituting willful misconduct, gross negligence, or bad faith occurring during the

chapter 11 cases, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**14.4    Injunction.  The satisfaction, releases, and discharge pursuant to Article 14 of the Plan will also act as an injunction against any Person or Entity commencing or continuing any action, employment of process or act to collect, offset, recoup or recover any Claim satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code.**

14.5    <u>Modification of the Plan</u>.  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time before the Confirmation Date.  After the Confirmation Date, the Debtors or Reorganized Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the modification does not materially and adversely change the treatment of the Claim of such holder.

14.6    <u>Withdrawal or Revocation of the Plan</u>.  The Debtors may withdraw or revoke the Plan at any time prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained in the Plan or Disclosure Statement shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other

person or to prejudice in any manner the rights of the Debtors or any other person in any further

proceedings involving the Debtors.

   14.7 <u>Effectuating Documents and Further Transactions</u>.  Upon entry of the

Confirmation Order, the Debtors and the Reorganized Debtor shall be authorized and are

instructed to execute, deliver, file or record such contracts, instruments, releases, indentures, and

other agreements or documents and take such actions as may be reasonably necessary or

appropriate to effectuate and further evidence the terms and conditions of the Plan.

   14.8 <u>Section 1146 Exemption</u>.  Pursuant to section 1146(a) of the Bankruptcy Code,

(a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the

creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or

assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other

instrument or transfer under, in furtherance of, or in connection with the Plan, will not be subject

to any stamp tax, or other similar tax held to be a stamp tax or other similar tax by applicable

law.

   14.9 <u>Dissolution of the Creditors' Committee</u>.  On the Effective Date, the Creditors'

Committee shall be dissolved and the members thereof shall be released and discharged of and

from all further authority, duties, responsibilities, and obligations related to and arising from and

in connection with the Bankruptcy Case.  The Creditors' Committee shall continue in existence

after the Effective Date solely for the purpose of reviewing and being heard by the Bankruptcy

Court, and on any appeal, with respect to applications for compensation and reimbursement of

expenses pursuant to section 330 and/or 503(b) of the Bankruptcy Code.

SLC_1125653.7

14.10   <u>Severability</u>.  In the event that the Bankruptcy Court determines, prior to the

Confirmation Date, that any provision of the Plan is invalid, void, or unenforceable, the

Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret

such term or provision to make it valid or enforceable to the maximum extent practicable,

consistent with the original purpose of the term or provision held to be invalid, void, or

unenforceable, and such term or provision shall then be applicable as altered or interpreted.

Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and

provisions of the Plan shall remain in full force and effect and shall in no way be affected,

impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order

shall constitute a judicial determination and shall provide that each term and provision of the

Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and

enforceable pursuant to its terms.  Notwithstanding the foregoing, the provisions in the Plan

relating to releases and exculpations are not severable from the remainder of the Plan.

14.11   <u>Governing Law</u>.  Except to the extent the Bankruptcy Code or Bankruptcy Rules

are applicable, rights and obligations arising under the Plan shall be governed by, and construed

and enforced in accordance with, the federal laws of the United States and, to the extent there is

no applicable federal law, the domestic laws of the State of Utah, without giving effect to Utah's

principles of conflicts of law.

14.12   <u>Binding Effect</u>.  Except as otherwise provided in section 1141(d)(3) of the

Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any

holder of a Claim against or Interest in the Debtors and their respective successors and assigns,

whether or not the Claim of such holder is impaired under the Plan and whether or not such

66

holder has accepted the Plan.  The rights, benefits, and obligations of any entity named or

referred to in the Plan, whose actions may be required to effectuate the term of the Plan, shall be

binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or

assign of such Entity.

14.13   Payment of Statutory Fees.  All fees payable pursuant to 28 U.S.C. § 1930(a)(6)

of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date,

shall be paid on the Effective Date by the Debtors.  Any Statutory Fees accruing after the

Confirmation Date also shall be paid by the Reorganized Debtor.

14.14   Notices.  Any notice required or permitted to be provided to the Debtors, the

Reorganized Debtor, or the Purchaser under the Plan shall be in writing and served by (a)

certified mail, return receipt requested, (b) hand delivery, or (c) overnight receipted delivery to

be addressed as follows:

If to the Debtors or Reorganized Debtor:

> Soung Joon Kim
> Korea Technology Industry America, Inc.
> 1245 East Brickyard Road, Suite 110
> Salt Lake City, UT  84106
> Facsimile:  (801) 466-4132
> Email:  soungjoonkim@gmail.com

with a copy to:

> Steven J. McCardell
> Kenneth L. Cannon II
> DURHAM JONES & PINEGAR, P.C.
> 111 East Broadway, Suite 900
> P.O. Box 4050
> Salt Lake City, UT  84110-4050
> Facsimile:  (801) 415-3500
> Email: smccardell@djplaw.com
>            kcannon@djplaw.com

If to the Purchaser:

      Rutter & Wilbanks Corporation
      301 South Main Street, Suite A (Overnight delivery only)
      P.O. Box 3186
      Midland, TX  79702
      Attn:   A.W. Rutter, III
      Email:  b3rutter@gmail.com

with a copy to

      Blake D. Miller
      William R. Gray
      James W. Anderson
      MILLER GUYMON, PC
      165 South Regent Street
      Salt Lake City, UT  84111
      Facsimile:  (801) 363-5601
      Email:  miller@millerguymon.com
            gray@millerguymon.com
            anderson@millerguymon.com

    14.15   Retention of Causes of Action/Reservation of Rights.  Except as provided in Sections 14.2, 14.3, and 14.4 of this Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim (as that term is defined in section 101(5) of the Bankruptcy Code), rights, causes of action, right of setoff, or other legal or equitable defense that the Debtors or the Reorganized Debtor may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code, and (iii) the turnover of any property of the Debtors' estates.

SLC_1125653.7

14.16    <u>Section 506(c) Reservation</u>.  Except as provided in any orders of the Bankruptcy

Court, the Debtors and Reorganized Debtor reserve all rights under section 506(c) of the

Bankruptcy Code with respect to any and all Secured Claims.

14.17    <u>Confirmation Request</u>.  The Debtors hereby request Confirmation of the Plan

pursuant to section 1129(a) and/or section 1129(b) of the Bankruptcy Code (in the event the Plan

is not approved by each of those Classes of Claims and Interests entitled to vote).

* THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK *

SLC_1125653.7

DATED this 25th day of July, 2012.

KOREA TECHNOLOGY INDUSTRY
   AMERICA, INC.

By: _/s/ Soung Joon Kim_____
    Soung Joon Kim
    Chief Operating Officer

CROWN ASPHALT RIDGE, L.L.C.

By: _/s/ Soung Joon Kim_____
    Soung Joon Kim
    Chief Operating Officer, Utah
    Hydrocarbon, Inc., Manager of Crown
    Asphalt Ridge, L.L.C.

UINTAH BASIN RESOURCES, LLC

By: _/s/ Soung Joon Kim_____
    Soung Joon Kim
    Chief Operating Officer, Utah
    Hydrocarbon, Inc., Member of Uintah
    Basin Resources, LLC

DURHAM JONES & PINEGAR, P.C.

By: _/s/ Kenneth L. Cannon II_____
    Steven J. McCardell (2144)
    Kenneth L. Cannon II (3705)
    111 East Broadway, Suite 900
    P.O. Box 4050
    Salt Lake City, Utah 84110-4050
    Telephone: (801) 415-3000
    Facsimile: (801) 415-3500

    Attorneys for the Debtors

SLC_1125653.7